# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

RALPH VARGAS AND BLAND RICKY
ROBERTS,

                Plaintiffs,

     v.

PFIZER INC., PUBLICIS, INC., FLUID MUSIC,
EAST WEST COMMUNICATIONS, INC., AND
BRIAN TRANSEAU P/K/A "BT",

             Defendants.

04 CV 9772 (WHP)
ECF CASE

## MEMORANDUM IN SUPPORT OF BRIAN TRANSEAU'S MOTION
## FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................1

CASE PROCEEDINGS TO DATE..................................................................1

STATEMENT OF FACTS..............................................................................2

ARGUMENT...................................................................................................4

I.  STANDARD TO GRANT SUMMARY JUDGMENT...........................4

II.  PLAINTIFFS DO NOT HAVE SUFFICIENT EVIDENCE TO SHOW
OR INFER THAT BT HAD ACCESS TO *BUST DAT GROOVE*. .........5

    A.  Plaintiffs Offer No Chain Of Events By Which BT Gained Access
To BDG........................................................................................8

    B.  *BDG* and *FD II* Were Not Widely Disseminated. .............................8

        1.  Neither *FD II* Nor *BDG* Were Commercial Successes.........................9

        *2.*  *BDG* Was Not Readily Available On The Market..............................11

III.  PLAINTIFFS CANNOT SHOW STRIKING SIMILARITY. ...............14

    A.  Copying Cannot Be Inferred From A Theory Of Striking Similarity
Unless The Evidence As A Whole Precludes Any Reasonable
Possibility Of Independent Creation...............................................14

    B.  Plaintiffs Fail To Show Striking Similarity Such That Any
Reasonable Possibility Of Independent Creation Is Precluded.....................15

        1.  Dr. Smith Has No Opinion On Whether *Aparthenonia* Was
Independently Created, And He Did Not Find A Single Drum
Strike In *Aparthenonia* That Is Copied from *Bust Dat Groove*..........16

        2.  Plaintiffs' Expert Rodriguez Does Not Show Either Copying Or
Striking Similarity..............................................................19

        3.  Plaintiffs' Expert Ritter Cannot Support Striking Similarity And
No Reasonable Jury Could Rely On His Testimony. .........................20

    C.  BT's Unrebutted And Convincing Evidence That *Aparthenonia*
Was Independently Created. ..........................................................22

CONCLUSION ............................................................................................23

# TABLE OF AUTHORITIES

**Page**

## Cases

*ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
    722 F.2d 988 (2d Cir. 1983)...................................................................................... 7, 11

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986).......................................................................................................... 5

*Arnstein v. Porter*,
    154 F.2d 464 (2d Cir. 1946)........................................................................................... 14

*Castle Rock Entertainment v. Carol Publishing Group, Inc.*,
    150 F.3d 132 (2d Cir. 1998)............................................................................................. 5

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986).......................................................................................................... 5

*Cf. Procter & Gamble Co. v. Colgate-Palmolive Co.*,
    199 F.3d 74 (2d Cir. 1999)............................................................................................. 15

*Cox v. Abrams*,
    Case No. 93-CV-6899, 1997 WL 251532 (S.D.N.Y. May 14, 1997)................. 6, 8, 14, 23

*Darrell v. Joe Morris Music Co.*,
    113 F.2d 80 (2d Cir. 1940)............................................................................................ 15

*Dimmie v. Carey*,
    88 F. Supp. 2d 142 (S.D.N.Y. 2000)......................................................................... 22, 23

*Feist Publications, Inc. v. Rural Telephone Service Co.*,
    499 U.S. 340 (1991).......................................................................................................... 5

*Ferguson v. Nat'l Broad. Co.*,
    584 F.2d 111 (5th Cir. 1978) ......................................................................................... 14

*Fran Corp. v. United States*,
    164 F.3d 814 (2nd Cir. 1999)........................................................................................... 5

*Gaste v. Kaiserman*,
    863 F.2d at 1061 (2d Cir. 1988)............................................................................. passim

*Goehaga v. March of Dimes Birth Defects Foundation*,
    51 F.3d 14 (2d Cir. 1995) ............................................................................................. 12

*Hoch v. MasterCard Intern, Inc.,*
    284 F. Supp. 2d 1217 (D. Minn. 2003) ............................................................. 9

*Intersong-USA v. CBS, Inc.*,
    757 F. Supp 274 (S.D.N.Y. 1991) ..................................................................... 6

*Jeffreys v. City of New York,*
    426 F.3d 549 (2d Cir. 2005) .............................................................................. 4

*Jewel Music Pub. Co. v. Leo Feist, Inc.*,
    62 F. Supp 596 (S.D.N.Y. 1945) ..................................................................... 10

*Johnson v. Gordon,*
    409 F.3d 12 (1st Cir. 2005) ............................................................................... 5

*Jorgensen v. Epic Records*,
    351 F.3d 46 (2d Cir. 2003) ...................................................................... 6, 12, 13

*Krasselt v. Seagram & Sons, Inc.,*
    01-Civ.-2821, 2002 WL 1997926 (S.D.N.Y. Aug. 29, 2002) ........................... 8

*Laureyssens v. Idea Group, Inc.,*
    964 F.2d 131 (2d Cir. 1992) .............................................................................. 5

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*,
    475 U.S. 574 (1986) ......................................................................................... 5

*McRae v. Smith,*
    968 F. Supp. 559 (D. Colo. 1997) ..................................................................... 9

*Mowry v. Viacom*,
    Case No. 03-CV-3090; 2005 WL 1793773, *2 (S.D.N.Y. July 29, 2005) ......... 6

*Northern Music Corp. v. King Record Distrib. Co.*,
    105 F. Supp. 393 (S.D.N.Y. 1952) .................................................................. 15

*Polsby v. St. Martin's Press Inc.*,
    97 CIV 690, 1999 WL 225536  (S.D.N.Y. Apr. 19, 1999) ......................... 8, 13

*Repp v. Webber*,
    947 F. Supp 105 (S.D.N.Y. 1996) ................................................................... 10

*Rice v. Fox Broadcasting Co.*,
    330 F.3d 1170 (9th Cir. 2003) ........................................................................ 10

*Santrayll v. Burrell*,
    91-Civ.-3166, 1998 WL 60924 (S.D.N.Y. Jan. 21, 1998) ............................... 8

*Silberstein v. Fox Entm't Group, Inc.*,
    424 F. Supp. 2d at 616 (S.D.N.Y. 2004)................................................................. 6, 9, 11

*Streetwise Maps, Inc. v. Vandam, Inc.,*
    159 F.3d 739 (2d Cir. 1998)................................................................................. 6

*Sylvestre v. Oswald*,
    91-Civ.-5060, 1993 WL 179101 (S.D.N.Y. May 18, 1993).................................... 8

*Tisi v. Patrick*,
    97 F. Supp. 2d 539 (S.D.N.Y. 2000)................................................................. 6, 14, 15

*Tomasini v. Walt Disney Co.*,
    84 F. Supp. 2d 516 (S.D.N.Y. 2000)................................................................. 7, 8

*Tuff 'N' Rumble Mgmt., Inc. v. Profile Records, Inc.*,
    95 Civ. 0246, 1997 WL 158364 (S.D.N.Y. Apr. 2, 1997)................................. 7

## Other Authorities

Federal Rules of Civil Procedure
    Rule 56(c)................................................................................................. 4

## Rules

1 WILLIAM F. PATRY, COPYRIGHT LAW & PRACTICE (1994) ....................................... 12

4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT
    § 13.02[A] (2002) ....................................................................................... 6

## PRELIMINARY STATEMENT

Plaintiffs Ralph Vargas and Bland Ricky Roberts accuse Defendants of infringing the sound recording copyright in Plaintiffs' album, *Funky Drummer Vol. II* ("*FD II*"). In particular, Plaintiffs claim that Defendant Brian Transeau's (professionally known as "BT") short drum loop, *Aparthenonia*, is a copy of Plaintiffs' drum track, *Bust Dat Grove without ride* ("*BDG*"), that appeared as one of the tracks on *FD II*. Plaintiffs claim that BT "sampled" *BDG* and then digitally manipulated it to create *Aparthenonia*.

Summary judgment must be granted against Plaintiffs because there is no legally sufficient evidence that BT copied Plaintiffs' work. Plaintiffs admit they have no direct evidence of copying. Nor do Plaintiffs have legally sufficient indirect evidence of copying. There is ***no*** evidence at all that BT ever had access to *BDG*.

Lacking any evidence of copying, Plaintiffs instead contend that *Aparthenonia* and *BDG* are so "strikingly similar" that copying can be inferred. Plaintiffs' contention cannot withstand summary judgment, however, because Plaintiffs cannot produce legally sufficient evidence to "preclude any reasonable possibility of independent creation," as is required by the Second Circuit. *Gaste v. Kaiserman,* 863 F.2d at 1061, 1068 (2d Cir. 1988). In fact, strong and unrebutted evidence exists that BT ***did*** independently create *Aparthenonia*.

## CASE PROCEEDINGS TO DATE

Plaintiffs filed their lawsuit on December 13, 2004 against five Defendants. Three of the five defendants have settled with Plaintiffs, leaving BT and East West Communications, Inc. as the remaining defendants. Pursuant to this Court's scheduling orders, discovery in this case is closed. Plaintiffs sought only limited discovery from Defendants, electing not to depose several of BT's witnesses, including BT's musicology expert Dr. Richard Boulanger. Additionally, Plaintiffs declined to inspect the computer used by BT to create *Aparthenonia*, despite repeated

invitations to do so. Plaintiffs' counsel also refused, at BT's deposition, to see a demonstration of how BT created *Aparthenonia*. Pursuant to the Court's scheduling order, BT brings this motion for summary judgment. East West joins in the motion. *See* Dkt. No. 81.

<u>**STATEMENT OF FACTS**</u>

Plaintiff Ralph Vargas recorded the allegedly infringed drum track, *BDG*, as part of his *FD II* album in 1994. Ex. B (Vargas Dep. Tr. 155:5-8); Ex. C (Roberts Dep. Tr. 152:23-155:3).[1] *FD II* was produced only as a vinyl long play album ("LP") and not in any other format. Ex. C (Roberts Dep. Tr. 104:2-4), Ex. B (Vargas Dep. Tr. 204:2-206:3). At most only 4,000 copies of *FD II* were ever created. (*Id.* at 111:5-7). *FD II* was only on sale for a few months, from February to April, 1994, mostly in "mom and pop records stores" and independent distribution houses around New York. Ex. B (Vargas Dep. Tr. 206:21-25); Ex. C (Roberts Dep. Tr. 158:16-165:13); Ex. D (Defendants' Dep. Ex. 8). No documentary evidence exists of any sale of FD II. Ex. C (Roberts Dep. Tr. 169:10-17); Ex. Q (Supp. Interrogatories at 5-7). *BDG* is a one-bar[2] drum pattern that is copied and "looped," such that every measure of *BDG* is identical to every other measure. Ex. E (Dr. Boulanger Decl. ¶ 4); Ex. F (Dr. Boulanger Rebuttal Report at 5).

Defendant BT is an accomplished performer, composer and producer of electronic music. Ex. G (BT Decl. ¶ 2). BT had never heard of *BDG*, *FD II*, or Plaintiffs before this litigation. (*Id.* at.¶ 6). BT never possessed a copy of *BDG* or *FD II*. *Id.* BT never received a copy of *BDG* or *FD II* from anyone. *Id.* The evidence is unrebutted that BT never had any access whatsoever to *BDG* prior to this litigation. In fact, in 1994—the period when *BDG* was released and sold—BT

---

[1] Although portions of Mr. Roberts deposition transcript were marked "confidential," Defendants have not cited any confidential pages. Thus, the cited pages do not need to be filed under seal.

[2] A "bar" can also be referred to as a "measure." It is a unit of music that typically contains four beats. Ex. U (Ritter Dep. Tr. At 135:23-136:8).

lived for several months in England, and he continued to live there for significant periods of time from 1994 through 1997.  Ex. I (BT Dep. Tr. 71:24-72:10).[3]  There is no evidence that *BDG* was ever sold in England.  Moreover, after this litigation began, BT attempted to locate a copy of *FD II*, and was unable to do so despite a diligent search.  Ex. G (BT Decl. ¶ 6).

BT did not use a copy of *BDG* to make his allegedly infringing drum track, *Aparthenonia*.  *Id.*  BT did not use any samples to make *Aparthenonia*.  BT made *Aparthenonia* on his blue and white Apple G3 computer using off-the-shelf software applications.  Ex. H (BT Supp. Decl. at ¶ 5).  *Aparthenonia* is a programmed beat; the percussion elements originated from a music-generation software program known as Propellerhead Reason, and were mixed and equalized by BT on his own equipment.  *Id.* at ¶¶ 5-6.  *Aparthenonia* is a two and one-quarter bar drum pattern that lasts approximately nine seconds.  Ex. J (Ricigliano Decl. ¶ 14).  Like *BDG*, and thousands of other drum beats, *Aparthenonia* contains sounds of a high-hat, snare drum, and bass drum.  This commonplace rhythm is considered a rudimentary drumming technique.  (*Id.* at 7); Ex. J (Ricigliano Decl. ¶¶ 5, 23-24); Ex. K (Ritter Decl. Ex. B).

Plaintiffs do not—because they cannot—show a single drum strike in *Aparthenonia* that is copied from *BDG*.  Ex. L (Smith Dep. Tr. 173:21-175:1); Ex. F (Dr. Boulanger Rebuttal Report at 2-3).  The absence of such copying is confirmed by a methodology known as Fast Fourier Transform ("FFT") frequency spectral analysis.  FFT is the best method for determining the similarities and differences between audio sounds; according to Plaintiffs' expert, it is an "appropriate and powerful method of resolving . . . if *Aparthenonia* is a digitally edited and/or manipulated copy of Funky Drummer."  Ex. M (Smith Report at 2); Ex. L (Smith Dep. Tr. at

---

[3] Defendants waive confidentiality as to the pages of BT's deposition transcript cited here.  Thus these pages do not need to be filed under seal.

63:14-21); Ex. N (Dr. Boulanger Report at 2). FFT spectral analysis can reveal the specific characteristics of sounds with much greater precision than the unaided ear. Ex. M (Smith Report at 2); Ex. L (Smith Dep. Tr. at 79:25-80:9); Ex. N (Dr. Boulanger Report at 2). FFT spectral analysis of *BDG* and *Aparthenonia* reveals not a single drum strike in *Aparthenonia* that is a direct copy from *BDG*. Ex. L (Smith Dep. Tr. at 173:21-175:1); Ex. F (Dr. Boulanger Rebuttal Report at 2-3).

Moreover, the difference in the sounds of *BDG* and *Aparthenonia* can be discerned by listening to the two loops. Ex. F (Dr. Boulanger Rebuttal Report at 2:11-12). *BDG* and *Aparthenonia* have different tempos, Ex. O (Rodriquez Dep. Tr. 257:4-6); Ex. F (Dr. Boulanger Rebuttal Report at 11), and different pitches, Ex. O (Rodriguez Dep. Tr. 344:12-346:2)[4]; Ex. F (Dr. Boulanger Rebuttal Report at 11). A listener can hear differences in the drum strike between *BDG* and *Aparthenonia* — no drum strike sounds identical between the two works. Ex. O (Rodriguez Dep. Tr. 390:19-392:2, 406:9-18, 408:2-14, 410:3-411:3, 411:24-412:17, 413:15-415:10); Ex. F (Dr. Boulanger Rebuttal Report at 3).

## ARGUMENT

## I.    STANDARD TO GRANT SUMMARY JUDGMENT.

A party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c); *Jeffreys v. City of New York,* 426 F.3d 549, 553 (2d Cir. 2005). The existence of a factual dispute between the parties is only relevant if that particular

---

[4] The deposition transcript of Mr. Rodriguez was erroneously marked "confidential." Plaintiffs have agreed, via email, that the transcript contains no confidential information, and thus does not need to be filed under seal.

fact is "material" (i.e., its resolution is necessary to achieve a final judgment on the merits). *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The "mere existence of *some* alleged factual dispute. . .will not defeat an otherwise properly supported motion for summary judgment." *Anderson*, 477 U.S. at 247-248, *see also Fran Corp. v. United States*, 164 F.3d 814, 816 (2nd Cir. 1999). The non-moving party must show more than a "metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

When the non-moving party bears the burden of proving a claim, the moving party can meet its burden by pointing out the absence of evidence of a genuine issue of material fact from the non-moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). When the non-moving party fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, there can be no genuine issue of material fact. *Id.* at 322.

## II. PLAINTIFFS DO NOT HAVE SUFFICIENT EVIDENCE TO SHOW OR INFER THAT BT HAD ACCESS TO *BDG*.

Plaintiffs cannot prove copyright infringement because Plaintiffs have no evidence that the Defendants engaged in copying of Plaintiffs' work—an element essential to Plaintiffs' case. Plaintiffs bear the burden of proving (1) ownership of a valid copyright; and (2) unauthorized copying of the copyrighted work. *Feist Publications, Inc. v. Rural Telephone Service Co.*, 499 U.S. 340, 361 (1991); *Castle Rock Entertainment v. Carol Publishing Group, Inc.*, 150 F.3d 132, 137 (2d Cir. 1998). Unauthorized copying can be shown through direct or indirect evidence of copying. *Johnson v. Gordon*, 409 F.3d 12, 20 (1st Cir. 2005); *Laureyssens v. Idea Group, Inc.,* 964 F.2d 131, 140 (2d Cir. 1992).

Plaintiffs have no direct evidence of copying by Defendants. Ex. C (Roberts Dep. Tr. 284:10-15), Ex. B (Vargas Dep. Tr. 400:14-402:13). With no direct evidence of copying, Plaintiffs must demonstrate copying through circumstantial evidence. An essential element of Plaintiffs' circumstantial case is proof that BT had access to Plaintiffs' work. *See Mowry v. Viacom*, Case No. 03-CV-3090; 2005 WL 1793773, *2 (S.D.N.Y. July 29, 2005) (plaintiff can prove copying through circumstantial evidence by first demonstrating that defendant had access to plaintiff's work); *Streetwise Maps, Inc. v. Vandam, Inc.,* 159 F.3d 739, 747 (2d Cir. 1998).

To prove access, courts have consistently required evidence showing that the alleged infringer had a reasonable opportunity to copy the original work. *Jorgensen v. Epic Records*, 351 F.3d 46, 51 (2d Cir. 2003). ("Access means that an alleged infringer had a reasonable possibility—not simply a bare possibility—of [obtaining the allegedly infringed work].") (internal quotations and citations omitted); *see also Silberstein v. Fox Entm't Group*, *Inc.*, 424 F. Supp. 2d 616, 624 (S.D.N.Y. 2004) ("'Access means that the alleged infringer had a reasonable opportunity to observe or copy plaintiff's work."); *Tisi v. Patrick*, 97 F. Supp. 2d 539, 547 (S.D.N.Y. 2000). A reasonable possibility to copy Plaintiffs' work "'does not encompass any bare possibility in the sense that anything is possible.'" *Jorgensen*, 351 F.3d at 51 (quoting 4 MELVILLE B. NIMMER & DAVID NIMMER, NIMMER ON COPYRIGHT § 13.02[A], at 13-19 to 13-20 (2002)).

Further, Plaintiffs' showing of access must include "significant, affirmative and probative evidence." *Id*. A simple "[c]onjecture or speculation is insufficient." *Tisi*, 97 F. Supp. 2d at 547; *see also Cox v. Abrams*, Case No. 93-CV-6899, 1997 WL 251532 *3 (S.D.N.Y. May 14, 1997). ("Mere conjecture and hypotheses will not suffice to establish access."); *Intersong-USA v. CBS, Inc.*, 757 F. Supp 274, 281 (S.D.N.Y. 1991) ("A plaintiff must offer significant,

affirmative and probative evidence to support a claim of access. . . Conjecture or speculation of access will not suffice."); *Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d 516, 519, 522 (S.D.N.Y. 2000).

Plaintiffs allege that BT physically copied, or "sampled," their work and must show proof of physical copying. In typical composition copyright infringement cases, access can be inferred if plaintiffs show that the defendant had a reasonable opportunity to ***hear*** the allegedly infringed work. *See ABKCO Music, Inc. v. Harrisongs Music, Ltd.*, 722 F.2d 988, 997-98 (2d Cir. 1983) (holding access could be found because defendant Harrison "admitted at trial that he remembered hearing [the plaintiff's work] in the early sixties when it was popular."). In the case at bar, however, Plaintiffs allege that BT violated their sound recording copyright by sampling—***physically copying***—their recording. Ex. P (Second Amended Compl. ¶¶ 10, 18); Ex. C (Roberts Dep. Tr. at 260:14-17). For BT to have ***physically copied*** Plaintiffs' record, BT must have ***physically*** had access to it. Ex. C (Roberts Dep. Tr. at 30:5-7). Plaintiffs admit that BT could not have accidentally sampled Plaintiffs' record. Ex. B (Vargas Dep. Tr. at 416:20-417:5). Thus, to survive summary judgment in this case, Plaintiffs must offer legally sufficient proof that BT had ***physical*** access to *BDG*.

Plaintiffs may show access by showing either (1) that "a particular chain of events exists by which the defendant might have gained access to the work," or (2) that "the infringed work has been widely disseminated." *Tuff 'N' Rumble Mgmt., Inc. v. Profile Records, Inc.*, 95-CV-0246, 1997 WL 158364 at *4 (S.D.N.Y. Apr. 2, 1997) (internal citations omitted). Plaintiffs have no theory as to a particular chain of events by which BT gained access to their work. Ex. B (Vargas Dep. Tr. 395:8-396:6; 400:14-402:13); Ex. C (Roberts Dep. Tr. 283:13-284:20). Plaintiffs also cannot provide *BDG* was widely distributed.

**A.    Plaintiffs Offer No Chain Of Events By Which BT Gained Access To *BDG*.**

One way Plaintiffs may show access is to come forward with evidence of a "particular chain of events or link by which the alleged infringer might have gained access to the work." *Krasselt v. Seagram & Sons, Inc.,* 01-CV-2821, 2002 WL 1997926 at *3 (S.D.N.Y. Aug. 29, 2002) (quoting *Cox*, 1997 WL 251532 at *3); *see also Tomasini v. Walt Disney Co.*, 84 F. Supp. 2d at 516, 519 (S.D.N.Y. 2000); *Santrayll v. Burrell*, 91-CV-3166, 1998 WL 60924 at *2 (S.D.N.Y. Jan. 21, 1998); *Sylvestre v. Oswald*, 91-CV-5060, 1993 WL 179101 at *3 (S.D.N.Y. May 18, 1993).

Plaintiffs offer nothing—not even a theory—to suggest how BT might have came to possess *FD II* or *BDG*.   Plaintiffs have no evidence of a connection, either direct or indirect, between their work and BT.   Ex. B (Vargas Dep. Tr. 345:8-396:6; 400:14-402:13); Ex. C (Roberts Dep. Tr. 283:13-284:20).   Plaintiffs do not allege that they ever gave their work to BT or any of the Defendants or that Plaintiffs made their work available to anyone connected to BT. Plaintiffs did not have studios, managers, record labels, bandmates, friends, or acquaintances in common with BT.   BT did not even purchase vinyl albums at the time that BDG was allegedly on sale.   Ex. H (BT Supp. Decl. ¶¶ 2-3); Ex. R (Vasquez Decl. ¶ 7).   Plaintiffs simply assert— without evidence—that BT must have had a copy of *BDG*.   This is insufficient as a matter of law to raise an inference of access.   *See Polsby v. St. Martin's Press Inc.*, 97-CV-690, 1999 WL 225536 at *3 (S.D.N.Y. Apr. 19, 1999) (granting defendants' motion for summary judgment where plaintiff failed to establish an inference of access because she offered no connection between her work and any of the defendants).

**B.    *BDG* and *FD II* Were Not Widely Disseminated.**

With no evidence—or theory—of any chain of events linking BT to *BDG*, Plaintiffs must provide evidence that BDG was "widely disseminated" to raise a legally sufficient inference of

access. Courts consider a work widely disseminated only if it has had considerable commercial success or is readily available on the market. *See Silberstein,* 424 F. Supp. 2d at 627 (S.D.N.Y. 2004). ("This court has consistently recognized widespread dissemination giving rise to an inference of access *exclusively* in cases where the allegedly infringed work has had considerable commercial success or is readily available on the market.") (emphasis added); *McRae v. Smith,* 968 F. Supp. 559, 564 (D. Colo. 1997) ("[T]he public dissemination necessary to infer that a defendant might have had access to the work is considerable."); *Hoch v. MasterCard Intern, Inc.,* 284 F. Supp. 2d 1217 (D. Minn. 2003) (hallmarks of widespread dissemination include a large number of copies distributed, commercial success or notoriety, and national performances or distribution).

### 1. Neither *FD II* Nor *BDG* Were Commercial Successes.

Plaintiffs' drum track *BDG* and album *FD II* did not have "considerable commercial success." There is no documentary evidence of sales of *FD II*. There is not a single receipt, royalty statement, invoice, accounting book, tax record, or the like to prove how many copies, if any, of *FD II* were sold. Ex. C (Roberts Dep. Tr. 119:3-23); Ex. B (Vargas Dep. Tr. 238:3-239:25). Indeed, the only known copy in existence is Ralph Vargas's personal copy. Ex. B (Vargas Dep. Tr. 214:18-215:3).

The only evidence of any sales of *FD II* is Plaintiffs' deposition testimony, which is based solely on their memories of alleged sales that occurred more than 10 years ago. Yet even Plaintiffs' self-serving and inconsistent testimony relates only to the number of copies of the recording that were manufactured, not to the number sold. Ex. C (Roberts Dep. Tr. 120:14-121:11) (4,000 *FD II* albums created); Ex. B (Vargas Dep. Tr. 204:2-206:3) (1,500 *FD II* albums created). Plaintiff Roberts simply asserted that he was "sure" that all the copies of *FD II* were sold. Ex. C (Roberts Dep. Tr. at 227:14-21). As did Vargas. Ex. B (Vargas Dep. Tr. 215:11-

218:18). Again, Plaintiffs have no documentation to confirm how many vinyl copies were pressed, the name or location of the manufacturer who pressed the vinyl, or when the albums were pressed. Ex. C (Roberts Dep. Tr. at 122:21-124:15). Even crediting Plaintiffs' unsupported testimony fully, *FD II* was offered for sale for only a few months, from February 1994 through March or April of 1994. *Id.* at 157:10-158:11. Plaintiffs claim they made a total of $32,000 from sales of *FD II*, none of which was recorded in any way—not even on tax records. *Id.* at 228:6-8; Ex. B (Vargas Dep. Tr. at 228:22-25).

But even accepting Plaintiffs' bare allegations as true, the small number of sales of *FD II* does not rise to the level of commercial success needed to show widespread dissemination. At most, Plaintiffs sold less than 4,000 copies of *FD II*, and the album was available for sale for a short time in 1994, mostly through independent record stores and independent distribution houses around New York. Ex. Q (Supp. Interrogatories Responses at 5-7) (discussing distribution, licensing and limited release on LP with no CDs or sheet music); Ex. B (Vargas Dep. Tr. 206:21-25; 237:3-238:2); Ex. C (Roberts Dep. Tr. 158:16-165:13); Ex. D (Defendants' Ex. 8). These facts are legally insufficient to constitute commercial success, especially in this case, in which Plaintiffs must show **physical** access. *See Repp v. Webber*, 947 F. Supp 105, 115 (S.D.N.Y. 1996) (holding that plaintiff Lloyd Webber's song, "Close Every Door," did not have widespread distribution despite 16,714 units of net sales and 40,000 to 45,000 copies of the printed sheet music sold); *Jewel Music Pub. Co. v. Leo Feist, Inc.*, 62 F. Supp. 596, 598 (S.D.N.Y. 1945) (holding that the sale of 5,626 records, plus several other public disseminations, "was not a success. Certainly it was not a financial success."); *Rice v. Fox Broadcasting Co.*, 330 F.3d 1170, 1178 (9th Cir. 2003) ("[W]e note that *The Mystery Magician* only sold approximately 17,000 copies between 1986 and 1999; therefore, the video cannot be considered

widely disseminated."); *ABKCO Music*, 722 F.2d at 997-98 (finding wide dissemination where plaintiff's work was "Number One on the Billboard charts" in the United States for five weeks).

### 2. *BDG* Was Not Readily Available On The Market.

Because *FD II* was not a commercial success, Plaintiffs' only other hope of raising an inference of access is to prove that *BDG* was "readily available on the market." *Silberstein,* 424 F. Supp. 2d at 627. But *BDG* was not readily available on the market. The drum track *BDG* was never sold as a single track; it was available only on the album *FD II*. Ex. C (Roberts Dep. Tr. at 230:11-15). At most, only 4,000 copies of FD II were ever made. Further, Plaintiffs admit that *FD II* was a "specialty record" with a very limited target audience. (*Id*. at 48:20-25). The intended audience for *FD II* was hip hop producers. Ex. B (Vargas Dep. Tr. at 112:20-112:23). BT is not a hip hop producer—he makes electronic music. Ex. G (BT Decl. at ¶ 2); Ex. R (Vasquez Decl. ¶ 4). Moreover, Plaintiffs' main distribution method was to hand deliver *FD II* to New York City record stores—what Plaintiffs called sales "out of the trunk of the car." Ex. B (Vargas Dep. Tr. at 202:21-203:4); Ex. C (Roberts Dep. Tr. at 158:16-159:17).

Plaintiffs have no admissible evidence that there was ever a single sale of the album *FD II* in California, where BT currently resides and works, Ex. C (Roberts Dep. Tr. 191:10-193:4), or in Maryland or England, where BT lived for various lengths of time from 1994-1997. *Id.* 54:13-19; 213:9-219:4). There is no evidence that BT spent time, or shopped for music, in New York. While Plaintiffs allege that *FD II* was distributed nationally and internationally, that allegation is unsupported. *Id.* at 213:9-217:24. Plaintiffs' entire documentary support for their allegation that they sent *FD II* to national or international distributors consists of **one** document, a single page memorandum entitled "Distribution List." Ex. Q (Plaintiffs Supp. Interrogatory

Responses); Ex. S (Bates 00003).[5]  This document contains merely the names of alleged distributors and record stores with no addresses or identifying information for these alleged entities, many of which Plaintiffs assert are no longer in business.  Ex. B (Vargas Dep. Tr. at 207:14-211:2).  Furthermore, the memorandum does not demonstrate that any of the named companies listed actually sold a copy of *FD II* and it does not indicate the location of stores outside the New York area where *FD II* was offered for sale.  Plaintiffs do not have logs or mailing receipts of where and when they supposedly delivered *FD II* to distributors or record stores, nor did Plaintiffs keep receipts or invoices showing payment for any sales of *FD II*.  *Id.* at 228:22-25.  No other witnesses corroborate Plaintiffs Vargas and Roberts' allegations that *FD II* was distributed.  When questioned about the "Distribution List," neither Vargas nor Roberts could identify sales in any specific areas outside New York.  Ex. C (Roberts Dep. Tr. 213:9-217:24); Ex. B (Vargas Dep. Tr. 207:14-211:2).

Plaintiffs' allegations are unsupported and conclusory; they are legally insufficient grounds upon which to infer that BT had access to Plaintiffs' work.  *Goehaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir. 1995).  There is no evidence of sales anywhere near where BT resided or worked.  Plaintiffs cannot merely rely on suspicion and speculation that BT must have somehow obtained a copy of *FD II*.  *Jorgensen v. Epic Records*, 351 F.3d 45, 51 (2d. Cir. 2003) ("In order to support a claim of access, a plaintiff must offer 'significant, affirmative, and probative evidence.'"), *see also* 1 WILLIAM F. PATRY, COPYRIGHT LAW & PRACTICE at 698-700 (1994) ("[T]he courts have cautioned that although circumstantial evidence is sufficient to establish access, a defendant's opportunity to view the copyrighted work must

---

[5]    This single page document is the *only* document from JBR Records regarding *FD II*.  All other documents were destroyed after JBR went out of business.  Ex. C (Roberts Dep. Tr. 162:21-163:15).  Plaintiff Roberts testified it was "by the grace of God" that this document exists.  *Id.* at 169:18-170:7.

exist by a reasonable possibility—not a bare possibility or by speculation, conjecture and suspicion. … What must be established in each case is probative evidence that the individual(s) who actually created the allegedly infringing work had a reasonable opportunity to see, hear, or read the plaintiff's work.")

In *Jorgensen*, the plaintiff alleged that he distributed his work to record and music publishing companies through a mass mailing, but he did not provide sufficient documentation that he actually mailed his work or when or to whom his work was purportedly sent. The Second Circuit concluded, "[Plaintiff's] mass mailing allegation was, thus, properly rejected by the District Court as legally insufficient proof of access." *Jorgensen*, 351 F.3d at 51-52. Similarly here, Plaintiffs' undocumented allegations of distribution are insufficient to infer BT had access to Plaintiffs' work.

Contrary to Plaintiffs' complete lack of evidence of BT's access to *BDG*, BT's uncontroverted evidence is that he did not possess a copy of *FD II* or *BDG* when he made his track, *Aparthenonia*. Ex. G (BT Decl. ¶ 6). Before this lawsuit, BT had never heard of, listened to, or possessed a copy of *BDG* or *FD II*. *Id*. BT attempted to locate a copy of Plaintiffs' work after this suit was filed, but he was unable to do so, despite a diligent search. Ex. G (BT Decl. ¶ 6). The allegedly infringing work, *Aparthenonia*, contains no sampling of any other sound recording and is not a recording of or based on *BDG*. *Id*. at 5-6. At the time *Aparthenonia* was made, BT did not even own a turntable. Ex. H (BT Supp. Decl. ¶ 1), Ex. R (Vasquez Decl. ¶¶ 4, 7), Ex. T (DiMittia Decl. ¶ 6).

To find a reasonable possibility that BT had access to *BDG* on the basis of Plaintiffs' allegations, and in light of BT's undisputed evidence to the contrary, "this court would have to engage in a degree of speculation and conjecture that is not permitted." *See Polsby*, 1999 WL

225536 at *3. This Court should grant BT's summary judgment motion rather than indulge such impermissible speculation and conjecture.

## III.    PLAINTIFFS CANNOT SHOW STRIKING SIMILARITY.

Due to their inability to provide legally sufficient evidence that BT had access to their work, Plaintiffs rely on an allegation that *BDG* and *Aparthenonia* are so strikingly similar that copying can be inferred.  Ex. C (Roberts Dep. Tr. at 284:10-15); Ex. B (Vargas Dep. Tr. at 400:14-402:13).  This allegation also fails, as a matter of law.

### A.    Copying Cannot Be Inferred From A Theory Of Striking Similarity Unless The Evidence As A Whole Precludes Any Reasonable Possibility Of Independent Creation.

Plaintiffs argue that *BDG* and *Aparthenonia* are so "strikingly similar" that copying can be inferred.  To succeed upon a "strikingly similar" basis for copying, however, there cannot be "any reasonable possibility of independent creation."  *Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d Cir. 1988).  Plaintiffs' evidence of "striking similarity" is insufficient as a matter of law because it does not preclude such a reasonable possibility of independent creation.  *Gaste*, 863 F.2d at 1068 ("[a] plaintiff has not proved striking similarity sufficient to sustain a finding of copying *if the evidence as a whole does not preclude any reasonable possibility of independent creation*.") (emphasis added); *Arnstein v. Porter,* 154 F.2d 464, 468 (2d Cir. 1946).  ("If evidence of access is absent, the similarities must be so striking as to preclude the possibility that plaintiff and defendant independently arrived at the same result."); *see also Tisi v. Patrick*, 97 F. Supp. 2d 439, 548 (S.D.N.Y. 2000) ("Under the stringent test of 'striking similarity,' a plaintiff can avoid dismissal only by proving that the works are so 'strikingly similar' as to preclude the possibility of independent creation.") (citations omitted); *Cox v. Abrams*, No. 93 Civ. 6899, 1997 WL 251532, at * 5 (S.D.N.Y. May 14, 1997); *Ferguson v. Nat'l Broad. Co.*, 584 F.2d 111, 113 (5th Cir. 1978).  In other words, "[s]triking similarity exists when two works are so nearly alike

that the only reasonable explanation for such a great degree of similarity is that the later . . . was copied from the first." *Tisi*, 97 F. Supp. 2d at 548 (citations omitted).

Plaintiffs' task of proving striking similarity is made even more difficult by the fact that "[t]he striking similarity test . . . is applied with particular stringency in cases . . . involving popular music." *Tisi*, 97 F. Supp. 2d at 548. It is undisputed that both works at issue in this case are drum rhythms created to be used in popular music. Ex B (Vargas Dep. Tr. 112:20-23); Ex. G (BT Decl. ¶ 3) Only so many choices are available to those wanting to make drum beats for popular music; similarities between two works may be as indicative of independent creation as of copying. *Cf. Procter & Gamble Co. v. Colgate-Palmolive Co.*, 199 F.3d 74, 78 (2d Cir. 1999) (holding that when only a limited number of choices exist for a particular type of work similarities between the works could be "attributable to independent creation rather than copying."); *see also Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d. Cir. 1988) (courts must be "mindful of the limited number of notes and chords available to composers and the resulting fact that common themes frequently appear in various compositions, especially in popular music."); *Darrell v. Joe Morris Music Co.*, 113 F.2d 80 (2d Cir. 1940) ("It must be remembered that, while there are an enormous number of possible permutations of the musical notes of the scale, only a few are pleasing; and much fewer still suit the infantile demands of the popular ear. Recurrence is not therefore an inevitable badge of plagiarism.") (L. Hand). This is especially true of rhythm. *Northern Music Corp. v. King Record Distrib. Co.*, 105 F. Supp. 393, 400 (S.D.N.Y. 1952) ("Rhythm is simply the tempo in which [musical] composition is written. It is the background for the melody. There is only a limited amount of tempos; these appear to have been long since exhausted.").

**B.    Plaintiffs Fail To Show Striking Similarity Such That Any Reasonable Possibility Of Independent Creation Is Precluded.**

Plaintiffs contend that *Aparthenonia* resulted from a copy of *BDG* that was digitally edited to change the rhythm and sound of the track. Accordingly, to prevail on their claim of striking similarity, Plaintiffs must show evidence that at least portions of *Aparthenonia* are identical to, or must have originated in, *BDG*. Plaintiffs cannot do this. Plaintiffs' only support for their striking similarity assertion is from their expert witnesses. As will be shown for each expert witness in turn, Plaintiffs' purported evidence of striking similarity falls far short of "precluding any possibility of independent creation" of BT's *Aparthenonia*. *Gaste*, 863 F.2d at 1068.

> **1.** **Dr. Smith Can Offer No Opinion On Whether *Aparthenonia* Was Independently Created, And He Did Not Find A Single Drum Strike In *Aparthenonia* That Is Copied from *Bust Dat Groove*.**

Dr. Smith is Plaintiffs' digital signal processing expert. He admits in his report that he has "no musical training," and thus "cannot render any opinion as to whether or not different musicians, with different instruments, playing at different points in time, can produce waveforms that look this similar." Ex. M (Smith Report at 2). This is an express acknowledgement that Dr. Smith cannot rule out the possibility that *Aparthenonia* was independently created. For this reason alone, his report and testimony are insufficient evidence of striking similarity.

Despite his lack of musical expertise, Dr. Smith is experienced with Fast Fourier Transform ("FFT") spectral analysis, a methodology that Dr. Boulanger, BT's expert, used to examine the spectrographic signatures of the drum strikes in *BDG* and *Aparthenonia*. Dr. Boulanger's analysis shows that *Aparthenonia* was not derived from BDG. Ex. N (Dr. Boulanger Report at 2-3); Ex. F (Dr. Boulanger Rebuttal Report at 4, 7, 11-12). Dr. Smith agrees that Dr. Boulanger used the correct method to analyze and generate his data, Ex. M (Smith Report at 2); Ex. L (Smith Dep. Tr. at 63:14-63:22, 79:25-80:16), and also agrees that the FFT analysis conducted by Dr. Boulanger is much more sensitive to differences and similarities

in sounds than simply listening to the two works, and is a superior method for determining whether one work is a copy of another. *Id*. at 79:25-80:16.

While recognizing the appropriateness of FFT analysis, Dr. Smith did no independent analysis of the drum tracks at issue in this case. *Id.* at 76:10-77:7. He did not generate any data on his own, *Id.* at 76:10-77:25, nor did he run the drum tracks through any FFT waveform or spectrographic analysis. *Id.* Instead, Dr. Smith simply reviewed the data presented in Dr. Boulanger's report. *Id.* at 77:1-7.[6]

Dr. Smith describes three types of copies in his report and testimony: exact, direct, and associated copies. In Dr. Smith's usage, "exact copies" are perfect copies, such that one cannot be distinguished from another. Ex. L (Smith Dep. Tr. 67:2-6). A digital copy, say of a song, is an example of an exact copy. "Direct copies" are copies in which some "noise" or corruption is introduced into the copy. One can tell that a direct copy is a copy of the original, but some slight variations from the copying process make the original and the copy not exactly the same. Dr. Smith assumes such differences are negligible. Ex. M (Smith Report at 4). Finally, "associated copies" are not copies at all. Rather, in Dr. Smith's usage, they are two recorded sounds that are very similar. They are not similar enough to be an original and a copy, but they are similar enough that Dr. Smith assumes that both recorded sounds must have been created by the same instrument, perhaps even by the same drummer playing the same instrument. (*Id*. at 4-5)

Dr. Smith states in his report that *Aparthenonia* contains only an associated copy of a drum strike from *BDG*. *Id.* at 4-5. Incongruously, Dr. Smith makes this assertion after admitting that he has "no musical training," and thus "cannot render any opinion as to whether or not

---

[6]   It is unclear, given that Plaintiffs have the burden of proof, why they failed to have their expert conduct his own analysis of the works. But Dr. Smith did not, Plaintiffs have no evidence of copying and thus Plaintiffs are left to rely on unsupported suppositions and conjectures from Dr. Smith.

different musicians, with different instruments, playing at different points in time, can produce waveforms that look this similar." *Id.* at 2. But putting aside Dr. Smith's admission that he lacks the experience to determine the meaning of the waveforms at issue, it is critical to note that ***the only thing that Dr. Smith ever finds in the spectral analysis of BDG and Aparthenonia is an associated copy***. He never finds an exact copy, Ex. L (Smith Dep. Tr. 168:5-7), or a direct copy, Ex. M (Smith Report at 4-5); Ex. L (Smith Dep. Tr. 174:6-20), between *BDG* and *Aparthenonia*. In other words, he did not find the source for even a single drum strike present in *Aparthenonia* anywhere in the one bar of *BDG* analyzed in Dr. Boulanger's report. Ex. M (Smith Report at 4-5); Ex. L (Smith Dep. Tr. 174:6-11, 178:3-22).

How then did Dr. Smith reach the conclusion that *Aparthenonia* is a copy of *BDG*? He did so by making a fatally flawed assumption. Dr. Smith assumed that the *BDG* sound recording was created by a drummer playing the same one-bar pattern approximately 26 times. Ex. M (Smith Report at 4); Ex. L (Smith Dep. Tr. 174:12-175:1). From this assumption, Dr. Smith reasoned that the drum strikes in each different bar of *BDG* would be similar but not identical— that each bar would contain "associated copies." *Id.* Accordingly, he believed that somewhere in the entirety of *BDG* the drum strikes that were used to create *Aparthenonia* must exist. Ex. L (Smith Dep. Tr. 176:8-21).

Dr. Smith's analysis is fatally flawed because *BDG*, in fact, is a single bar of drumming that is copied and looped, such that every bar of *BDG* is identical. Ex. F (Dr. Boulanger Rebuttal Report at 5); Ex. E (Dr. Boulanger Declaration ¶ 4). Quite simply, there is no more to *BDG* than what Dr. Smith has already reviewed. *BDG* is a single bar repeated, not 26 bars, and Dr. Smith's inability to find even a single drum strike in *Aparthenonia* that is copied from *BDG* means that

Plaintiffs cannot prove striking similarity. Indeed, when his erroneous factual assumption is taken into account, Dr. Smith's report demonstrates the independent creation of *Aparthenonia*.

<strong>2. Plaintiffs' Expert Rodriguez Does Not Show Either Copying Or Striking Similarity.</strong>

The testimony of Plaintiffs' other two experts does not avail them either. Plaintiffs' expert Ivan Rodriguez is a purported "sampling expert" who has no experience using Propellerhead Reason—the software BT used to create *Aparthenonia*. Ex. O (Rodriguez Dep. Tr. 182:9-15); Ex. G (BT Decl. ¶ 5). He has no knowledge of the huge sound libraries that are available in Reason that allow users to choose from an enormous number real drum sounds in making music. Ex. O (Rodriguez Dep. Tr. 183:4-9); Ex. T (Dimittia Decl. ¶ 9); Ex. R (Vasquez Decl. ¶ 8).

In his report, Mr. Rodriguez describes altering *BDG* to create another drum track—one that admittedly does not sound exactly the same as *Aparthenonia*. Ex. O (Rodriguez Dep. Tr. 412:23-414:14). Although Mr. Rodriguez claims that he ***could*** have made his remixed version of *BDG* sound more like *Aparthenonia*, (*Id*. at 244:12-245:13), it is telling that he never did so.[7] And even if Mr. Rodriguez had digitally manipulated *BDG* to sound identical to *Aparthenonia*, it would not prove striking similarity. Even if it were possible to create *BDG* from *Aparthenonia*—as Rodriguez asserts but never shows—that possibility would ***not*** "preclude any reasonable possibility" that *Aparthenonia* was created independently. *Gaste v. Kaiserman*, 863 F.2d 1061, 1068 (2d. Cir. 1988), Mr. Rodriguez's analysis has no bearing on the legal question before this Court. Given the commonness of both *BDG* and *Aparthenonia*, it is unsurprising that digital manipulation could be employed to make one sound more like the other (especially if one

---

[7] Again, Plaintiffs' expert does not provide full analysis or evidence, even though the burden of proof rests with Plaintiffs. Plaintiffs are again left relying on belief and conjecture without evidentiary support.

started out with that goal).  But this says nothing about the reasonable possibility of independent creation.  Accordingly, Mr. Rodriguez's testimony provides no evidence sufficient to support Plaintiffs' allegation of striking similarity.

### 3. Plaintiffs' Expert Ritter Cannot Support Striking Similarity And No Reasonable Jury Could Rely On His Testimony.

The testimony of Plaintiffs' expert Matthew Ritter does not salvage Plaintiffs' striking similarity argument.  Mr. Ritter does not have familiarity with electronically created music, Ex. U (Ritter Dep. Tr. 77:6-9), nor does Mr. Ritter have any experience with sampling music.  *Id.* at 288:4-6.  Although Plaintiffs transparently strive to put the right combination of magic words in their experts' mouths to create a fact issue regarding striking similarity, Mr. Ritter's testimony is also unavailing.  Mr. Ritter's opinion is based solely on listening to the drum track at issue. While he claims to hear similarities between the works, his analysis is woefully inadequate to prove striking similarity, as a matter of law.

First, although Mr. Ritter states in his declaration that every element in *Aparthenonia* was copied exactly from *BDG*, Ex. U (Ritter Decl. at ¶ 14 and Ex. B), this contention is directly disproved by Plaintiffs' own expert Dr. Smith: as described above, Dr. Smith admitted that he found no exact or direct copying in the FFT waveform analysis.  Taking the evidence as a whole, as is required by the Second Circuit, this contradiction in Plaintiffs' experts' opinions alone means that Plaintiffs cannot preclude any reasonable possibility of independent creation of *Aparthenonia*, and therefore cannot withstand summary judgment on the issue of striking similarity.  *Gaste*, 863 F.2d at 1068.

Second, even though Mr. Ritter claims that he can tell that Vargas is playing on both *BDG* and *Aparthenonia*, no reasonable jury could rely on this testimony because, during his deposition, Mr. Ritter was unable to identify whether it was Mr. Vargas playing on any of the

other tracks from Plaintiffs' *FD II* album.  Ex. U (Ritter Dep. Tr. 236:32-277:6).  Mr. Ritter

stated in his declaration that each drummer "has his own personal way of holding the sticks and

striking the drums" which results in a "'fingerprint' that gets left on every drum recording."  Ex.

K (Ritter Decl. at 16).  But when counsel for BT played each track from *FD II* during Mr.

Ritter's deposition, Mr. Ritter could not identify whether Vargas was playing on any track other

than *BDG*.  Ex. U (Ritter Dep. Tr. at 236:13-277:25; see, e.g., Ritter Dep. Tr. 241:3-7, 244:12-

20; 246:4-22, 250:14-251:13, 256:5-11, 259:7-10, 261:10-19, 264:14-22).  Mr. Ritter had the

opportunity to listen to each track one at a time, and to hear each track as many times as he

wanted, yet he could not identify whether Mr. Vargas was playing on any other track.  *Id.*  In

fact, Mr. Vargas did not play on every track of *FD II*.  His mixing engineer, Carlos Bess, played

on some of the tracks.  Ex. B (Vargas Dep. Tr. at 81:23-82:13).  But Mr. Ritter was completely

unable to distinguish when Mr. Vargas was playing, and when someone else was playing.  *Id.;*

(see, e.g., Ritter Dep. Tr. 241:3-7, 244:12-20; 246:4-22, 250:14-251:13, 256:5-11, 259:7-10,

261:10-19, 264:14-22).

Third, Mr. Ritter's statement that the drum sounds on *BDG* and *Aparthenonia* are

"identical" is contradicted by the testimony of Plaintiffs' expert Rodriguez, who testified that the

drum sounds are different, Ex. O (Rodriguez Dep. Tr. 390:19-392:2, 406:9-18, 408:2-14, 410:3-

411:3, 411:24-412:17, 413:15-414:14); Ex. F (Dr. Boulanger Rebuttal Report at 3), and is also

contradicted by simply listening to the drum sounds from the two tracks, which sound different

even to a lay person.  Anyone can hear that the two drum sounds are not identical.  The works

have different tempos, Ex. O (Rodriguez Dep. Tr. At 257:4-6); Ex. F (Boulanger Rebuttal Report

at 11), and different pitches.  Ex. O (Rodriguez Dep. Tr. at 344:12-346:2); Ex. F (Boulanger

Rebuttal Report at 11).  Moreover, Ritter's statement that the drum sounds are identical is

contradicted by his own deposition testimony: when he was played Rodriguez declaration exhibit C1 (containing the back-to back-comparisons of the similar drum sounds from *BDG* and *Aparthenonia*), he admitted that the works sounded different—at least until he realized what it was he was listening to and tried to backtrack. Ex. U (Ritter Dep. Tr. at 131:4-138:19); Ex. V (Rodriguez Decl. at Ex. C1).

Mr. Ritter's contention that the sounds of the drums in the two works are identical and that there was no manipulation to the sounds other than the drum strikes being rearranged, Ex. U (Ritter Dep. Tr. at 123:10-124:14), is contrary to Plaintiffs' argument that BT digitally manipulated the sounds from *BDG* to create *Aparthenonia*. Ex. O (Rodriguez Dep. Tr. at 240:12-241:18). Mr. Ritter's testimony about the "identicalness" of the drum sounds on the two works is also contradicted by plaintiffs' other experts—Dr. Smith and Mr. Rodriguez, who both admitted to differences in the drum strikes—and by the detailed analysis of Dr. Boulanger. Accordingly, Plaintiffs cannot rely on Ritter to prove striking similarity. In fact, given all of this, no reasonable jury could find copying based on Ritter's testimony that the drum sounds in *Aparthenonia* and *BDG* are identical. *See e.g. Dimmie v. Carey*, 88 F. Supp. 2d 142, 150-51 (S.D.N.Y. 2000) (finding that plaintiffs failed to show substantial similarity where expert only testified that it was "unlikely" that the two works were created independently). This Court should therefore grant summary judgment for defendants.

C.    **BT's Unrebutted And Convincing Evidence That *Aparthenonia* Was Independently Created.**

Finally, opposing Plaintiffs' legally insufficient evidence of copying is BT's substantial and unrebutted evidence of independent creation of *Aparthenonia*. BT himself, his experts, and three additional fact witnesses all provide substantial evidence of independent creation. The unrebutted evidence shows that BT created *Aparthenonia* on the back of his bus while on tour in

2000 and 2001.  Ex. G (BT Decl. ¶ 5), Ex. H (BT Supp. Decl. ¶ 1), Ex. R (Vasquez Decl. ¶ 6).

BT did not have a turntable on the bus, in his studio, or anywhere else at the time.  Ex. H (BT

Supp. Decl. ¶ 1-2), Ex. R (Vasquez Decl. ¶ 7), Ex. T (DiMittia Decl. ¶¶ 5-6).  Neither BT, nor

anyone associated with him, ever heard of *BDG* before this case.  Ex. G (BT Decl. ¶ 5), Ex. H

(BT Supp. Decl. ¶¶ 1, 3, 6), Ex. R (Vasquez Decl. ¶ 9), Ex. T (DiMittia Decl. ¶ 8).  BT created

*Aparthenonia* using a computer and off the shelf software.  Ex. G (BT Decl. ¶¶ 4-5), Ex. H (BT

Supp. Decl. ¶¶ 4-5), Ex. R (Vasquez Decl. ¶¶ 5, 7), Ex. T (DiMittia Decl. ¶ 7).  BT makes his

music "from scratch."  Ex. G (BT Decl. ¶¶ 5-6), Ex. R (Vasquez Decl. ¶¶ 4-6), Ex. T (DiMittia

Decl. ¶ 7).  He did not use any samples on *Aparthenonia*.  Ex. G (BT Decl. ¶¶ 6), Ex. T (DiMittia

Decl. ¶ 7), Ex. R (Vasquez Decl. ¶¶ 4-7.

For the Court to accept Plaintiffs' theory of copying, it would have to credit Plaintiffs'

suppositions of copying over the substantial direct evidence of independent creation provided by

BT and his witnesses.  It would be legally impermissible for the Court to rely on such

insufficient evidence in the light of BT's substantial direct evidence of independent creation.

Accordingly, summary judgment must be granted for defendants.  *Cox*, 1997 WL 251532 at *7

("Evidence of independent creation offers yet another ground on which summary judgment can

be granted"); *Dimmie*, 88 F. Supp. 2d at 151 (pointing to "convincing documentary evidence to

support. . .claim of independent creation" in granting summary judgment to defendants).

## CONCLUSION

For the above stated reasons, the Court should grant Defendants' motion for summary

judgment and dismiss Plaintiffs' case with prejudice.

Dated:  September 25, 2006.                    KIRKLAND & ELLIS LLP


                                               By:/s/_____
                                                   Julie A. Ahrens (JA 0372)
                                                   jahrens@kirkland.com
                                                   Christopher W. Keegan (CK 2853)
                                                   ckeegan@kirkland.com

                                               KIRKLAND & ELLIS LLP
                                               555 California Street
                                               San Francisco, California  94104-1501
                                               Telephone:    (415) 439-1400
                                               Facsimile:    (415) 439-1500

                                               David S. Olson (DO 4906)
                                               dolson@law.stanford.edu
                                               STANFORD LAW SCHOOL CYBERLAW CLINIC
                                               CENTER FOR INTERNET AND SOCIETY
                                               559 Nathan Abbott Way
                                               Stanford, California 94305-8610
                                               Telephone: (650) 724-0517
                                               Facsimile:  (650) 723-4426

                                                   Attorneys for Defendant
                                                   BRIAN TRANSEAU p/k/a "BT"

24