UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| RALPH VARGAS AND BLAND - RICKY ROBERTS,<br><br>PLAINTIFFS,<br><br>- V. -<br><br>PFIZER INC., PUBLICIS, INC., FLUID MUSIC, EAST WEST COMMUNICATIONS, INC., AND BRIAN TRANSEAU P/K/A "BT",<br><br>DEFENDANTS. | Case No.:   04 CV 9772 (WHP)<br><br>ECF Case |

## LOCAL RULE 56.1 STATEMENT OF UNDISPUTED FACTS

Pursuant to Local Civil Rule 56.1 of the United States District court for the Southern District of New York, Defendants submit this Statement of Undisputed Facts in connection with Brian Transeau's Motion for Summary Judgment filed on September 25, 2006.

This statement of undisputed facts is based on relevant portions of the following evidence from this case:

    i.    the Second Amended Complaint in this action;

    ii.    the Declaration of Anthony Ricigliano and Exhibits thereto;

    iii.    the Declarations of Brian Transeau;

    iv.    the Declaration of Rhys Moody and Exhibit thereto;

    v.    the Declaration of Edward P. Kelly and the Exhibit thereto;

    vi.    selected pages of the Deposition Transcript of Ralph Vargas;

    vii.    selected pages of the Deposition Transcript of Bland-Ricky Roberts;

    viii.    selected pages of the Deposition Transcript of Brian Transeau;

    ix.    selected pages of the Deposition Transcript of Dr. Steven Smith;

    x.    selected pages of the Deposition Transcript of Ivan Rodriguez;

xi.   selected pages of the Deposition Transcript of Matthew Ritter;

xii.  Dr. Steven Smith's Expert Report and Exhibits thereto;

xiii. Dr. Richard Boulanger's Expert Reports and Exhibits thereto;

xiv.  Dr. Richard Boulanger's Declaration;

xv.   the Declaration of Carlos Vasquez;

xvi.  the Declaration of Mike DiMattia;

xvii. Documents produced by Plaintiffs in this litigation; specifically Bates 00003 and 00017.

The relevant documents, or relevant portions, are submitted with this motion. For purposes of this motion, the material facts to which there are no genuine issue to be tried are as follows:

1. Defendant Brian Transeau ("BT") is an accomplished performer, composer and producer of electronic music. Ex. G (BT Decl. ¶ 2)

2. BT did not own a turntable or record player during the time he created his drum track, *Aparthenonia*. Ex. H (BT Supp. Decl., ¶¶ 1-2), Ex. T (DiMittia Decl., ¶ 6), Ex. R (Vasquez Decl. ¶ 7).

3. Plaintiffs allege that BT created *Aparthenonia* by sampling—physically copying—their sound recording called *Bust Dat Groove without ride* ("*BDG*"). Ex. C (Roberts Dep. Tr. at 260:14-17).

4. BT originally created *Aparthenonia* on a computer in his tour bus. Ex. H (BT Supp. Decl., ¶ 1), Ex. R (Vasquez Decl., ¶ 6), Ex. I, (BT Dep. Tr. at 149:24-150:10), Ex. G (BT. Decl. ¶¶ 4-6).

5. The studio on the tour bus never included a turntable or a record player and consisted solely of his computers and speakers. Ex. H (BT Supp. Decl., ¶ 1), Ex. R (Vasquez Decl., ¶ 7); Ex. I (BT Dep. Tr. at 139:20-150:1).

6. BT did not "sample" any vinyl for any portion of the *Breakz from the Nu Skool* album. Ex. H (BT Supp. Decl., ¶¶ 1-2), Ex. R (Vasquez Decl., ¶ 5-7); Ex. I (BT Dep. Tr. at 139:20-150:1), Ex. G (BT Decl. ¶¶ 5-6).

2

7. BT did not use a copy of *Bust Dat Groove ("BDG")* to make his allegedly infringing drum track, *Aparthenonia*. Ex. G (BT Decl. ¶ 6).

8. BT made *Aparthenonia* on his blue and white Apple G3 computer using off-the-shelf software applications. *Id.* at ¶ 5; Ex. H (BT Supp. Decl. at ¶ 5).

9. *Aparthenonia* is a programmed beat; the percussion elements originated from a music-generation software program known as Propellerhead Reason, and were mixed and equalized by BT on his own equipment. Ex. G (BT Decl. at ¶¶ 5-6).

10. *Aparthenonia* is a two and one-quarter bar drum pattern that lasts approximately nine seconds. Ex. J (Ricigliano Decl. ¶ 14).

11. Like *BDG*, and thousands of other drum beats, *Aparthenonia* contains sounds of a high-hat, snare drum, and bass drum. This commonplace rhythm is considered a rudimentary drumming technique. *Id.* at 7; Ex. J (Ricigliano Decl. ¶¶ 5, 23-24); Ex. K (Ritter Decl. Ex. B).

12. Prior to and at the time BT created *Aparthenonia*, he did not shop for vinyl and did not purchase records. Ex. H (BT Supp. Decl. ¶ 1).

13. Plaintiff Ralph Vargas recorded the allegedly infringed drum track, *BDG*, as part of his *FD II* album in 1994. Ex. B (Vargas Dep. Tr. 155:5-8); Ex. C (Roberts Dep. Tr. 152:23-155:3).

14. *BDG* was only distributed on *Funky Drummer Volume II ("FD II")*. Ex. B (Vargas Dep. Tr. at 155:5-8, 244:15-19); Ex. C (Roberts Dep. Tr. at 152:23-155:3-229:22-232:5), Ex. Q (Plaintiffs' Supplemental Interrogatory Responses at pgs. 5-7).

15. There is no documentary evidence of a single sale of *FD II*. Ex. B (Vargas Dep. Tr. at 203:14-17, 238:3-239:25), Ex. C (Roberts Dep. Tr. at 119:3-23, 169:10-17), Ex. Q (Plaintiffs' Supplemental Interrogatory Responses at pgs. 5-7).

16. The only known copy of *FD II* is owned by Plaintiff Ralph Vargas. Ex. B (Vargas Dep. Tr. at 214:18-215:3).

17. The only evidence of distribution of *FD II* is Plaintiffs' memory and one single-page document. Ex. B (Vargas Dep. Tr. at 206:21-25), Ex. C (Roberts Dep. Tr. at 158:16-

165:13), Ex. Q (Plaintiffs' Supplemental Interrogatory Responses at pgs. 5-7).

18. *BDG* was only crated as vinyl long play records. Ex. B (Vargas Dep. Tr. at 203:14-17), Ex. C (Roberts Dep. Tr. at 152:23-155:3).

19. *BDG* was not made available in any other format. Ex. B (Vargas Dep. Tr. at 203:14-17), Ex. C (Roberts Dep. Tr. at 152:23-155:3).

20. There are no documents or admissible evidence of any sales of *FD II* in California. Ex. C (Roberts Dep. Tr. at 191:10-193:4), Ex. Q (Plaintiffs' Supplemental Interrogatory Responses at pgs. 5-7).

21. *FD II* was only on sale for a few months, from February to April, 1994, mostly in "mom and pop records stores" and independent distribution houses around New York. Ex. B (Vargas Dep. Tr. 206:21-25); Ex. C (Roberts Dep. Tr. 158:16-165:10-13); Ex. D (Defendants' Dep. Ex. 8, Plaintiffs' Bates Label 00017).

22. BT never purchased *FD II*, heard of *FD II*, saw *FD II*, or listened to any track from *FD II* before this litigation. Ex. H (BT Supp. Decl., ¶¶ 1, 3, 7), Ex. G (BT Decl. ¶ 6).

23. BT never purchased *BDG*, heard of *BDG*, saw *BDG*, or listened to *BDG* before this litigation. Ex. H (BT Supp. Decl., ¶¶ 1, 3, 7), Ex. G (BT Decl. ¶ 6).

24. In 1994—the period when *BDG* was released and sold—BT lived for several months in England, and he continued to live there for significant periods of time from 1994 through 1997. Ex. I (BT Dep. Tr. 71:24-72:10).

25. After this litigation began, BT attempted to locate a copy of *FD II*, and was unable to do so despite a diligent search. Ex. G (BT Decl. ¶ 6).

26. Only between 1,500 and 4,000 copies of *FD II* were ever manufactured. Ex. B (Vargas Dep. Tr. at 204:2-206:3), Ex. C (Roberts Dep. Tr. 120:14-121:11).

27. The instruments played on *BDG* are a high hat, a snare drum, and a bass drum. Ex. B (Vargas Dep. Tr. at 85:8-11).

28. BDG and Aparthenonia are drum rhythms created to be used in popular music. Ex. B (Vargas Dep. Tr. 112:20-23); Ex. G (BT Decl. ¶3).

29. Fast Fourier Transform wave and spectrographic analysis are the best methods for determining the similarities and differences between audio sounds. Ex. L (Smith Dep. Tr. at 63:4-22, 79:25-80:16), Ex. N (Dr. Boulanger Expert Report at 2).

30. Fast Fourier Transform analysis can reveal the special characteristics of sounds with much greater precision that the unaided ear. Ex. L (Smith Dep. Tr. at 63:4-22, 79:25-80:16), Ex. N (Dr. Boulanger Expert Report at 2).

31. Fast Fourier Transform analysis of *BDG* and *Aparthenonia* reveals not a single drum strike in *Aparthenonia* that is a direct copy from *BDG*. Ex. L (Smith Tr. at 173:21-175:1); Ex. F (Dr. Boulanger Rebuttal Report at 2-3).

32. Dr. Smith, Plaintiffs' digital signal processing expert, has "no musical training," and thus "cannot render any opinion as to whether or not different musicians, with different instruments, playing at different points in time, can produce waveforms that look [as] similar" as *BDG* and *Aparthenonia*. Ex. M (Smith Report at 2).

33. Dr. Smith describes three types of copies in his report and testimony: exact, direct, and associated copies. (Smith Dep. Tr. 67:2-6); Ex. M (Smith Report at 4).

34. Dr. Smith defines "exact copies" as perfect copies, such that one cannot be distinguished from another. Ex. L (Smith Dep. Tr. 67:2-6).

35. Dr. Smith defines "direct copies" as copies in which some negligible "noise" or corruption is introduced into the copy. Ex. M (Smith Report at 4).

36. Dr. Smith defines "associated copies" as not being copies at all. Rather, in Dr. Smith's usage, they are two recorded sounds that are very similar. Ex. M (Smith Report at 4).

37. Dr. Smith states in his report that *Aparthenonia* contains only an associated copy of a drum strike from *BDG*. Ex. M (Smith Report at 4-5).

38. Dr. Smith never found an exact copy between *BDG* and *Aparthenonia*. Ex. L (Smith Dep. Tr. 168:5-7).

39. Dr. Smith never found a direct copy between *BDG* and *Aparthenonia*. Ex. M (Smith Report at 4-5); Ex. L (Smith Dep. Tr. 174:6-20).

40. Dr. Smith did not find the source for a single drum strike present in *Aparthenonia* anywhere in the one bar of *BDG* analyzed in Dr. Boulanger's report. Ex. M (Smith Report at 4-5); Ex. L (Smith Dep. Tr. 174:6-11, 178:3-22).

41. Dr. Smith incorrectly assumed that the *BDG* sound recording was created by a drummer playing the same one-bar pattern approximately 26 times. Ex. M (Smith Report at 4); Ex. L (Smith Dep. Tr. 174:12-175:1).

42. *BDG* is a one-bar loop. The one bar is exactly copied and repeated to create the track. Each bar is identical. Ex. F (Dr. Boulanger Rebuttal Report at page 5), Ex. E (Dr. Boulanger Decl. ¶ 4).

43. The difference in the sounds of *BDG* and *Aparthenonia* can be discerned by listening to the two loops. Ex. O (Rodriguez Dep. Tr. 412:3-414:14), Ex. F (Dr. Boulanger Rebuttal Report at 2, 11-12).

44. *BDG* and *Aparthenonia* have different tempos, Ex. O (Rodriquez Dep. Tr. 257:4-6); Ex. F (Dr. Boulanger Rebuttal Report at 11), and different pitches, Ex. O (Rodriguez Dep. Tr. 344:12-346:2); Ex. F (Dr. Boulanger Rebuttal Report at 11).

45. A listener can hear differences in the drum strike between *BDG* and *Aparthenonia* — no drum strike sounds identical between the two works. Ex. O (Rodriguez Dep. Tr. 390:19-392:2, 406:9-18, 408:2-14, 410:3-411:3, 411:24-412:17, 413:15-415:10); Ex. F (Dr. Boulanger Rebuttal Report at 3, 12).

46. Plaintiffs' "sampling expert," Ivan Rodriguez, has no experience using Propellerhead Reason—the software BT used to create *Aparthenonia*. Ex. O (Rodriguez Dep. Tr. 182:9-15); Ex. G (BT Decl. ¶ 5).

47. Mr. Rodriguez has no knowledge of the huge sound libraries that are available in Reason that allow users to choose from an enormous number real drum sounds in making music. Ex. O (Rodriguez Dep. Tr. 183:4-9); Ex. T (Dimittia Decl. ¶ 9); Ex. R (Vasquez Decl. ¶ 8).

48. In his report, Mr. Rodriguez describes altering *BDG* to create another drum track—one that admittedly does not sound exactly the same as *Aparthenonia*. Ex. O (Rodriguez

Dep. Tr. 412:23-414:14).

49. Plaintiffs' expert Matthew Ritter does not have familiarity with electronically created music, Ex. U (Ritter Dep. Tr. 77:6-9).

50. Mr. Ritter does not have any experience with sampling music. Ex. U (Ritter Dep. Tr. 77:6-9).

51. Mr. Ritter was unable to identify whether it was Mr. Vargas playing on any of the other tracks from Plaintiffs' *FD II* album. Ex. U (Ritter Dep. Tr. 236:32-277:6).

52. When counsel for BT played each track from *FD II* during Mr. Ritter's deposition, Mr. Ritter could not identify whether Vargas was playing on any track other than *BDG*. Ex. U (Ritter Dep. Tr. at 236:13-277:25; see, e.g., Ritter Dep. Tr. 241:3-7, 244:12-20; 246:4-22, 250:14-251:13, 256:5-11, 259:7-10, 261:10-19, 264:14-22).

53. Mr. Vargas did not play on every track of *FD II*. His mixing engineer, Carlos Bess, played on some of the tracks. Ex. B (Vargas Dep. Tr. at 81:23-82:13).

54. When counsel for BT played Rodriguez Declaration exhibit C1 (containing the back-to back-comparisons of the similar drum sounds from *BDG* and *Aparthenonia*), Mr. Ritter admitted that at least some of the drum strikes in *BDG* sounded different than those in *Aparthenonia*. Ex. U (Ritter Dep. Tr. at 131:4-138:19).

55. A person cannot accidentally sample another recording – it is an intentional act of physical copying. Ex. B (Vargas Dep. Tr. at 416:16-417:1), Ex. C (Roberts Dep. Tr. at 29:23-30:3).

56. *FD II* was a "specialty record" with a very limited target audience. Ex. C (Roberts Dep. Tr. 48:20-25). The intended audience for *FD II* was hip hop producers. Ex. B (Vargas Dep. Tr. at 112:20-112:23).

57. BT is not a hip hop producer—he makes electronic music. Ex. G (BT Decl. at ¶ 2); Ex. R (Vasquez Decl. ¶ 4).

58. Plaintiffs' main distribution method was to hand deliver *FD II* to New York City record stores — what Plaintiffs called sales "out of the trunk of the car." Ex. B (Vargas Dep. Tr.

at 202:21-203:4); Ex. C (Roberts Dep. Tr. at 158:16-159:17).

59. The only document remaining from JBR, Roberts' company that sold *FD II* is the list produced at bates range 00003 purporting to identify distributors of *FD II*. Ex. C (Roberts Dep. Tr. at 162:4-6, 169:18-170:7).

60. BT attempted to demonstrate the method he used to create *Aparthenonia* several times at his deposition, but Plaintiff's counsel refused to see any demonstration. Ex. H (BT Supp. Decl. ¶ 4); Ex. I (BT Dep. Tr. at 61:7-10; 103:21-104:5; 142:1-142:13; 145:17-146:8; 150:11-14; 178:17-24).

61. Plaintiff's counsel refused to inspect the computer used by BT to make *Aparthenonia* at BT's deposition and has never inspected that computer. Ex. H (BT Supp. Decl. ¶ 5), Ex. I (BT Dep. Tr. at 178:25-179:12).

Dated: September 25, 2006

KIRKLAND & ELLIS LLP

By: _____
Julie A. Ahrens (JA 0372)
jahrens@kirkland.com
Christopher W. Keegan (CK 2853)
ckeegan@kirkland.com

KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California 94104-1501
Telephone: (415) 439-1400
Facsimile: (415) 439-1500

David S. Olson (DO 4906)
dolson@law.stanford.edu
STANFORD LAW SCHOOL CYBERLAW CLINIC
CENTER FOR INTERNET AND SOCIETY
559 Nathan Abbott Way
Stanford, California 94305-8610
Telephone: (650) 724-0517
Facsimile: (650) 723-4426

Attorneys for Defendant
BRIAN TRANSEAU p/k/a "BT"