# EXHIBIT 6

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

---oOo---

RALPH VARGAS and BLAND-RICKY )
ROBERTS, )
          )
         Plaintiffs, )
          ) No. 04CV 9772
vs. ) (JCF)
          )
          )
PFIZER, INC.; PUBLICIS, INC.; )
FLUID MUSIC; EAST WEST )
COMMUNICATIONS, INC. and )
BRIAN TRANSEAU, p/k/a "BT", )
          Defendants.

**CERTIFIED COPY**

Deposition of

BRIAN TRANSEAU

NON-CONFIDENTIAIL SECTIONS, PAGES 1-94; 112-182

CONFIDENTIAL SECTION, PAGES 95-111

Wednesday, August 16, 2006

Reported by:

GEORGE SCHUMER, CSR            (01-385207)



**LEGALINK®**
A **WORDWAVE** COMPANY

**LegaLink San Francisco**
575 Market Street, 11th Floor
San Francisco, CA 94105

tel (415) 357-4300
tel (800) 869-9132
fax (415) 357-4301

www.legalink.com

GLOBAL COURT REPORTING · LEGAL VIDEOGRAPHY · TRIAL SERVICES

1                         I N D E X

2     DEPOSITION OF BRIAN TRANSEAU

3     Wednesday, August 16, 2006

4

5     EXAMINATION BY:                              Page

6     MR. CHIN                                       6

7

8     AFTERNOON SESSION                            109

9

10                      E X H I B I T S

11    Number                                        Page

12    (Plaintiff exhibits)

13      6    Transeau blog excerpts, Bates 44-47      99

14      7    Notice of Deposition of Brian Transeau,  112
             8-11-06, 3 pages, includes Bates 43

15

        8    Answer to Second Amended Complaint,     117
16           11-28-05, 10 pages

17      9    Declaration of Brian Transeau, 6-28-05,  134
             3 pages

18

        10   BT 21, Compact Disk                     150

19

        11   Plaintiffs' First Set of Interrogatories 158
20           to Defendant, 8-31-05, 14 pages

21      12   Plaintiffs' First Request For The        167
             Production of Documents And Things To
22           Defendant Brian Transeau, 9-2-05, 11 pages

23

24

25

       **LegaLink, A Merrill Communications Company**   **(800) 869-9132**

1          BE IT REMEMBERED that, pursuant to Notice of

2    Taking Deposition, and on Wednesday, August 16, 2006,

3    commencing at the hour of 10:15 a.m. thereof, at the

4    Law Offices of Kirkland and Ellis, 555 California

5    Street, 27th Floor, San Francisco, California, before

6    me, George Schumer, a Certified Shorthand Reporter in

7    and for the State of California, personally appeared

8                         BRIAN TRANSEAU,

9          called as a witness by plaintiffs, who,

10   being by me first duly sworn, was thereupon

11   examined and testified as hereinafter set forth.

12                        - - -

13        KIRKLAND AND ELLIS, 555 California Street,

14   27th Floor, San Francisco, CA 94104, represented by

15   CHRISTOPHER W. KEEGAN, Attorney at Law, appeared as

16   counsel on behalf of defendant Transeau.

17   415-439-1400

18        LAW OFFICES OF PAUL A. CHIN, 233 Broadway,

19   5th Floor, New York, NY 10279, represented by PAUL

20   A. CHIN, Attorney at Law, appeared as counsel on

21   behalf of plaintiffs.  212-964-8030

22   {lawyerchin@aol.com}

23        STANFORD LAW SCHOOL, 559 Nathan Abbot Way,

24   Stanford, California 94305, represented by DAVID S.

25   OLSON, Attorney at Law, appeared as counsel on

3

1    behalf of defendant Transeau.  650-724-0517

2    {dolson@law.stanford.edu}

3              Also Present:  Video by Ted Hoppe

4                         -  -  -

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1    AUGUST 16, 2006                 10:15 A.M.

2         THE VIDEOGRAPHER: Here begins Volume 1,

3    Videotape 1, in the deposition of Brian Transeau, in

4    the matter of Ralph Vargas and Bland-Ricky Roberts vs.

5    Pfizer, Inc., et al., in the United States District

6    Court, Southern District of New York, Case No.

7    04-CV-9772.

8         Today's date is August 16, 2006.  The time on

9    the video monitor is 10:19.

10        The video operator today is Ted Hoppe, a

11    Notary Public contracted by LegaLink-Video Solutions,

12    San Francisco, California.  This video deposition is

13    taking place at 555 California Street, San Francisco.

14        Counsel, could you please voice-identify

15    yourselves, and state whom you represent?

16        MR. CHIN:  Paul Chin, the attorney for the

17    plaintiffs in this case, Ralph Vargas and Bland-Ricky

18    Roberts.

19        MR. KEEGAN:  Chris Keegan of Kirkland and

20    Ellis, for Brian Transeau.

21        MR. OLSON:  David Olson of Center for Internet

22    and Society, from Stanford Law School, for defendant

23    Brian Transeau.

24        THE VIDEOGRAPHER:  The court reporter today is

25    George Schumer of LegaLink-San Francisco.  Please

1  swear the witness in.

2      (Whereupon, BRIAN TRANSEAU was duly sworn)

3            EXAMINATION BY MR. CHIN

4      MR. CHIN:  Q.  Good morning, Mr. Transeau.

5   A.  Good morning.

6   Q.  As I indicated earlier, my name is Paul Chin;

7   I'm the attorney for the plaintiffs in this case.

8   Today we are going to be taking your deposition.

9        Have you ever had your deposition taken

10  before?

11  A.  Yes, I have.

12  Q.  So probably some of the rules that applied in

13  your previous depositions are going to apply here, and

14  I'll just go over some of the ground rules and we'll

15  get started.

16       I'm going to be asking you questions related

17  to this case.  I'm going to be asking your personal

18  knowledge.  If I ask you a question that you don't

19  understand, please let me know that you don't

20  understand, and I'll try to rephrase it as best I can.

21       I don't want you to guess at any of your

22  answers.  I don't want you to speculate, but I am

23  entitled to your best estimates.  And provided that

24  your best estimates can be given without guessing or

25  speculating, I would like to have those.

6

1          MR. KEEGAN: Objection. Ambiguous as to what

2     sound engineering is.

3          MR. CHIN: Q.  What is sound engineering?

4     A.  Sound engineering would be -- what I think you

5     are referring to is mixing records.

6          Q.  Is there another definition of sound

7     engineering that you know of?

8          A.  I have never heard it referred to in that --

9          Q.  How would you usually hear it?

10         A.  Mixing.

11         Q.  And so let's use the word "mixing," since that

12    is probably more appropriate.

13         When did you first learn the art of mixing?

14         A.  I started mixing my own music out of necessity

15    when I was -- I think I was 13 years old, about.

16         Q.  How did you go about learning how to mix?

17         A.  I moonlighted at a studio called Omega Studios

18    in Rockville, Maryland, and I learned to mix on a

19    Neve; SSL consoles; splicing on half-inch and

20    quarter-inch tape; recording to, you know, two-track,

21    24 -- sorry, to 24-track, 2-inch tape.  All those kind

22    of now-antiquated and defunct art forms.

23         Q.  When you were at the Omega Studios in

24    Rockville, Maryland, did they have a mixing board that

25    they used there?

1        A.   They had both a Neva and SSL console.   I
2   learned to mix on both of them.
3        Q.   How would you describe the Neva console?
4        A.   As warm.
5        Q.   Physically touching as warm?
6        A.   No.
7        Q.   What do you mean?
8        A.   It sounds warm.   It is a warm-sounding board.
9   That's how I answered your question.   I didn't
10  understand what you were specifically asking, so...
11       Q.   I'll make it a little clearer.
12            Was it a 24-track channel console?
13       A.   No.
14       Q.   How many channels would a Neva console have on
15  it?
16       A.   It depends.
17       Q.   The one that you worked on.
18       A.   I would say that it was probably an 80-input
19  Neva console.
20       Q.   What about the SSL?
21       A.   Roughly the same.
22       Q.   What does equipment like the Neva console and
23  SSL console -- what do they do, with respect to mixing
24  music?
25       A.   I'm not sure I understand your question.

1      Q.   What is the function of the console?

2      A.   The function of a recording console in

3   general?  Is that your question?

4      Q.   Yes, sure.

5      A.   The function of a recording console is as an

6   input device to -- like I said, antiquated recording

7   systems, which is analog tape.  Analog tape is not

8   even manufactured anymore.

9           But now a recording console functions as a

10  glorified input box to a computer, where one would do

11  subtle EQ'ing; compression; a variety of other

12  engineering techniques to sculpt sound, and to mix --

13  although I don't know anybody that mixes on large

14  mixing boards anymore.  I mix with a mouse.

15     Q.   What about to create dynamics?  Would you use

16  the console for that as well?

17          MR. KEEGAN:  Objection; vague.

18          MR. CHIN:   Q.  You can answer it.

19     A.   What do you mean by "dynamics"?

20     Q.   Do you have an understanding what the term

21  "dynamics" means with respect to mixing music?

22     A.   I don't understand the question.

23     Q.   Do you know what the word "dynamics" means, in

24  terms of recording music?

25     A.   I really don't understand that question,

24

1      A.   No.

2      Q.   What do you mean by "frequency"?

3      A.   The frequency information inherent in a sound

4  is -- depending on if the sound is stochastic or

5  periodic in nature, it can be a plethora of different

6  wave forms occurring simultaneously, or it can be one

7  periodic wave form with overtones, which is a guitar

8  strike or a mallet strike on a marimba, for example.

9      Q.   Anything else that comes to mind?

10     A.   No.

11     Q.   Do you know what sampling is?  Sampling a

12 sound.

13     A.   I understand, I think, the colloquial way you

14 are using the term "sampling," yes.

15     Q.   Is there a more professional way of using it,

16 rather than colloquial?

17     A.   I would say there is, actually.

18     Q.   Great.  So one at a time.

19          The colloquial form of sampling:  What do you

20 understand that to mean?

21     A.   The usage of the word "sampling" in the way

22 that I think that you are referring to it as -- would

23 be the process of someone taking the Tekniqs SP-1200

24 turntable, and the Akai MPC-3000, and grabbing a loop

25 off a Bob James record.  That's how I think you are

1  referring to it.

2      Q.  That would be sort of the colloquial form?

3      A.  That's correct.

4      Q.  Now give me the more professional definition

5  of what sampling is.

6      A.  It is actually -- sampling, as it were -- you

7  can define any kind of digital recording technique as

8  sampling.  So if you record a guitar into a computer,

9  you could technically call that sampling.

10     Q.  So would it be fair to say that either in the

11 colloquial form or the professional form, sampling is

12 the process of taking something -- whether it be music

13 or sound -- and putting it someplace else?

14     A.  No.

15     Q.  Is there some process that is -- that can be

16 used in order to sample something, whether you are

17 talking about it in the colloquial form or in the

18 professional form?

19     A.  I don't understand the question.  Sorry.

20     Q.  When you said "taking a guitar string, copying

21 it," and then you said "using it someplace else";

22 right?

23     A.  No.

24     Q.  Could you say that description again?

25     A.  I said a guitar strike being recorded into a

1    the Akai MPC-3000 and SB-12, no.

2        Q.  And have you had experience in the

3    professional form of sampling?

4        A.  I wouldn't characterize digital audio

5    recording as sampling, so I would say no.

6        Q.  So sampling doesn't apply to that?

7        A.  Sampling doesn't apply at all to my work.

8        Q.  Sampling doesn't apply at all to your work?

9        A.  That's correct.

10       Q.  Are you familiar with something called a

11   "stutter edit"?

12       A.  Yes, it is a technique I have developed --

13   proprietary sound design technique I have developed

14   over the last ten years.

15       Q.  What is a stutter edit?

16       A.  It is a very complicated question.  Do you

17   want the long answer, or the longer answer?

18       Q.  We both probably would prefer getting the

19   shorter answer.

20       A.  A stutter edit, the technique that I've

21   invented, is basically the repetition of microevents

22   of an audio file, and something I have coined as

23   calling "unreal note values" -- which are over

24   notatable note values, which would be 64th notes,

25   extending up to 128th, 256th, 512th; 1024th; 2048th

1    notes.  An extension of my stutter technique I have

2    developed over the last couple of years is applying

3    math curves, exponential and logarithmic curves, to

4    micronote values, and splining from pitch into rhythm

5    -- so the area between 12 Hertz and 20 Hertz.

6         That's the short definition.  And it sounds

7    really, really cool.

8         MR. KEEGAN:  The definition?

9         THE WITNESS:  The technique.

10         MR. CHIN:  Q.  I know that was the short

11    version you provided me, but would it be fair to say

12    that a stutter edit is the technique of taking a small

13    sample of a sound, and then repeating it in a musical

14    as well as a mathematical way?

15         A.  Yes.

16         Q.  And when you talk about a "sample of a sound,"

17    in that definition, we're not talking about the

18    colloquial form of sampling that we just discussed?

19         A.  I actually didn't catch that you said

20    "sample."  So I disagree with my last statement.

21         Q.  Let me state the definition again, kind of a

22    narrowed-down definition -- that the stutter edit is a

23    technique which consists of taking a small sample of a

24    sound --

25         A.  I would disagree with that.

Q.  Let me finish, and then you can disagree --
taking a small sample of a sound, and then repeating
it in a musical, as well as a mathematical way.

A.  I would disagree with that.

Q.  What part of that would you disagree with?

A.  I would define my stutter edit technique very
simply as the rhythmic repetition of audio material.

Q.  The rhythmic repetition of audio material?

A.  Yes.  The way that you stated it implies
sampling in the vernacular sense, which I said before
is not a part of my work, and it is not.  And it is
important for me to stress that, especially with what
we're talking about here.

Q.  Sure, I understand.

A.  So it could be something, for example, where I
have done a digital audio recording of a 110-piece
orchestra, as, where we're using as an example Fast
and the Furious, and a bar before a big down beat,
taken and done really cool sort of microslicing and
dicing job, to recorded audio material in a rhythmic
fashion, that yields these sort of exotic and
interesting rhythmic results.

Q.  So when you are doing this slicing and dicing,
you are slicing and dicing a sound; is that correct?

A.  That's correct.

1    Q.  And where does that sound come from?

2    A.  The sounds are all sounds I create.

3    Q.  So you have never -- your music doesn't

4    involve taking a copy of a recording, whether it be

5    the recording of a 10-piece orchestra or your own

6    recording -- and then putting it into a computer, and

7    then doing this slicing and dicing, and then having

8    some portion of that sliced sound be repeated over and

9    over in a musical and/or mathematical way?

10            MR. KEEGAN:  Objection.  Compound.

11            THE WITNESS:  I don't understand the question.

12            MR. CHIN:  Q.  Have you ever recorded music --

13    not your own -- into a computer, and then sliced and

14    diced that music, and taken a portion of it, and

15    created a stutter edit of that sliced and diced sound?

16    A.  No, I have not.

17            MR. KEEGAN:  Objection.  Compound.

18            MR. CHIN:  Q.  Do you know what granular

19    synthesis is?

20    A.  Very well.

21    Q.  Here again, if you have a short, layman's

22    definition?

23    A.  Those are big ones.

24            MR. KEEGAN:  Go ahead and give the

25    definitions.  You need to give a full definition of

1   what it is.  But to the extent that it is not 10

2   minutes.

3        THE WITNESS:  I apologize for being so

4   loquacious.

5        MR. CHIN:  Q.  That's all right.  If that's

6   what the answer calls for, that's fine.

7        A.  Granular synthesis is the process of taking a

8   sound file and splitting it into very small

9   components, and having the ability in some sound

10  design platforms to literally shred a sound file into

11  thousands of particles, and to recongeal them at will.

12       It is kind of akin to being able to scatter a

13  cloud and recongeal it at will.  It is a very modern

14  synthesis technique.

15       Q.  If I said that granular synthesis is the

16  equivalent of taking a deck of cards, spreading them

17  out, and then bringing them back together, would that

18  be the same thing?

19       A.  Yes, I think so.

20       Q.  And during this process, can you take, say,

21  the jack of hearts, and put it someplace else when you

22  bring it back together?

23       A.  I don't understand the question.  But just to

24  restate what granular synthesis is, granular synthesis

25  involves very, very small sound fragments.  We're

talking about things 10-to-the-15th samples, which

would be in the range of 1/10,000th of a second.

Q.   When you say "samples," what do you mean by

that?

A.   Samples is a technical definition of

in-recorded audio material.

Q.   In-recorded audio material?

A.   In-recorded audio material -- this is the way

I use the word "samples."  If I say I need to cut 15

samples into something, that means you cut sample --

used in this more popularized, or actually musically

correct usage of the word -- is -- a sample is one bit

of audio information.

Q.   Okay.

A.   It is the smallest not-subdividable division

of audio material.

Q.   So in my example of the deck of cards -- and

the deck of cards at the top is the jack of hearts --

granular synthesis is the spreading out of that whole

deck of cards, and could you put the jack of hearts,

when you bring it back together, at the bottom of the

deck?

A.   Actually, you would have the jack of hearts

subdivided into 10,000 micro pieces.  So you could

exchange 1/10,000th of it with 1/10,000th of another

1   card.

2       Q.   So basically granular synthesis allows you to

3   sort of mix and match sounds?

4       A.   No.

5       Q.   You can't mix and match sounds?

6       A.   No.

7       Q.   Can you mix and match a sound?

8       A.   It depends on what you are referring to.

9       Q.   The deck-of-cards example:  I'm just using

10  that as one sound; maybe the strike of a drum.

11      A.   You are completely mischaracterizing what

12  granular synthesis is, and what it sounds like.

13      Q.   Okay.

14      A.   Granular synthesis sounds like a massive

15  textural cloud.  You don't make rhythmic things with a

16  granular synthesis, ever.

17      Q.   What do you use it for?

18      A.   Use it for textures and ambiences; sound

19  design.  You would never use granular synthesis for

20  designing anything rhythmic, ever.

21      Q.   Would you say that granular synthesis involves

22  sound manipulation?

23      A.   Define "sound manipulation."

24      Q.   I'm not sure.  The ability to manipulate

25  sound.

1   see.

2        Four or five.

3        Q.   Okay, so there were more vocals on ESCM?

4        A.   I could afford a microphone at that point.

5        Q.   Now --

6        A.   That's true, too.  I couldn't afford a

7   microphone for my first record.

8        Q.   I represent recording artists, and they go

9   through -- many recording artists go through that pain

10  still.

11       A.   Yes.

12       Q.   ESCM:  Did you say that it fell under a

13  particular genre of music?  Or you couldn't define it?

14       A.   It is more eclectic, ESCM, than my first

15  album.

16       Q.   Eclectic?

17       A.   Stylistically eclectic.

18       Q.   What styles?

19       A.   Stylistic break beat; trance; progressive

20  house.  There is a track that's fairly industrial

21  sounding.  And all of it is kind of interspersed with

22  this big, washy Eno-esk ambience, so it is not really

23  definable, honestly.

24       Q.   That was 1997.  What was your third album?

25  Strike that.  Did you record a third album?

1    A.  Yes.

2    Q.  What was your third album?

3    A.  My third album is called "Movement In Still

4  Life."

5    Q.  Do you know what year that was released?

6    A.  1999, I believe, or 2000.  Depending on the

7  territory.

8    Q.  Was ESCM and Movement In Still Life also

9  distributed by Warner Brothers?

10    A.  ESCM was distributed by Warner Brothers -- by

11  Kinetic Records in America; by Perfecto/East West --

12  Warner Brothers in England.  In different territories

13  it was distributed by different companies.

14    Q.  But Warner Brothers was the main distributor;

15  the main label?

16    A.  For England.

17    Q.  Not for the US?

18    A.  No.

19    Q.  It was East West for the US?

20    A.  No, it was Kinetic -- which is also a

21  subsidiary of East West.  But it is also related to

22  Reprise Records.

23    Q.  Reprise is not related to Warner Brothers?

24    A.  Reprise is defunct now.

25    Q.  In 1997?

78

1    A.   No, Reprise and Warner Brothers were two

2  companies that operated in the same space.  So I don't

3  know, honestly.  I wouldn't be able to tell you that.

4    Q.   And "Movement In Still Life":  How would you

5  define the genre of music on that album?

6    A.   Again, that was even more eclectic than the

7  last.

8    Q.   Did it have any break beats?

9    A.   It had a track called -- let's see.  There was

10  a track called "Ride" that -- when I say "break beat,"

11  I mean break beat in a different way than I think you

12  mean break beat.

13      There is a style of music popularized by

14  artists such as Adam Freeland; Meat Katie

15  Dylan-Rhymes, that functions in the BPM range of

16  128-135 beats per minute.  It is influenced by drum

17  and bass and jungle bass lines, and does not follow a

18  four-on-the-floor pattern, as other styles of house

19  music or electronic music typically follow.

20      So there were what would be classified as Nu

21  Skool Break beat tracks on there, and two or three of

22  them.

23    Q.   And are you saying that the Nu Skool Break

24  beats were different than break beats that we would

25  consider in, say, the genre of music of hip-hop?

79

1     A.  They are not even related.

2     Q.  Not related at all?

3     A.  Not even remotely related.

4     Q.  So the break beats in Movement In Still Life

5  are not related to break beats in, say, hip-hop?

6     A.  No, there is actually a track on Movement In

7  Still Life that's a hip-hop track.  There is a

8  down-tempo track on Movement In Still Life that's

9  actually very much a hip-hop track.  But the Nu Skool

10  Break beat tracks on the record aren't even kind of

11  stylistically related to hip-hop.

12     Q.  What is the hip-hop break beat that's on

13  Movement In Still Life?  What is the name of it?

14        MR. KEECAN:  Objection.  Mischaracterization.

15        MR. CHIN:  Q.  You said there was a hip-hop

16  beat on Movement In Still Life.

17     A.  No, I said there was a hip-hop track on

18  Movement In Still Life.  It is called "Love on Haight

19  Street."

20     Q.  Did that have vocals?

21     A.  Yes, it does.

22     Q.  Who sang the vocals?

23     A.  It is rhyming; it is not singing.

24     Q.  Who rhymed the vocals?

25     A.  Rasco, and a guy called 50 Grand.

1    A.  No, on the song "Movement In Still Life,"

2  which is a song on the album "Movement In Still Life."

3    Q.  I thought that you said you didn't use any

4  samples on Movement In Still Life.

5    A.  No, I said "on ESCM."

6    Q.  You are right.

7    How did you go about getting that sample from

8  Sugar Hill Gang, to get on the song of Movement In

9  Still Life?  Can you tell me -- take me through the

10  process of how it is done.

11    A.  Sure, I would be happy to.

12    I had my friend Rasco, that's a Bay Area

13  rapper, rhyme over the top of a track that I put

14  together, which was the track Movement In Still Life,

15  which was unnamed at the time.  And he did a vocal.

16    And in it he said that line, and I thought

17  that line was really cool, and I didn't actually like

18  the rest of his vocal, but we were talking, and he

19  goes "that vocal" -- "that line" -- "is from a Sugar

20  Hill Gang song."

21    So I had the box set of the Sugar Hill Gang

22  collection, and I thought it would be really cool --

23  because I hadn't ever sampled before, because --

24  anybody that follows my work, or knows my work, knows

25  that so much of the focus of what I do is creating

85

1    sounds literally from scratch, even at times from

2    command line, that it was actually a very cool thing

3    to my fan base that I was going to -- you know, I

4    thought it would be a cool thing that I was going to

5    do that.

6        So I decided, instead of using Rasco's vocal,

7    to -- I took the vocal from off a CD.  There was an a

8    Capella version of the song on that CD, and I asked my

9    manager to call Sugar Hill Records, and they have a

10   sample clearance department.  And so we cleared the

11   sample and put it on the album.

12   Q.  Now the actual process of sampling that a

13   Capella vocal:  How did you do that?  Did you use a

14   sampling machine?

15   A.  No.

16   Q.  Could you tell me that process?  On how you

17   sampled the vocals.

18   A.  A sample in the colloquial term?

19   Q.  As you are using it in this, yes.

20   A.  I put a CD in my CD-ROM drive of my computer,

21   and I pulled the audio track off the CD.  And I found

22   that line, and cut it out, and used it in my

23   recording.

24   Q.  How did you cut it out?

25   A.  Using audio recording software.

1      Q.   Which was?

2      A.   Logic Audio.

3      Q.   Now Logic Audio is a software; correct?

4      A.   It is software, that's right.

5      Q.   And when you sampled that vocal, do you recall

6   what the sample rate was?

7      A.   Yes, I do, actually.

8      Q.   What was it?

9      A.   44-1.

10     Q.   44-1 hertz; right?

11     A.   Kilohertz.

12     Q.   When you sampled, did you have to use

13   plug-ins?

14     A.   No.

15     Q.   That Logic Audio -- does it have a native

16   sample rate?

17     A.   No, it has multiple sample rates.

18     Q.   When you come up, does it start off at a

19   native sample rate?

20     A.   No.

21     Q.   So --

22     A.   It is user-defined.

23     Q.   So it doesn't have one that it loads up with?

24     A.   It may.  But it is -- no, it is

25   user-definable.

1   complaint.  I'll show you a copy of the second

2   complaint.  I'll show you what the defendants have

3   previously marked as Defendant Exhibit 11.

4       A.  (Examining document)

5           I have never seen this.

6       Q.  Can you summarize plaintiffs' allegations

7   against you in this case?

8           MR. KEEGAN:  I'll object, to the extent it is

9   calling for legal analysis or legal conclusion.

10          MR. CHIN:  Just his personal knowledge.

11          THE WITNESS:  Can you ask the question again?

12          MR. CHIN:  Q.  Can you summarize for me, in

13  your own words, what you believe plaintiffs' claims

14  are against you?

15      A.  I think the plaintiff believes that I sampled

16  his drum loop.

17      Q.  To your understanding, is it the plaintiffs'

18  position that you sampled a drum loop in the creation

19  of Aparthenonia?

20      A.  My belief is that the plaintiff has obviously

21  not an understanding of what I do, and has said that I

22  sampled something off some record I have never, ever

23  seen in my life; never had access to; don't know

24  anything about.

25          None of my friends, even from the hip-hop

116

Q.   What drum machines did you use?

A.   Roland TR-808; TR-909.  A Roland CR-78.
TR-606.  That's it.

Q.   And you said "a computer."  What computer did
you use?

MR. KEEGAN:  Just to clarify, Paragraph 5 is
about Aparthenonia.  Are you talking about Breakz, the
whole album, or Aparthenonia?

MR. CHIN:  Aparthenonia.

THE WITNESS:  That's not what Paragraph 5 is
talking about.  I have been answering for the whole
record.

MR. CHIN:  Q.  Since you have started talking
about the whole record, then I'll ask you about
Aparthenonia.

A.   Okay.

Q.   What computer did you use?

A.   A blue and white G-3.  And -- sorry.  And a
Dell PC, too.  There is an application called Stomper
on the Dell PC, that's used for synthesis of snare
drums and kick drums, that I used to use a lot during
that time period.

Q.   Anything else?

A.   In the way of computers?

Q.   Yes.

1          A.   No.

2          Q.   Now, for Aparthenonia, what software

3     application did you use?

4          A.   Reason and Logic.   Reason 1.0, and Logic,

5     roughly version 4.7.

6          Q.   What drum machines did you use?

7          A.   None.   I used the soft drum machine, Red Drum.

8     It is not a plug-in.   It is a function of Reason.   It

9     is how you make beats in Reason.   The Rex player in

10    Red Drum.   So if you want to classify that as a drum

11    machine, I did use that.

12         Q.   But it wasn't a separate plug-in?

13         A.   No, it wasn't.

14         Q.   Which computer did you use?

15         A.   The G-3.   So I used Reason 1.0 with the Reason

16    factory sound library.   And Logic.   And then in

17    mixing, I used the plug-ins I stated.

18         Q.   You indicate in Paragraph 5 that Aparthenonia

19    is "programmed."   What do you mean by that?

20         A.   I mean, when I say "programmed," that it is a

21    beat created in a computer.

22         Q.   Then you say, "The percussion elements

23    originated in an off-the-shelf music generator

24    computer program, Propellerhead Reason."

25         A.   That's correct.

141

1    Q.  What percussion elements are you referring to?

2    A.  Kick drum, snare drum, high hat, and

3  low-velocity snare notes, which I have heard referred

4  to as ghost notes.

5    Q.  Any tom-toms?

6    A.  No.

7    Q.  The other snare drum -- you said a low

8  velocity?

9    A.  That's right.

10    Q.  Is there any particular reason why you chose

11  to use a low-velocity snare drum?

12    A.  If you will see any of my interviews, I will

13  talk about programming beats.  And one of the

14  characteristics of a live drummer, that makes a live

15  drummer sound like a live drummer, is the syncopation

16  between the back beat hits of a snare drum.  And it is

17  sort of one of my specialties in back beats, to make

18  beats that sound live.

19    Q.  The low-velocity snare drum, you indicated

20  that it had been referred to by the plaintiff as

21  "ghost notes"?

22    A.  Yes.

23    Q.  Do you know what a ghost note is?

24    A.  I understood the term.  Yes, I know what it

25  is.

1  working in Reason for years, I probably have saved 200

2  patches total, and I have done tens of thousands of

3  sounds in reason.

4      Q.  So when you say you "rendered it down," what

5  does that mean?

6      A.  Again, it is easier to show than to speak

7  about.

8          There is a function called "render song" or

9  "render loop" as an audio file.  So it is bouncing out

10  the beat you are working on, or the pad you are

11  working on, or the bass line you are talking about or

12  whatever.

13      Q.  Did you bounce it internally to a disk, or did

14  you bounce it mixed to a DAT?

15      A.  At that time I would have bounced it out to an

16  external hard drive.  DAT players are a thing of the

17  90's.

18      Q.  So you bounced it out to an external hard

19  drive?

20      A.  To an external skuzzy drive.  FireWire didn't

21  exist at that time.

22      Q.  Did you use Midi?

23      A.  No.

24      Q.  And where were you, when you created

25  Aparthenonia?

1      A.   On the back of my tour bus.

2      Q.   How long did it take for you to create

3 Aparthenonia on the back of your tour bus?

4      A.   I would be speculating, because there's 403

5 beats on the record.

6      Q.   403 versions of Aparthenonia?

7      A.   No, there's 403 beats on my record.

8      Q.   I'm talking about Aparthenonia.  Just that

9 one.

10      A.   I would be speculating.  Five minutes or less.

11      Q.   That would kind of coincide with the time that

12 you mentioned in Plaintiff Exhibit 6.

13      A.   That's right, yes.  Again, which I'm happy to

14 demonstrate at any time.

15      Q.   And in Paragraph 6, you say that Aparthenonia

16 is not a recording of any work, and it contains no

17 sampling of any other sound recording.  Is that

18 correct?

19      A.   That's correct.

20      Q.   And that's true?

21      A.   Yes, it is true.

22           MR. CHIN:  Let's get this marked as 10.

23           (Document referred to herein marked

24           for identification Exhibit 10)

25           MR. CHIN:  We're just going to go off the

1    record, so he can change the tape.

2         THE VIDEOGRAPHER:  The time now is 3:03.  We

3    are going off videotape record.  This also is the

4    conclusion of Tape 2 in the deposition of Brian

5    Transeau.

6         (Recess taken, 3:03-3:08 p.m.)

7         THE VIDEOGRAPHER:  The time now is 3:08.

8    We're back on the videotape record.  This also marks

9    the beginning of Tape 3 in the deposition of Brian

10   Transeau.

11        Please continue.

12        MR. CHIN:  Q.  Mr. Transeau, what drum sounds

13   were you able to extract out of Reason, in order to

14   create Aparthenonia?

15        MR. KEEGAN:  Objection.  Mischaracterizes the

16   testimony.

17        THE WITNESS:  Reason has a factory sound

18   library in it, that is filled with both loops,

19   one-shots, synthesis patches, and the like.  So I

20   typically, in making beats in Reason -- what I would

21   be demonstrating to you -- it would be taking samples

22   out of the Reason one-shot library, combining them and

23   programming a beat.

24        MR. CHIN:  Q.  Do you know which ones you

25   selected?

1    A.  I actually found the bulk of them, yes.

2    Q.  Are they named?

3    A.  Yes, they are named.

4    Q.  Can you tell me their names?

5    A.  I don't remember their names.

6    Q.  Do you have something written down, which has

7    the name?

8    A.  No, I know where to look for them in the

9    library.  They are in the hip-hop section of the

10   one-shot library.  So I have to flip through them and

11   listen to them to find them.

12       But actually, the drums that I use for

13   Aparthenonia are actually a combination of drums.  So

14   there's not just the one kick drum or one snare drum

15   or one high hat.  They are a conglomerate of multiple

16   sound sources.

17       MR. CHIN:  Let me go off the record.  It is my

18   hotel with my travel information.

19       THE VIDEOGRAPHER:  The time now is 3:10, and

20   we're going off videotape record.

21       (Discussion off the record)

22       THE VIDEOGRAPHER:  The time now is 3:10.

23   We're back on the videotape record.

24       MR. CHIN:  Q.  If you were to look back into

25   that hip-hop section in the sound library of Reason,

1    would you be able to identify which ones you used in

2    order to -- which one of the drum sounds you used to

3    create Aparthenonia?

4         A.   By sound, yes.

5         Q.   If we were to ask you -- the plaintiffs would

6    ask you to do that, not now, but at a later time, and

7    to provide that information to us, could you do that?

8         A.   By sound file?  Or by sound?

9         Q.   After listening to it and identifying which

10   ones you used, write it down and provide that

11   information to us.  Could you do that?

12        A.   It is possible that I could do that, yes.

13             MR. CHIN:  We would like to ask that he do

14   that.

15             MR. KEEGAN:  Sure, we can talk about it at a

16   break, and we'll need you to sort of put it formally

17   in a letter, obviously.

18             MR. CHIN:  No problem.

19        Q.   With respect to ghost notes that we just

20   talked about, were the ghost note sounds also created

21   from drum sounds in Reason?

22        A.   Yes.

23        Q.   And if you had the time and could listen

24   through the section of the sound library in Reason in

25   which you got the ghost notes, could you provide that

1   information to us?

2       A.  Yes, but I couldn't provide what I did to

3   them.

4       Q.  That's fine.

5       A.  So it is not going to sound anything like a

6   ghost note, unless you watch me do it.

7       Q.  It will help to at least know what you started

8   off with.

9       A.  It won't.

10      Q.  To me it will.

11          Can you do that?

12      A.  I can give you sound file names that will

13  sound nothing like a ghost note.  I can make them for

14  you in real time.  I know you really want to give a

15  performance right now; we can't do it right now.

16          We may be able to do it; I doubt it, but we

17  just can't.  So I would like to go just straight

18  through, and if you can, give me the names of the drum

19  sounds that you used in order to create the ghost

20  notes, and if you can do that, that will be fine.

21          Can you do that?

22      A.  It is possible.

23      Q.  Now I want to show you a document that we have

24  got marked as Plaintiff Exhibit 10.  It is a CD with a

25  Bates stamp number BT 00021.  I want you to take a

1        So once you finished creating Aparthenonia,

2   and it was rendered, that process -- how long did it

3   take you?

4        A.   Again, I would be speculating.  There were 403

5   beats on my sample CD.

6        Q.   So you don't really remember?

7        A.   Can you make your question more specific?

8        Q.   Yes, how long did it take you to bring

9   Aparthenonia to where it is on that CD, Plaintiff

10  Exhibit 10?

11       A.   It took about five minutes or less to program

12  the beat.  And then to mix I would be speculating,

13  because I spent different amounts of time on different

14  beats.

15       MR. KEEGAN:  You can give an estimate or

16  range, if you recall.

17       THE WITNESS:  At the most, 10 more minutes.

18  So 15 minutes tops to mix a one-bar beat.

19       MR. CHIN:  Q.  Mr. Transeau, do you recall

20  receiving interrogatories from the plaintiffs -- and

21  interrogatories being questions in written form that

22  the plaintiffs wanted you to answer.

23       A.   No, I don't.

24       MR. CHIN:  Let's get this marked as Plaintiff

25  Exhibit 11.

1          (Document referred to herein marked

2          for identification Exhibit 11)

3          THE WITNESS:  (Examining document)

4          MR. CHIN:  Q.  Mr. Transeau, I have produced

5  to you a copy of what we have marked as Plaintiff

6  Exhibit 11.  It is a document entitled "Plaintiffs'

7  First Set of Interrogatories to Defendant Brian

8  Transeau, and Responses Thereto."

9          I would like you to look through this

10  document, and once you have done it, let me know, and

11  I'll ask you some questions.

12     A.  I remember this document.

13     Q.  Can you tell me what that document is?

14     A.  It is responses to questions that were asked.

15     Q.  By plaintiffs?

16     A.  That's right.

17     Q.  And the responses contained in Plaintiff

18  Exhibit 11, in your interrogatories -- are they true

19  and accurate?

20     A.  I actually noticed something inaccurate in

21  here.  It says I used a laptop.  That's not accurate.

22     Q.  That's incorrect?

23     A.  Yes.

24     MR. KEEGAN:  Which paragraph?

25     MR. CHIN:  Q.  Yes, which one is that?

158

1    the G-3 here, up and running, for inspection.  It has

2    got Reason in the state that it is in right now.  We

3    turned it on yesterday; didn't really play around with

4    anything.  There seems to be sort of a file mismatch

5    right now, but all of the software is there, just so

6    you know.  But we'll make that available for mutual

7    inspection at a mutually convenient time, if that

8    works.

9         MR. CHIN:  Right, because I don't have the

10    sophistication or the knowledge to look at it, sort of

11    like Mr. Transeau looking at the affirmative defenses.

12         MR. KEEGAN:  And with that, we actually have

13    no questions for redirect.

14         MR. CHIN:  Thank you.

15         THE VIDEOGRAPHER:  Let's go off the record.

16    Here marks the end of Videotape 3 in the deposition of

17    Brian Transeau.  The original videotapes will be

18    retained by LegaLink-Video Solutions, located at 50

19    First Street, San Francisco, California.  Going off

20    the record, the time now is 3:59.

21              (Deposition concluded, 3:59 p.m.)

22

23

24

25

LegaLink, A Merrill Communications Company    (800) 869-9132

1                    DECLARATION OF WITNESS

2          I declare under penalty of perjury that

3     the foregoing is true and correct.  Subscribed at

4     _____, California, this

5     _____day of _____, 2006.

6

7

8     _____

9          Signature of witness

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**LegaLink, A Merrill Communications Company**   **(800) 869-9132**