6B3YVASC                                                    1

 1    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF NEW YORK
 2    ------------------------------x

 3    RALPH VARGAS, et al.,

 4                    Plaintiffs,

 5              v.                        04 Civil 9772 (WHP)

 6    BRIAN TRANSEAU, et al.,

 7                    Defendants.

 8    ------------------------------x

 9                                       November 3, 2006
10                                       11:30 a.m.

11    Before:

12              HON. WILLIAM H. PAULEY III,

13                                       District Judge

14

15                       APPEARANCES

16    PAUL A. CHIN, ESQ.,
      Attorney for Plaintiffs
17

18    ANTHONY T. FALZONE, ESQ.,
      Attorney  for defendant Brian Transeau
19

20    KIRKLAND & ELLIS, LLP
      Attorneys  for defendant Brian Transeau
21         Of counsel

22    ERICK M. STAHL, ESQ., (By telephone)
      Attorney for Defendant East West Communications
23

24

25

Dockets.Justia.com

1    THE CLERK:  In the matter on for argument Vargas

2  against Pfizer.

3    Will counsel for the plaintiff please state your

4  appearance for the record.

5    MR. CHIN:  Good morning.  Paul Chin for the plaintiff.

6    THE CLERK:  Counsel for the defendants.

7    MR. FALZONE:  Good morning, your Honor.  Anthony

8  Falzone represented Brian Transeau.

9    With me at my rights is jULIE Ahrens and Alice Barber

10  also representing Transeau.

11    If it please the court, I would like Ms. Ahrens to

12  address the motion.

13    MR. STAHL:  I should state my appearance as well.

14  Eric Stahl, East West Communications by telephone.

15    THE COURT:  Good morning to all of you.

16    This is oral argument on the defendant's motion for

17  summary judgment.

18    Do you wish to be heard?

19    MS. AHRENS:  Yes, your Honor.

20    Your Honor, plaintiff's theory of infringement in this

21  case is one of theft.  They claim that Brian Transeau BT, that

22  he created his beat by taking plaintiff's vinyl album, copying

23  the track Bust Dat Groove, changing the order of the drum

24  strikes in that song and making his own beat, which he calls

25  Aparthenonia.

1    Plaintiff has the burden of proving this theory of any

2    copying, but they don't have sufficient evidence to do so.

3    Plaintiff concedes they don't have any evidence of access in

4    this case.  They have abandoned that argument entirely in their

5    papers.  So they are attempting to prove digital copying with

6    absolutely no evidence that BT ever possessed their album.  By

7    so doing plaintiff rests their entire case on the stringent

8    striking similarity test.  To avoid dismissal, plaintiffs must

9    demonstrate that the two works are so strikingly similar that

10   all of the evidence, taken as a whole, precludes any reasonable

11   possibility that BT independently created his beat.  Plaintiffs

12   don't have sufficient evidence to do so.

13        Your Honor, this is not a battle of the experts --

14        THE COURT:  The Second Circuit's opinion in Gates at

15   least implies that once there is conflict in expert testimony

16   on striking similarity, it's difficult, if not impossible, to

17   grant summary judgment.  How do you deal with that precedent?

18        MS. AHRENS:  Your Honor, the Gast case, and I quote,

19   the quote is, plaintiff has not proved striking similarity

20   sufficient to sustain a finding of copying if the evidence as a

21   whole does not preclude any reasonable possibility of

22   independent creation.

23        This case is not a case of a battle of the experts.

24   Plaintiff's own experts do not support plaintiff's theory.

25        None of plaintiffs' three experts are capable of

1  precluding the very reasonable possibility that Aparthenonia

2  was independently created using the specific electronic sound

3  software that BT testified he used to create Aparthenonia.  So

4  the question here is whether plaintiffs have sufficient

5  evidence from which a reasonable jury could conclude that there

6  is no possibility that BT independently created his work.  The

7  plaintiffs don't have sufficient evidence.

8       Your Honor, there are several cases where plaintiffs

9  who do not have any evidence of access but do have experts who

10  use the magic works striking similarity, they do not survive

11  summary judgment where there those experts cannot preclude any

12  reasonable possibility of independent creation.

13       THE COURT:  But didn't Ritter testify that the

14  plaintiff and the defendant's works were identical?

15       MS. AHRENS:  Your Honor, Matthew Ritter's conclusion

16  that the works are identical are problematic for a couple of

17  reasons.

18       First, Mr. Ritter bases his opinion on similarity

19  using only his unaided ear, which by plaintiff's own admission

20  is a less sophisticated method than their other experts, Dr.

21  Smith, which he could not identify a single drum strike in

22  Aparthenonia that is identical or even a direct copy that is in

23  Bust Dat Groove.

24       But nevertheless, even wholly crediting Mr. Ritter's

25  conclusion that the beats are identical, Mr. Ritter admitted

1   that he is not sure whether any of those exact same sounds

2   could have been created without copying Bust Dat Groove, and I

3   quote, "for all I know, you know, maybe there is a piece of

4   equipment out there that could take that exact same sound and

5   mimic it or something."

6           Indeed, Mr. Ritter has no knowledge of the specific

7   technology we are talking about here, which is Propellerhead

8   Reason.  Before this case he had never even heard of it.  He

9   knows nothing about his capability of producing sound or how

10  sounds generated from that program would compare to the sounds

11  in Bust Dat Groove.

12          Mr. Ritter admitted, "I don't know enough about the

13  electronic music.  I actually know very little about it so I

14  don't know for sure if there is technology that exists that

15  could do that."

16          That is an admission that it is possible, that there

17  is technology that could have created the work at issue here.

18          THE COURT:  But isn't that an issue of fact for the

19  jury?

20          MS. AHRENS:  Your Honor, it's not an issue of fact

21  because the plaintiffs bear the burden because they have no

22  evidence of access.  They are in the narrow circumstances of

23  proving it is so strikingly similar that there is no

24  possibility of independent creation, it had to be copied, and

25  under the case law of TC, Mary and Gimmy, those pieces show

1    that on summary judgment where a plaintiff's expert admits that

2    it is possible, even if it is unlikely but admits that it is

3    possible, summary judgment can be entered for the defendant

4    because the plaintiffs haven't met their burden.  They have not

5    precluded any reasonable possibility of independent creation.

6         THE COURT:  On the question of independent creation,

7    why didn't the defendant submit evidence of re-enactment of the

8    creation of Aparthenonia using the Apple G3 and the Reason

9    software?

10        MS. AHRENS:  Your Honor, during Mr. Transeau's

11   deposition he offered several times to make that demonstration

12   and plaintiffs have turned a blind eye and refused to listen to

13   that.

14        THE COURT:  That doesn't preclude you from putting

15   that very question to the witness in the deposition or offering

16   an affidavit, does it?

17        MS. AHRENS:  It doesn't, your Honor, but we have

18   offered affidavits, we have declarations of Mr. Transeau in the

19   record where he states how he created the beat, what software

20   he used, when he created it, the fact that he didn't own a

21   turntable, he wasn't using vinyl --

22        THE COURT:  I know about all of that, but I am asking,

23   I guess, a simpler question.

24        When I look at all of this, isn't the real key what a

25   re-enactment of the creation of Aparthenonia would show since

1   the equipment -- the parties agree that the equipment, the

2   precise equipment that Transeau said he used to create it in

3   the first place still exists?  He could have recreated it and

4   then these experts from Berkeley could have done an FFT

5   analysis on it, right?

6           MS. AHRENS:  Yes, your Honor.

7           THE COURT:  So my question is, if you want to

8   establish independent creation, why didn't you submit evidence

9   specifically doing that?

10          I mean, it's not the plaintiff's burden at a

11  deposition to offer evidence that helps the defendant.

12          MS. AHRENS:  Right, your Honor.  But it is the

13  plaintiff's burden in this case to preclude the possibility of

14  independent creation.  They have that burden.  They have that

15  burden because they have clearly stated their position in this

16  case because they have no evidence of access, only relying on

17  striking similarity.  They, under the case law, under the case

18  law of Gast and Republic and all of those cases, clearly state

19  that it is the plaintiff and they cannot survive dismissal

20  unless they preclude the possibility of independent creation,

21  and the evidence of independent creation is unrebutted.  BT's

22  declaration states the manner in which he created this work,

23  how he went about making it.

24          THE COURT:  I know he says all of that, but wouldn't

25  the actual recreation of Aparthenonia be, to coin a term, the

1   very best evidence that could be offered?

2          MS. AHRENS:  Yes, your Honor, as would --

3          THE COURT:  So why not do it?

4          MS. AHRENS:  Your Honor, the corresponding question to

5   that is, why don't defendants -- why can't they preclude it.

6   They have experts.  None of their experts have experienced

7   using it and they can't deny what Mr. Transeau has said he has

8   done.  No one on the plaintiffs' side can rebut what

9   Mr. Transeau and his corroborating witnesses testified under

10  oath how this beat was made.

11         THE COURT:  Right.  But then I'm left with dueling

12  experts, and you may say that it's not really an even dual and

13  I might agree that it's not really an even dual, but it still

14  winds up being a question for a jury.

15         I mean, at the end of the day, you are the folks who

16  are here moving for summary judgment to avoid going to trial,

17  and is there any reason why the very best evidence that you

18  could offer on the question of independent creation has not

19  been submitted to the court or couldn't be submitted after this

20  argument?

21         MS. AHRENS:  No, your Honor.

22         The point that I would like to make is it is just that

23  the issue whether it is dueling experts, you don't even have to

24  consider what the defendants' experts say, there is no dual,

25  because the plaintiff's experts admit that they can't -- they

1  cannot preclude the reasonable possibility of independent

2  creation. Because they can't prove that, that is their burden,

3  it is their burden at summary judgment, and they bear the

4  responsibility of that preclusion, and because they can't and

5  they have not, they do not have sufficient evidence to create

6  an issue for the jury.

7          THE COURT: All right.

8          I recognize that you keep saying that and I'm saying

9  something else. So I have tried to be clear. I'm telling you

10 what I am interested in, a recreation.

11         Can you provide it?

12         MS. AHRENS: Yes, your Honor, our client can provide

13 that.

14         THE COURT: All right.

15         MS. AHRENS: Our client's testimony during his

16 deposition is that he can do that within, you know, five

17 minutes of opening a box of Propellerhead Reason and he is

18 seeking to do that.

19         THE COURT: Would you be able to provide the FFT

20 analysis of that recreation?

21         MS. AHRENS: Yes, your Honor.

22         THE COURT: All right. I am going to let you do that,

23 because I think it's important on this motion.

24         MS. AHRENS: Okay.

25         THE COURT: And I am going to give the plaintiff an

1  opportunity to respond to it.

2        MS. AHRENS:  Okay.

3        Your Honor, as far as determining the best method and

4  how we can do that, we are open to discuss that, whether it

5  should be in a deposition-like setting or submit it by

6  affidavit of what he says he is doing.

7        THE COURT:  Let me hear from your adversary.

8        MR. CHIN:  Thank you, your Honor.

9        First I would object to the court's consideration of

10  allowing the defendant at this stage to now do something that

11  the plaintiffs, in fact, did very early on, and that is to take

12  what evidence we had and show how this recreation occurred.

13        They had that evidence in front of them.  They should

14  have said, just as your Honor suggested, why don't we do the

15  same thing.  If he got the beat from Propellerhead Reason,

16  which, by the way, has never been produced in this case -- I

17  don't have a copy of it, never received it, requested it but

18  never got a copy of it -- I got this from Propellerhead Reason

19  and then I'll take these beats out and make the same thing

20  again, submit it to my experts, prepare a report, get it to the

21  plaintiffs and they will do the same thing.

22        But now at the eleventh hour while we are prepared to

23  go to trial, to have them do that now is to set up another long

24  line of discovery that we can certainly avoid for three

25  reasons:

1           I'm sorry, I didn't mean to interrupt you.

2           THE COURT:  I don't think it would be a long line of

3     discovery.  I mean, at the end of the day, I am asked to decide

4     this motion.  I'm interested in it.  So I think -- I don't

5     understand why you fight it, recognizing the colloquy that I

6     have had here.  I mean, look how long it took me to get the

7     defendant to recognize they could provide it.  All they want to

8     talk about is what your burden is.

9           MR. CHIN:  I understand and I understand the court's

10    interest in receiving that kind of demonstration, but the point

11    is that Repp v. Webber controls this fact and the facts of this

12    case are very similar and the legal issues in this case are

13    very similar to Repp v. Webber.  It says three very important

14    things, Judge:

15          First, on a motion for summary judgment, the evidence

16    of the non-moving party must be assumed as true.

17          The second part of that is, any ambiguities in that

18    evidence must be inferred in favor of the non-moving party.

19          This is not a case where there is no evidence at all.

20    We have a music expert, we have a digital engineer expert and

21    we have an FFT expert who all say that one is indistinguishable

22    from the other.  That evidence has to be assumed as true.

23          Now, the defendants, of course, have said that their

24    experts say something other than that.  Well, Repp v. Webber

25    actually better than Gast says what should happen.

1    The court said, and I quote, it was not for the

2 district court to make this factual finding where such strong

3 competing evidence was before it.  The issue of striking

4 similarity by virtue of the supported opinions of the experts,

5 including that of profession Ferrara for the defendants, was

6 shown to be a genuine issue of material fact.

7    That is on competing evidence of striking similarity

8 and the Second Circuit says when you have that, let the jury

9 decide, let the jury decide.

10    Finally, with respect to defendants' claim of

11 independent creation, well, I would like to take a quote from

12 Repp v. Webber which says proof of independent creation,

13 whether direct or inferential, should be taken with a gain of

14 salt.

15    And that adage is particularly applicable in this

16 case.  What we have here is Mr. Transeau saying one of two of

17 three of four various scenarios on how he created this.  First

18 he created it on the laptop, then he created it on the G3

19 computer.  First it took him an hour to create it, then it took

20 him five minutes to create it.

21    He submits affidavits of witnesses he claims saw him

22 create it from scratch, but in that same affidavit the witness

23 didn't even meet him until after the music was composed.

24    I mean, the jury should sit down and listen to this

25 kind of evidence and make a determination as to whether or not

1    it is believable or not.

2         The evidence of independent creation, I submit,

3    respectfully, is only the self-serving affidavit of

4    Mr. Transeau and that's all we have here.  That's all we have

5    here.

6         The evidence of our -- and with respect to Dr.

7    Bullinger with the FFT analysis, I did a lot of research when

8    the defendants first offered this evidence to me.  I have not

9    found a case in any district court in which FFT analysis has

10   been used as a premise for proving substantial similarity,

11   striking similarity or otherwise.

12        THE COURT:  But in Bullinger's FFT data, is there any

13   sound at all in Bust Dat Groove that corresponds to any sound

14   in Aparthenonia?

15        MR. CHIN:  Absolutely.  Absolutely.  Dr. Smith's

16   report, which basically took the existing data that Dr.

17   Bullinger had, and analyzed that same data.  There is a graph

18   attached to it in which he has the lines corresponding.

19        THE COURT:  I looked at that, but he does -- doesn't

20   Smith say there are similarities?

21        MR. CHIN:  No.  What he is saying is, and that is a

22   bit of a strawman in this case only because what the defendants

23   are trying to say is he never found any direct copying, okay,

24   and Dr. Smith says we didn't find any direct copying because we

25   didn't undertake that analysis.  What he is saying what an

1  associated copy is --

2        THE COURT:  Why didn't he look at any direct copies?

3        MR. CHIN:  I don't know.  Because Dr. Bullinger's

4  report didn't look for it, either.

5        What Dr. Smith was saying is that the drum strikes,

6  the first 2.3 second of one drummer playing the drum, so you

7  pay a drum for 2.3 seconds, you have that, that the first 2.3

8  seconds in Aparthenonia, the drum strikes in that are as

9  similar as the first 2.3 drum strikes in Bust Dat Groove.  One

10 drum strike will not be identical to the second drum strike

11 because you are playing it live, but it will be as similar as

12 that second drum strike because it is the same person playing

13 it.

14        Now, if it were different it would be totally

15 different.  It would be a different person playing a drum.

16 Therefore, you wouldn't have the kind of similarity, that

17 indistinguishable similarity, that Dr. Smith identified in his

18 report.

19        He, in fact, took a drum strike from Aparthenonia and

20 two drum strikes from Bust Dat Groove and showed it to several

21 individuals and they couldn't tell which one was which.  That

22 means they are indistinguishable from one another.  Therefore,

23 the court does not have to undertake another analysis through a

24 recreation.  I think that time --

25        THE COURT:  You are just pointing to it is hearsay,

1   isn't it?

2          MR. CHIN:  No, it's in his report.

3          THE COURT:  You relied on what somebody else did?

4          MR. CHIN:  No, no, no.  What he did -- you mean the

5   comparison?

6          THE COURT:  Yes.

7          MR. CHIN:  Yes, yes, I would say that would be a part

8   of his report.  But in his --

9          THE COURT:  But it wouldn't be admissible evidence, it

10  is hearsay.

11         MR. CHIN:  It is hearsay.

12         THE COURT:  I shouldn't consider that on a motion for

13  summary judgment, should I?

14         MR. CHIN:  Absolutely not and you are correct.  But

15  what I think you should consider was his conclusion in his

16  report, which is that the two are indistinguishable from each

17  other, that they are an exceptional match and that the evidence

18  is overwhelming, overwhelming that Aparthenonia is a digitally

19  edited copy of Bust Dat Groove.  That is his conclusion point

20  blank no matter which way you look at it, and that evidence, I

21  submit, your Honor, should be believed by this court, should be

22  believed by this court.

23         THE COURT:  Doesn't your expert Smith agree that there

24  are only associated copies, not direct copies?

25         MR. CHIN:  That is because nobody undertook that

1  analysis.

2         THE COURT:  Didn't the defendant's expert look for

3  direct copies and couldn't find any?

4         MR. CHIN:  No, that is not true.  In Dr. Smith's

5  deposition he specifically states I didn't look for direct

6  copies because Bullinger didn't look for direct copies.

7         I think the reason, Judge, you have to understand how

8  it came about that we got Dr. Smith.  The defendants, after

9  Rasigliano's testimony which said there was a tom-tom when

10  there was no tom-tom, they came and got this FFT analysis

11  expert, submitted it to me.  I said fine, if it's true, I'll

12  dismiss the rests of this case.

13         I got the report, found Dr. Smith, who has written a

14  book on this, and said, Dr. Smith, could you please tell me

15  whether or not the conclusions in this report are correct

16  because if they are I am dismissing this case, and he said yes,

17  I'll look at it; came back and said not only are the

18  conclusions incorrect, but the way he analyzed the data was

19  improper.

20         THE COURT:  But shouldn't your expert have looked for

21  evidence of direct copying?  Shouldn't Smith have done that?

22         MR. CHIN:  I would submit that, no, because all we are

23  doing is submitting an opposition to the report that they

24  submitted.  Our prima facie case was established under Ritter,

25  Rodriguez.  They submitted -- we had more than adequate

1  evidence to show that these things are the same.

2  One point I would like to make, your Honor, and that

3  is Ivan Rodriguez went through in detail format how he

4  digitally sampled Bust Dat Groove and how he could move using

5  this technology one/16th of a note to rearrange and change it

6  and create Aparthenonia which they did, and they were so

7  identical that they began to flange.

8  I submit that you couldn't take --

9  THE COURT:  Hold on one thing.  I thought when

10  Rodriguez manipulated Bust Dat Groove, what he noticed that

11  there were differences --

12  MR. CHIN:  That is not true.  He said they were 99

13  percent the same.

14  THE COURT:  Like I said, there were differences.

15  MR. CHIN:  I'm sorry, I'm sorry, your Honor.  The

16  differences that he recognized were --

17  THE COURT:  It's not Ivory Soap, right?

18  MR. CHIN:  No.  But it may not be Ivory Soap, but the

19  differences that he recognized were all due to the quality of

20  the recording, not the actual elements of the music.  He is

21  saying digital signal processing, reverb, that's what caused

22  the slight differences in the sound, not that there was --

23  THE COURT:  How did he know that?

24  MR. CHIN:  He's the expert.  He does this for a

25  living.  He does this for a living.

1         THE COURT:  What is his basis for concluding that

2    Transeau somehow manipulated digitally the recording?

3         MR. CHIN:  Well, I would have to go into more detail,

4    it's in my papers, but his position was that there is the exact

5    same snare, the sound of the snare.

6         What he said was by digitally manipulating Bust Dat

7    Groove to create Aparthenonia, you couldn't do that unless you

8    had the same source sound.  Basically you couldn't take, you

9    know, the Star Spangled Banner and turn it into What Has Love

10   Got To Do With It unless they have the same, unless they have

11   the same source sound.  And so that's what he showed.

12        You can't take things apart that don't come from the

13   same place to create an identical copy of it and that is simply

14   what he said that's why I know 98 percent sure.

15        Now, your Honor asked for a recreation to sort of I

16   suspect that you think that that evidence would kind of put the

17   whole issue to rest.  But what would put the issue to rest

18   really without having to go back, what about the master?  The

19   master that Ivan Rodriguez asked for, the master.  The master

20   has each individual sound on a different track.

21        Ivan Rodriguez testified I've been in the music

22   industry 20 years, I've never heard, I've never heard of a CD

23   being created, manufactured and distributed without the company

24   or the artist having the master.

25        Now, the defendants also, they cited a case, I think

1    it was Glove -- I forgot the name of the case, but I will get

2    it back to you.  But in that case they had the master.

3         THE COURT:  But the defendants did offer to give you

4    Transeau's computer, right, for inspection?

5         MR. CHIN:  Yes.  They told me the day of the

6    deposition that the computer was there.  I'm not a computer

7    expert.  I couldn't, I couldn't analyze and look at the hard

8    drive of that computer and, number two --

9         THE COURT:  You could have accepted their invitation

10   on subsequent days, couldn't you, and have an expert look at

11   Transeau's computer?

12        MR. CHIN:  Well, that would have been possible had the

13   discovery deadline been extended, but it was extended three

14   times before then.  I deposed him on the last day and it is the

15   last day I find out they have a computer.  That is not fair.

16        THE COURT:  Well, do you want to examine the computer?

17        MR. CHIN:  I think that that time is past, that it is

18   a time for a jury to say, Mr. Chin, you are right, or,

19   Mr. Chin, you are wrong.

20        THE COURT:  All right.

21        I would like some evidence on the recreation of

22   Aparthenonia with the FFT analysis and I will give the

23   plaintiff the opportunity to examine that laptop and respond to

24   the submission.  Whether it takes the form of testimony or

25   takes the form of an affidavit with a CD that this court can

1    listen to with the FFT analysis, I think that's the way it

2    should proceed.

3        Do you see it any differently? Do you have any

4    suggestions as to how you would like it to proceed?

5        MR. CHIN: Yes. Two things, your Honor.

6        Number one, I'm not sure how the court is going to get

7    a copy of Propellerhead Reason because according to the

8    defendant they couldn't produce it to anybody because there is

9    some form of licensing agreement which precludes them to giving

10   it to either to me or the court, apparently, so I don't know

11   how you are going to get a copy of that, and that is in writing

12   from them.

13       If there is some way that I guess the creators of

14   Propellerhead Reason gives the court approval to get a copy of

15   that, then we would like the same copy and we would like the

16   same recreation and we would have to, of course, go back to Dr.

17   Smith and incur the cost of having him undertake the burden of

18   going through another FFT analysis.

19       The question that I have for the court is, assuming

20   that this new FFT analysis doesn't prove what defendants say it

21   proves, what is the remedy to the plaintiff for having to

22   undergo yet more costs to disprove something that they could

23   have done during discovery and we could have done that a long

24   time ago?

25       Dr. Smith, he is very expensive, and so I mean it

6B3YVASC

1    seems like the defendants are seeming to be receiving the

2    burden of the benefit as opposed to the plaintiff.  That's my

3    only objection, your Honor.

4             THE COURT:  When do you want to submit this?

5             MS. AHRENS:  Your Honor, we would request four weeks

6    to have the recreation.  I just want to clarify that you are

7    asking for a recreation of Aparthenonia, you are not asking for

8    a copy of Propellerhead Reason, is that correct?

9             THE COURT:  I am asking for a recreation of

10   Aparthenon.

11            MS. AHRENS:  Okay.  We would request four weeks, at

12   least four weeks to have the recreation and then have our

13   expert Dr. Bullinger do his FFT analysis.

14            MR. CHIN:  Judge, if I may, you should also require

15   the defendants to also produce the Pro Tools Session report

16   which will identify exactly what BT did during the recreation.

17   That's what they didn't have before.

18            MS. AHRENS:  Your Honor, just to clarify that, BT does

19   not use Pro Tools the way Mr. Chin is describing.  The program

20   that he uses is called Logic.  It is equivalent but a different

21   program.  We would be willing to produce that.

22            MR. CHIN:  The Logic session report, then.

23            THE COURT:  Fine.

24            We will do that by December 1.

25            How much time do you want to respond to it, Mr. Chin?

1        MR. CHIN:  That would all depend, of course, on Dr.

2   Smith's availability.  I can't expect longer than 30 days.

3        THE COURT:  January 5.

4        All right.

5        With respect to the motion for summary judgment,

6   decision reserved.

7        Now, this is also a final pretrial conference.

8        I have the proposed joint pretrial order here.  I

9   would like to select a tentative date for trial, subject to my

10   criminal trial schedule.

11       How many days do the parties anticipate, recognizing

12   that I try a case from 9:45 in the morning until five p.m., we

13   take a luncheon recess from one until 2:15 and a short recess

14   in the morning and the afternoon and I try the case Monday

15   through Thursday.  At such time as the jury is deliberating, we

16   will also sit on Friday.  That's the schedule.

17       How many days do you anticipate for plaintiff's case?

18       MR. CHIN:  If I include the cross, anticipating the

19   length of cross, I would say six days.

20       THE COURT:  Six days on plaintiff's case?

21       MR. CHIN:  Only because I anticipated a very long

22   cross.  If it's going to be a very short cross, then four days.

23       THE COURT:  How long do the defendants anticipate for

24   their case?

25       MR. FALZONE:  I think we had thought something maybe

1    closer to four days.

2           As to the cross on plaintiff's witnesses, again, I

3    have little control over how long the direct lasts, but I will

4    say personally that six days strikes me as quite a long time

5    for plaintiff's case and I would say that if we reserved maybe

6    eight trial days total we should be able to get it done.

7           THE COURT:  I tend to think that we are going to do

8    this in less time than that.  I try to run an efficient trial

9    and juries really don't like coming in a second week in a

10   trial.

11          March 5 for jury selection and trial, subject to my

12   criminal trial calendar.

13          Now, I currently am scheduled to start a very lengthy

14   trial on February 26, but it has been adjourned several times,

15   and it is entirely conceivable that the case will be put over

16   again because it is currently in the Court of Appeals on an

17   interlocutory appeal, but that gives me the benefit of being

18   able to let you know if that trial starts, you will have at

19   least a week notice it is not going and probably more than

20   that, and if I have any sense that it is going, we will give

21   you as much notice as possible to wave you off and then we will

22   not be in a position to try the case until sometime toward the

23   end of April or early May.

24          Now, Mr. Falzone, are you going to be trying the case?

25          MR. FALZONE:  I will with assistance from Kirkland and

1    some colleagues at Stanford.  It depends on everybody's

2    schedule, but, yes, I will be here.

3            THE COURT:  Is that going to work for you?

4            MR. CHIN:  Yes, your Honor.

5            THE COURT:  All right.

6            Are there any other issues that counsel want to raise

7    at this juncture?

8            MR. STAHL:  Your Honor, can I say one thing for the

9    schedule.

10           The dates you mentioned work with the exception of if

11   we are pushed into April or May.  I have an arbitration, a long

12   arbitration April 9 through May 4, so if it does bring us to

13   late April, early May, I ask that that be taken into effect.

14           THE COURT:  The point is, if the criminal case doesn't

15   go on March 5, you will, so you won't have to be worried about

16   being pushed into early April.

17           MR. STAHL:  Okay.  We can work that out if you get to

18   that.  I understand.

19           MR. CHIN:  With respect to the recreation, I just like

20   to have -- the report should be at least detailed what track

21   from Reason we used, just so there is no speculation where the

22   drum beats came from and so on.  It should be detailed so we

23   can kind of follow through.

24           THE COURT:  That's all fair.  I mean, if it's not

25   detailed and every T crossed and I dotted, it's not going to be

1   helpful to the court.

2          Yes, Mr. Falzone.

3          MR. FALZONE:  Back to the trial schedule briefly.

4          I assume if we lose the March 5 date and we slip to

5   late April or May we will have another conversation about

6   everybody's calendar.

7          THE COURT:  We will.

8          MR. FALZONE:  Then I will save it for that.

9          THE COURT:  All right.  Well, especially for somebody

10  who is coming across country.

11         MR. FALZONE:  Thank you.

12         THE COURT:  All right.

13         Thank you for your arguments.

14         Decision reserved.

15         Have a good afternoon.

16                              - - -

17

18

19

20

21

22

23

24

25