# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

RALPH VARGAS AND BLAND RICKY
ROBERTS,

                    Plaintiffs,

          v.                                                    04 CV 9772 (WHP)
                                                                ECF CASE
PFIZER INC., PUBLICIS, INC., FLUID MUSIC,
EAST WEST COMMUNICATIONS, INC., AND
BRIAN TRANSEAU P/K/A "BT",

                    Defendants.

## DEFENDANT BRIAN TRANSEAU'S MEMORANDUM IN SUPPORT OF MOTION FOR ATTORNEYS' FEES AND COSTS

Dockets.Justia.com

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................1

BACKGROUND ........................................................................................3

A.    The Parties And The Works At Issue ....................................................3

B.    Plaintiffs' Original Allegations And Their Changing Theories..............5

C.    Plaintiffs' Lack Of Evidence ...................................................................6

D.    BT's Motion For Summary Judgment And His Recreation Of
Aparthenonia...........................................................................................10

E.    The Court's Order Granting Defendants' Motion For Summary
Judgment And Its Findings Regarding Plaintiffs' Lack Of
Evidence...................................................................................................12

ARGUMENT ...........................................................................................13

A.    The Copyright Act Permits An Award Of Costs And Fees
To BT At The Court's Discretion ..........................................................13

B.    The Court Should Award Attorneys' Fees And Costs To BT ..............15

    1.    The Successful Defense Of This Action Enhanced
Creative Freedom.......................................................................15

    2.    Plaintiffs Asserted Factual And Legal Positions That
Were Objectively Unreasonable ...............................................17

    3.    Considerations Of Compensation And Deterrence
Demand A Fee Award Here.......................................................20

C.    An Award Of $752,485 In Fees And Costs Is Reasonable
And Appropriate Here..............................................................................21

CONCLUSION.........................................................................................25

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Adsani v. Miller*, No. 94 Civ. 9131, 1996 WL 531858
(S.D.N.Y. Sept. 19, 1996) .............................................................................20

*Antenna Television, A.E. v. Aegean Video, Inc.*, No. 95-CV-2328,
1996 WL 298252 (E.D.N.Y. Apr. 23, 1996) ...............................................24

*Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, No. 06-
0086, 2007 WL 1189487 (2d Cir. Apr. 24, 2007) .......................................22

*Arclightz & Films Pvt. Ltd v. Video Palace, Inc.*, No. 01 Civ. 10135,
2003 WL 22434153 (S.D.N.Y. Oct. 24, 2003) ................................... *passim*

*Assessment Techs. of Wis., LLC v. WIREData, Inc.*, 361 F.3d 434
(7th Cir. 2004) .............................................................................................21

*Baker v. Urban Outfitters, Inc.*, 431 F.Supp.2d 351 (S.D.N.Y. 2006) .................17, 20, 21

*Cohen v. West Haven Bd. of Police Com'rs*, 638 F.2d 496 (2d Cir. 1980) ......................22

*Crescent Publ'g Group, Inc. v. Playboy Enters., Inc.*, 246 F.3d 142
(2d Cir. 2001) ..............................................................................................22

*Diamond v. Am-Law Pub. Corp.*, 745 F.2d 142 (2d Cir. 1984) ..................................14, 17

*Earth Flag, Ltd. v. Alamo Flag Co.*, 154 F.Supp.2d 663 (S.D.N.Y. 2001) .................20, 21

*Edwards v. Red Farm Studio Co.*, 109 F.3d 80 (1st Cir. 1997) .........................................17

*Fantasy, Inc. v. Fogerty*, 94 F.3d 553 (9th Cir. 1996) ......................................................16

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) .......................................................... *passim*

*Gierlinger v. Gleason*, 160 F.3d 858 (2d Cir.1998) ..........................................................22

*Goldberger v. Integrated Resources, Inc.*, 209 F.3d 43 (2d Cir. 2000) ............................21

*Heng Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048, 2007 WL 1373118
(S.D.N.Y. May 8, 2007) ...............................................................................22

*Hensley v. Eckerhart*, 461 U.S. 424 (1983) ................................................................22, 23

*Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996 (2d Cir. 1995) ................................21

ii

*Matthew Bender & Co., Inc. v. West Pub. Co.,* 240 F.3d 116
    (2d Cir. 2001).................................................................................................13, 15, 17

*N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250 (2d Cir. 1992)...................22

*National Football League v. PrimeTime 24 Joint Venture*, 131 F.Supp.2d 458
    (S.D.N.Y. 2001) ........................................................................................................24

*New York State Ass'n for Retarded Children, Inc. v. Carey*,
    711 F.2d 1136 (2d Cir. 1983)...................................................................................22

*Screenlife Establishment v. Tower Video, Inc.*, 868 F.Supp. 47
    (S.D.N.Y. 1994) ..................................................................................................17, 20

*Sparaco v. Lawler, Matusky, Skelly Eng'rs LLP*, 60 F.Supp.2d 247
    (S.D.N.Y. 1999) ..................................................................................................17, 19

*Video-Cinema Films, Inc. v. Cable News Network, Inc.,* No. 98 Civ. 7128,
    2003 WL 1701904 (S.D.N.Y. Mar. 31, 2003) ...........................................................20

*Williams v. Crichton*, 891 F.Supp. 120 (S.D.N.Y. 1994) ...........................................17, 20

## FEDERAL STATUTES AND RULES

17 U.S.C. § 505..................................................................................................13, 21, 24

## MISCELLANEOUS

Lauren F. Brandes, *From Mozart to Hip-Hop:  The Impact of Bridgeport v.
    Dimension Films on Musical Creativity*, 14 UCLA Ent. L. Rev. 93 (2007) ...............15

Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* (2007).............................15

# INTRODUCTION

In successfully defending this copyright case, Defendants Brian Transeau ("BT") and East West Communications ("East West") (collectively, "Defendants") won an important victory not only for themselves, but for free expression as well. Plaintiffs Ralph Vargas and Bland-Ricky Roberts (collectively, "Plaintiffs") asserted copyright infringement claims against Defendants based entirely on a passing similarity between two drumbeats that each derive from common elements of popular music. Such claims have the potential to restrict and threaten creative freedom, and to reduce the number of new musical works created. That is precisely opposite to the fundamental purpose of the Copyright Act, which is to encourage the creation of new artistic works. Accordingly, Defendants' successful defense of this case furthered the most central purposes of the Copyright Act, and an award of attorneys' fees is therefore appropriate.

Defendants' success was hard-won and expensive. Plaintiffs began this litigation by alleging copyright infringement of a one-bar drum composition. In the face of a summary judgment motion on this claim, Plaintiffs amended their complaint to add a claim premised on the assertion that Defendants copied Plaintiffs' recording of the short drum composition. This new claim proceeded on the theory that BT acquired a copy of a vinyl album that had been on sale for less than six months in 1994, digitized it, and then in 2001 digitally manipulated Plaintiffs' seven second drum beat to create the accused work – another one-bar drum beat.

Once forced to support their new theory with evidence, Plaintiffs revealed they had none. Unable to produce any evidence of a single sale of the recording at issue, they abandoned the issue of access altogether. This required them to show the two works

were so strikingly similar as to preclude the possibility of independent creation, but Plaintiffs brought forth no evidence that could plausibly do so. On the contrary, the Court observed that one of Plaintiffs' experts "confirmed" that BT did not copy Plaintiffs' drumbeat, and their other two experts "expressly admit[ted] to the possibility of independent creation."

While Plaintiffs' claims proved baseless, they were not costless. They required extensive analysis and testimony from five experts and a total of six depositions. Other defendants decided to avoid this costly exercise by settling early for a total of [REDACTED] – presumably based on the fact the case would cost more than that to defend. Indeed, had the vast bulk of the work performed on this case not been performed *pro bono,* the true cost of defending this case would have exceeded $500,000 for BT alone.

Defendants and their counsel should not have to bear this cost. A fee award is proper where a Copyright plaintiff's claims are unsupported by evidence and objectively baseless. The Court's order on summary judgment reveals Plaintiffs' claims here to be exactly that, and a fee award is proper on that basis alone. A fee award is likewise appropriate for the sake of deterrence. Allowing baseless claims like these to proceed unpenalized would only encourage Plaintiffs or others to bring similar claims that have the potential to chill creative freedom and inhibit the creation of new musical works, based merely on passing similarity between common musical elements.

Defendants achieved complete success in this case. In doing so, they enhanced creative freedom and furthered the most fundamental purposes of the Copyright

Act.  An award of fees and costs to the prevailing Defendants is necessary and appropriate, and should be made here.

## BACKGROUND

### A.    The Parties And The Works At Issue

Plaintiff Ralph Vargas recorded *Bust Dat Groove Without Ride* ("*BDG*") in 1994 as part of an album entitled *Funky Drummer II* ("*FD II*").  *See* Declaration of Julie Ahrens In Support Of Defendant Brian Transeau's Motion For Attorneys' Fees And Costs ("Ahrens Dec."), Ex. A (Vargas Dep. Tr. 155:5-8); Ex. B (Roberts Dep. Tr. 152:23-155:3).  *BDG* is a one-bar drum pattern that is copied and "looped" so that every measure of *BDG* is identical to every other measure.  Ahrens Dec. Ex. C (Dr. Boulanger Decl. ¶ 4); Ex. D (Dr. Boulanger Rebuttal Report at 5).

"Funky Drummer" is also the title of a famous James Brown song released in 1970 by King Records as a two-part 45 rpm single.  *See* Declaration of Anthony T. Falzone In Support Of Defendant Brian Transeau's Motion For Attorneys' Fees And Costs ("Falzone Dec.") ¶ 20.  The drum rhythm in James Brown's "Funky Drummer" bears more than a passing similarity to *BDG*.  *Compare* Falzone Dec., Ex. B Audio Track 1 (*BDG*) *with* Audio Tracks 2-3 (James Brown's "Funky Drummer").  Indeed, rhythm patterns adopted from, or similar to, both BDG and James Brown's "Funky Drummer" show up in many works of popular music released just a few years before Vargas recorded *Funky Drummer II* and *BDG*.  *See* Falzone Dec. ¶¶ 22-27 and Ex. C Audio Tracks 4-9.

*FD II* was produced only as a vinyl long-playing album ("LP") and not in any other format.  Ahrens Dec. Ex. B (Roberts Dep. Tr. 104:2-4), Ex. A (Vargas Dep. Tr.

204:2-206:3). At most only 4,000 copies of *FD II* were ever created. Ahrens Dec. Ex. B (Roberts Dep. Tr. at 111:5-7). *FD II* was only on sale for a few months, from February to April, 1994, mostly in "mom and pop records stores" and independent distribution houses around New York. Ahrens Dec. Ex. A (Vargas Dep. Tr. 206:21-25); Ex. B (Roberts Dep. Tr. 158:16-165:13); Ex. EE (Defendants' Dep. Ex. 8). No documentary evidence exists of any sale of *FD II*, wholesale or retail, to anyone, anywhere. Ahrens Dec. Ex. B (Roberts Dep. Tr. 169:10-17); Ex. X (Plaintiffs' Supp. Responses to Interrogatories at 5-7).

Defendant BT is an accomplished performer, composer and producer of electronic music. Ahrens Dec. Ex. E (BT Decl. ¶ 2). In 2001, BT released an album entitled *Breakz from the Nu Skool* ("*Breakz*"). *Breakz* includes 403 tracks of short drum rhythms intended not to be enjoyed on their own, but to be used as raw material for the creation of other musical works. *Id.* at ¶ 3; Ex. F (BT Dep. Tr. 122:16-17). Indeed, BT sold *Breakz* with a license that prohibits wholesale copying of the CD, but allows the purchaser to use individual drum tracks to produce new musical works. Ahrens Dec. Ex. F (BT Dep. Tr. 122:2-15).

One of the tracks on *Breakz* is a drum loop called *Aparthenonia*, a two and one-quarter bar drum pattern lasting about nine seconds. BT created *Aparthenonia* while traveling between live shows on his tour bus. Ahrens Dec. Ex. G (BT Supp. Decl. ¶¶ 1, 5). Like *BDG* -- and countless other drum beats -- *Aparthenonia* contains sounds of a high-hat, snare drum, and bass drum. This commonplace rhythm is considered a rudimentary drumming technique. Ahrens Dec. Ex. H (Ricigliano Decl. ¶¶ 5, 7, 23-24); Ex. I (Ritter Decl. Ex. B).

But BT did not create *Aparthenonia* by playing the drums. BT created *Aparthenonia* electronically, from scratch, using an Apple G3 computer running off-the-shelf software. Ahrens Dec. Ex. E (BT Decl. ¶ 5). All of the percussion elements in *Aparthenonia* originated from a music-generation software program known as Propellerhead Reason, and were mixed and equalized by BT on his own equipment. *Id.* When BT created *Aparthenonia* he did not have a turntable or any other equipment capable of playing vinyl LP's such as Plaintiffs' *FD II* on his tour bus, in his studio, or anywhere else. Ahrens Dec. Ex. G (BT Suppl. Decl. ¶ 1). Prior to this litigation, BT had never heard of *BDG*, *FD II*, or Plaintiffs. Ahrens Dec. Ex. E (BT Decl. ¶ 6). Nor had BT ever seen, touched or possessed a copy of *BDG* or *FD II*. *Id.* After this litigation began, BT attempted to locate a copy of *FD II*, but was unable to find one anywhere. *Id.*

**B.    Plaintiffs' Original Allegations And Their Changing Theories**

In December 2004, Plaintiffs filed this lawsuit alleging that BT's *Aparthenonia*, which had been used in a Pfizer advertisement for Celebrex, infringed the copyright Plaintiffs held in the composition of *FD II*. Ahrens Dec. Ex. J (First Amended Complaint, ¶¶ 16-17, Ex. A). Plaintiffs sought ten million dollars in actual and compensatory damages, or statutory damages, as well as punitive and exemplary damages. *Id.* at Prayer for Relief, ¶¶ A- H. In June 2005, Defendants moved for summary judgment, arguing that *BDG*, a rudimentary one-bar drum loop composition, was not subject to copyright protection. During the course of the briefing and argument regarding Defendants' first motion to for summary judgment, transcriptions of *BDG* and *Aparthenonia* were entered in the record. The transcriptions showed that *Aparthenonia* was not the same composition as *BDG*. Although similar sounding drum strikes

instruments were used, the drum strikes occur in different order in the two works. Ahrens Dec. Ex. H (Ricigliano Decl. ¶¶ 15 -18).

In the face of this evidence as well as strong case law disfavoring composition copyrights in rudimentary drum beats, Plaintiffs changed their theory. Plaintiffs asserted for the first time that their claim was for infringement of the sound recording copyright of *BDG*. Ahrens Dec. Ex L (Motion for Summary Judgment on the Issue of Originality of Plaintiffs' Work at 2, n.2). So instead of alleging that BT simply created a substantially similar drum rhythm, Plaintiffs alleged that BT gained physical access to *BDG*, copied it, and then digitally rearranged and modified the sounds of the drum strikes to create *Aparthenonia*. Ahrens Dec. Ex M (Plaintiffs' Opposition to Defendants' Joint Motion for Summary Judgment at 10 and 20).

## C.     Plaintiffs' Lack Of Evidence

While Plaintiffs' new theory allowed them to save their claims temporarily, they had no evidence whatsoever to support their new theory. Plaintiffs' first problem was access. They had no evidence of it. Indeed, Plaintiffs admitted that *FD II* had been on sale for no more than six months in 1994, and they could not point to any records that would suggest a single copy of *FD II* was ever sold, wholesale or retail, to anyone, anywhere. Ahrens Dec. Ex. B (Roberts Dep. Tr. 119:3-23); Ex. A (Vargas Dep. Tr. 238:3-239:25). Nor did Plaintiffs' report any income from the sale of *FD II* on their taxes. Ahrens Dec. Ex. B (Roberts Dep. Tr. 119:3-23; 228:6-8); Ex. A (Vargas Dep. Tr. 228:22-25; 238:3-239:25). Accordingly, Plaintiffs abandoned the issue of access altogether. Ahrens Dec. Ex. N (Plaintiffs' Opp. Br. at 13); Ex. O (Order Granting SJ at 6).

Having abandoned any attempt to show BT had access to the work he supposedly copied, Plaintiffs were left to prove that *Aparthenonia* was so "strikingly similar" to *BDG II* as to preclude even the possibility of independent creation of *Aparthenonia* by BT. Ahrens Dec. Ex. O (Order Granting SJ at 6). Faced with the prospect of expensive discovery on this issue, Defendants Pfizer, Fluid Music, and Publicis settled out of the case in February 2006, resulting in a payment to Plaintiffs of [REDACTED]. Ahrens Dec. Ex. P (Settlement Agreement at 3).

Defendants BT and East West chose to fight Plaintiffs' claims and disprove Plaintiffs' false assertions of copying. In order to demonstrate that *Aparthenonia* was not created by copying *BDG*, BT hired Dr. Richard Boulanger to do a Fast Fourier Transform ("FFT") analysis of the two works. Both sides acknowledge that FFT is the best method for determining the similarities and differences between audio sounds; according to Plaintiffs' expert, it is an "appropriate and powerful method of resolving . . . if *Aparthenonia* is a digitally edited and/or manipulated copy of *Funky Drummer* [*BDG*]." Ahrens Dec. Ex. Q (Smith Report at 2); Ex. R (Smith Dep. Tr. at 63:14-21); Ex. S (Dr. Boulanger Report at 2). FFT spectral analysis can reveal the specific characteristics of sounds with much greater precision than the unaided ear. Ahrens Dec. Ex. Q (Smith Report at 2); Ex. R (Smith Dep. Tr. at 79:25-80:9); Ex. S (Dr. Boulanger Report at 2). Based on his FFT analysis, Dr. Boulanger concluded that "the audio source materials used in *Aparthenonia* is unique and original, and is not at all based on or copied or derived from [*BDG*]." Ahrens Dec. Ex. S (Dr. Boulanger Report at 61). Plaintiffs' own expert acknowledged that FFT spectral analysis of *BDG* and *Aparthenonia* reveals not a single drum strike in *Aparthenonia* that is a direct copy from

*BDG*. Ahrens Dec. Ex. R (Smith Dep. Tr. at 173:21-175:1); Ex. D (Dr. Boulanger Rebuttal Report at 2-3); Ex. O (Order Granting SJ at 7).

Even without FFT analysis, the difference between *BDG* and *Aparthenonia* can be discerned by listening to the two loops. Ahrens Dec. Ex. D (Dr. Boulanger Rebuttal Report at 2; 11-12). As Plaintiffs' experts conceded, *BDG* and *Aparthenonia* have different tempos, Ahrens Dec. Ex. T (Rodriquez Dep. Tr. 257:4-6); Ex. D (Dr. Boulanger Rebuttal Report at 11), and different pitches, Ahrens Dec. Ex. T (Rodriguez Dep. Tr. 344:12-346:2); Ex. D (Dr. Boulanger Rebuttal Report at 11). A listener can hear differences in the drum strikes between *BDG* and *Aparthenonia*—no drum strike sounds identical between the two works. Ahrens Dec. Ex. T (Rodriguez Dep. Tr. 390:19-392:2, 406:9-18, 408:2-14, 410:3-411:3, 411:24-412:17, 413:15-415:10); Ex. D (Dr. Boulanger Rebuttal Report at 3).

Rather than conceding that *Aparthenonia* was not created by copying *BDG*, Plaintiffs hired Dr. Smith, an expert on X-ray technology and digital signal processing, who had self-published a book that included a chapter on FFT analysis, yet Plaintiffs did not have Dr. Smith conduct any independent FFT analysis. Ahrens Dec. Ex. R (Smith Dep. Tr. 76:10-77:7). Nor did Dr. Smith know the instruments used in the two tracks. *Id*. In fact, Dr. Smith admitted that he had no musical training, or any experience using FFT analysis to determine whether two sounds are the same. Ahrens Dec. Ex. Q (Smith Report at 2). Accordingly, he conceded that he could not say from the FFT analysis whether *Aparthenonia* was created using *BDG*. *Id*. Nevertheless, based only on his review of Dr. Boulanger's report, and Smith's tracing of part, but not all, of some figures in Dr. Boulanger's report, Ahrens Dec. Ex. R (Smith Dep. Tr. 76:6-77:7), Dr.

Smith offered a self-contradictory conclusion: he opined that *Aparthenonia* was made by copying *BDG*, but admitted he could not preclude the possibility of independent creation. Ahrens Dec. Ex. Q (Smith Report at 2).

By this time BT had spent so much money on legal fees that, despite being a successful musician, he could not afford to pay for his own defense. Accordingly, his counsel withdrew on March 21, 2006, and for the next two months BT acted *pro se*. During this time Plaintiffs' counsel noticed BT's deposition in New York, even though BT was, and is, a resident of California. When BT said that he was willing to be deposed in California, or to fly to New York at Plaintiffs' expense, Plaintiffs' counsel threatened to move for an order compelling BT's appearance in New York at his own expense on the date set by Plaintiffs or for sanctions against BT. Ahrens Dec. Ex. W (Letter from Paul Chin to Hon. William H. Pauley III, May 18, 2006, requesting pre-motion conference).

On May 23, 2006, BT obtained pro bono counsel. *See* Falzone Dec. ¶ 2. At this point discovery was re-opened and depositions of BT, as well as of Plaintiffs' witnesses, proceeded. At the deposition of Dr. Smith, the flaws in Plaintiffs' evidence became even more apparent. For example, Smith admitted that none of the drum strikes in *Aparthenonia* were direct copies of those in the one bar of *BDG* that he examined via FFT analysis. Ahrens Dec. Ex. R (Smith Dep. Tr. at 173:21 – 175:1). He was only able to maintain his opinion that *Aparthenonia* was copied from *BDG* by assuming that the entire duration of *BDG* was live drumming and that direct copies of the *Aparthenonia* drum strikes were present in some other portion of *BDG* that he did not examine. Ahrens Dec. Ex. BB (Defendants' Reply Memorandum at 1-2). In fact, *BDG* consisted of only one bar of drumming looped over and over. Ahrens Dec. Ex. D (Dr. Boulanger Rebuttal

Report at 5); Ex. C (Dr. Boulanger Supp. Decl. ¶ 4). Accordingly, there was nothing more for Dr. Smith to review and no support for his assumption that direct copies existed elsewhere in *BDG*.

Once this flaw in Dr. Smith's testimony was revealed, Dr. Smith was never heard from again. Ahrens Dec. Ex. O (Order Granting SJ at 11, n.6). But instead of admitting that Dr. Smith's own analysis showed that not a single drum strike from *BDG* was present in *Aparthenonia*, and dismissing their case, Plaintiffs persisted in their digital copying theory based on the conclusory and contradictory opinions of their experts.

**D.      BT's Motion For Summary Judgment And His Recreation Of *Aparthenonia***

After the close of discovery, Defendants moved for summary judgment because it was apparent that Plaintiffs did not have any proof that BT copied Plaintiffs' work. Plaintiffs had no direct evidence of copying. Nor did they have any evidence that BT had access to *BDG*. This left Plaintiffs to prove that *Aparthenonia* was so "strikingly similar" to Plaintiffs' work as to "preclude any reasonable possibility of independent creation." Yet Plaintiffs' own experts had all acknowledged – not precluded – the possibility of independent creation. Ahrens Dec. Ex. O (Order Granting SJ at 7, 10).

At the argument of Defendants' second motion for summary judgment on November 3, 2006, this Court asked whether BT could independently recreate *Aparthenonia*. Ahrens Dec. Ex. V (SJ Oral Argument Tr. 9:8-24). When assured that BT could, the Court ordered BT to do so and to provide FFT analysis from his expert of the recreated *Aparthenonia*. *Id*. at 9:19-24. The Court also provided Plaintiffs the

opportunity to examine the recreation and perform their own analysis, which Plaintiffs' attorney stated would be done by Dr. Smith, Plaintiffs' FFT expert. *Id.* at 19:21-22:3.

BT recreated *Aparthenonia* on November 16, 2006. The entire recreation was recorded on video and witnessed by BT's counsel and two other witnesses. Ahrens Dec. Ex Y (Supp. Dec. of Julie A. Ahrens, dated Dec. 1, 2006). Dr. Boulanger, BT's FFT expert, analyzed the recreated *Aparthenonia* and concluded that it was as close a match to the original *Aparthenonia* as was possible without digitally copying the original. Ahrens Dec. Ex. Z (Supp. Dec. of Dr. Richard Boulanger, dated Dec. 1, 2006, ¶¶ 7, 12). Boulanger also noted that recreated *Aparthenonia* was a much closer match to original *Aparthenonia* than either was to *BDG*. *Id.* at ¶ 8. BT's recreated *Aparthenonia*, along with files saved as part of the process, the video recording of the recreation, and Dr. Boulanger's analysis were provided to the Court and Plaintiffs on December 1, 2006. Ahrens Dec. Ex Y (Supp. Dec. of Julie A. Ahrens, dated Dec. 1, 2006).

Plaintiffs responded to this evidence with no FFT analysis, or anything at all from Smith, their FFT expert. Instead, on January 23, 2007, Plaintiffs filed a two-page declaration from Matthew Ritter, their drum instructor expert, and a four-page declaration from Plaintiffs' counsel, Paul Chin. Ahrens Dec. Ex. AA (Supp. Dec. of Paul Chin, dated Jan. 23, 2007). Mr. Ritter's declaration stated that recreated *Aparthenonia* was "very similar" to the original *Aparthenonia*. Ahrens Dec. Ex. DD (Matthew Ritter's Dec., dated Jan. 23, 2007, ¶ 3). The declaration then quibbled about a couple of items, but concluded without opining that original *Aparthenonia* must have been created by copying *BDG*. So again, Plaintiffs offered no evidence that spoke to, much less precluded, the possibility of independent creation.

**E.    The Court's Order Granting Defendants' Motion For Summary Judgment And Its Findings Regarding Plaintiffs' Lack Of Evidence**

On May 9, 2007, this Court granted Defendants' Motion for Summary Judgment because Plaintiffs had no evidence that BT copied Plaintiffs' work. Plaintiffs conceded they had no evidence of access, so it was Plaintiffs' burden to "demonstrate that there is no possibility of independent creation." Ahrens Dec. Ex. O (Order Granting SJ at 9).

In granting summary judgment for Defendants, the Court found that Plaintiffs had failed to offer any evidence that would preclude the possibility of independent creation. Specifically, the Court found that Plaintiffs' experts "waffled" and offered "conclusory" and "contradictory" testimony on the critical issue of independent creation. Indeed, the Court observed that two of Plaintiffs' three experts ultimately "conceded . . . the possibility of independent creation" and the third actually "<u>confirmed</u> that *Aparthenonia* was not digitally copied from *BDG*." *Id*. at 7, 8, 10 (original emphasis). Accordingly, Plaintiffs did not simply fail to prove their own case, their experts proved the possibility of independent creation that was Plaintiffs' burden to disprove. *See id.* at 7-8 (Smith's testimony "undermines Plaintiffs' theory of the case").

Moreover, Plaintiffs' revealed that their underlying theory of the case – that BT digitally copied and manipulated *BDG* to create *Aparthenonia* – was based entirely on speculation and guess-work. While Plaintiffs' expert Rodriguez clung to the conclusion that BT copied *BDG* and digitally manipulated it to create *Aparthenonia*, Rodriguez failed to offer any support for that theory. So while he asserted that BT manipulated sounds from *BDG* using the Reason software program, he failed "to substantiate his opinion," offered "no explanation for what the tools are" that supposedly

accomplished this manipulation, and "provide[d] no significant detail regarding how a sound from *BDG* would be manipulated to achieve one of the sounds from *Aparthenonia.*" *Id*. at 9-10.

Accordingly, the Court not only saw through Plaintiffs' lack of proof, it identified the danger implicit in allowing such claims to proceed. The Court rejected the proposition that a plaintiff can put a defendant to the burden and expense of trial simply "by producing any expert witness who testifies that one sound was sampled from another, regardless of how conclusory the statement may be and regardless of whether it contradicts the testimony of Plaintiffs' other witnesses." *Id*. at 11.

## ARGUMENT

### A.    The Copyright Act Permits An Award Of Costs And Fees To BT At The Court's Discretion

While litigants generally bear their own attorneys' fees under the so-called "American Rule," the Copyright Act provides an important exception to that rule. *See Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 533-34 (1994). Under the Copyright Act, "the Court may allow the recovery of full costs by or against any party" and "may also award a reasonable attorney's fee to the prevailing party as part of the costs." 17 U.S.C. § 505. The decision of whether to award fees and costs is left to the Court's discretion, so long as prevailing plaintiffs and defendants are treated alike and the Court's exercise of its discretion is consistent with the purposes of the Copyright Act. *See Fogerty*, 510 U.S. at 534; *Matthew Bender & Co., Inc. v. West Pub. Co.*, 240 F.3d 116, 121-22 (2d Cir. 2001).

There is "no precise rule or formula" for determining whether to award fees in a particular case. *E.g.*, *Matthew Bender*, 240 F.3d at 121 (quoting *Fogerty*, 510 U.S. at 534). The Court may consider a variety of factors in deciding whether to award

fees, including "frivolousness, motivation, objective unreasonableness (both in the factual and in the legal components of the case) and the need in particular circumstances to advance considerations of compensation and deterrence." *Id.* (quoting *Fogerty*, 510 U.S. at 534 n.19). These factors, however, are not exclusive, and may only be considered "so long as [they] are faithful to the purposes of the Copyright Act." *Id.*

Prior to *Fogerty*, many courts awarded attorneys' fees as a matter of course to plaintiffs who prevailed in copyright infringement actions, but rarely to defendants who succeeded in defending against infringement claims. *See Fogerty*, 510 U.S. at 520-21. This "dual" approach was premised on the theory that the critical purpose of the Copyright Act is to deter against infringement and encourage the assertion of meritorious infringement claims. *See id.* at 525 (citing *Diamond v. Am-Law Pub. Corp.*, 745 F.2d 142, 148 (2d Cir. 1984)).

The Supreme Court expressly rejected the dual standard the Second Circuit and other courts had employed because its underlying premise ignored the more fundamental goals of the Copyright Act. *Fogerty* recognized that "[t]he primary objective of the Copyright Act is to encourage the production of original literary, artistic, and musical expression for the good of the public." *Fogerty*, 510 U.S. at 524.

> Because copyright law ultimately serves the purpose of enriching the general public through access to creative works, it is particularly important that the boundaries of copyright law be demarcated as clearly as possible. To that end, defendants who seek to advance a variety of meritorious copyright defenses should be encouraged to litigate them to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement. In the case before us, the successful defense of [the song at issue] increased public exposure to a musical work that could, as a result, lead to further creative pieces. Thus a successful defense of a copyright infringement action may further the policies of the

Copyright Act every bit as much as a successful prosecution of an infringement claim by the holder of a copyright.

*Fogerty*, 510 U.S. at 527.

Accordingly, the "purpose[] of the Copyright Act" to which the Court must remain true in deciding whether to award fees to a successful defendant (*Matthew Bender*, 240 F.3d at 121) is the goal of "promoting broad public availability of literature, music and the other arts." *Fogerty*, 510 U.S. at 526.

**B.       The Court Should Award Attorneys' Fees And Costs To BT**

**1.       The Successful Defense Of This Action Enhanced Creative Freedom**

The lawsuit initiated by Plaintiffs here threatened the primary purpose of Copyright Act identified by *Fogerty* and creative freedom itself.  Plaintiffs sought millions of dollars in compensatory and punitive damages based on a passing similarity between common musical elements.  But music is an art form that builds on itself.  *See* Lauren F. Brandes, *From Mozart to Hip-Hop: The Impact of Bridgeport v. Dimension Films on Musical Creativity*, 14 UCLA Ent. L. Rev. 93, 101-04 (2007); *see generally* 1-2 Melville B. Nimmer & David Nimmer, *Nimmer on Copyright* § 2.05[D] (2007).  Musicians often create new works using new variations on existing themes, often in combination with other elements, or simply through new combinations of existing elements.  *See id*.  Artists who vindicate the right to create and perform music free of liability based on the use of common musical elements do more than simply secure the right to distribute their own musical creations, they open the door to still further creations.

The fee award ultimately granted in the *Fogerty* case was based on this very principle.  Following remand from the United States Supreme Court, the District

Court awarded Fogerty more than $1.3 million in fees. *See Fantasy, Inc. v. Fogerty*, 94 F.3d 553, 555 (9th Cir. 1996). The premise of the infringement claim against Fogerty was that his song *The Old Man Down The Road* infringed the copyright of another song he had written, *Run Through The Jungle*, because it sounded similar. *See id.* at 555-56. Fogerty defeated that claim at trial, thereby vindicating his right "to continue composing music in the distinctive 'Swamp Rock' style and genre." *Id.* at 555. The District Court held that Fogerty had furthered the purposes of the Copyright Act because he vindicated not only his right to perform the song at issue, but "paved the way for future original compositions – by Fogerty and others – in the same distinctive 'Swamp Rock' style and genre." *Id.* at 556. The Ninth Circuit affirmed the award, concluding the District Court's justification was a valid basis for fees, regardless of whether the plaintiff did anything "blameworthy" in conducting the litigation. *See id.* at 556-60.

The same reasoning compels a fee award here. The short drum rhythms at issue are variations on well-known drum rhythms made famous decades ago by James Brown and other rhythm and blues musicians; similar rhythms have been key features of not only the rhythm and blues genre, but also rap, hip-hop and other forms of popular music as well. *See, infra* p. 3. By successfully defending this claim, Defendants have vindicated not only their rights to create and distribute their music containing elements of these genres, but paved the way for other artists to continue to make use of these elements without fear of facing copyright infringement allegations based on nothing more than passing similarity among stock musical elements.

Defendants vindicated their rights to create and distribute new music, the express purpose of which was to serve as a building block for the musical creations of

others.  Defendants created the drum beats and made them available on *Breakz From the Nu Skool* specifically so they could be copied by other artists and incorporated into new works.  Ahrens Dec. Ex. F (BT Dep. Tr. 122:2-15).  Defendants should be rewarded and encouraged because vindication of their rights furthers the most central purposes of the Copyright Act– "promoting broad public availability of literature, music, and the other arts."  *Fogerty*, 510 U.S. at 526.

### 2. Plaintiffs Asserted Factual And Legal Positions That Were Objectively Unreasonable

A fee award does not require a finding that a litigant acted frivolously or in bad faith.  *See Sparaco v. Lawler, Matusky, Skelly Eng'rs LLP*, 60 F.Supp.2d 247, 258-59 (S.D.N.Y. 1999); *Williams v. Crichton*, 891 F.Supp. 120 (S.D.N.Y. 1994); *see generally Edwards v. Red Farm Studio Co.*, 109 F.3d 80 (1st Cir. 1997) (imposing requirement of frivolousness or bad faith would reimpose standard *Fogerty* rejected).

The Second Circuit does, however, place great weight on the consideration of whether litigants made objectively unreasonable factual or legal assertions in the course of litigation, or asserted objectively baseless factual or legal arguments.  *See Matthew Bender*, 240 F.3d at 122.  Indeed, a finding that a litigant has done so will itself support an award of attorneys' fees.  *See Screenlife Establishment v. Tower Video, Inc.*, 868 F.Supp. 47, 52 (S.D.N.Y. 1994) (citing *Diamond*, 745 F.2d at 148 (2d Cir. 1984)) (concluding that the pre-*Fogerty* cases of the Second Circuit, and the post-*Fogerty* cases from other Circuits interpreting *Fogerty*, establish that a prevailing defendant may secure § 505 attorneys' fees once a court finds plaintiff's claim was objectively unreasonable); *Baker v. Urban Outfitters, Inc.,* 431 F.Supp.2d 351, 357 (S.D.N.Y. 2006); *Arclightz & Films Pvt. Ltd v. Video Palace, Inc.*, No. 01 Civ. 10135, 2003 WL 22434153, at *3, n. 33

(S.D.N.Y. Oct. 24, 2003). The cases that apply that standard demonstrate Plaintiffs' factual and legal assertions were objectively unreasonable, if not frivolous.

In *Arclightz*, plaintiffs alleged that an individual defendant had made and sold unauthorized DVD copies of their films, which were seized at a video store. *See Arclightz*, 2003 WL 22434153, at *1. Although plaintiffs conceded they had no evidence linking the defendant to the video store where the pirated films were found, they nonetheless asserted that the defendant had duplicated the films on DVD, even though the defendant did not have a machine capable of making DVD's with the same specifications as those confiscated. *See id.* at *1-2. The Court dismissed plaintiffs' claims on summary judgment for lack of evidentiary support. In determining whether to award fees under the Copyright Act, the Court held that plaintiffs' assertions were objectively unreasonable because while plaintiffs' evidence may have been sufficient to show that defendant *could* have copied the DVD's at issue, plaintiffs presented no evidence that defendant *did* copy them; indeed, plaintiffs presented no evidence that defendant had access to the pirated film, or had the equipment necessary to create the confiscated films. *See id.* at *4. Thus, the Court held that "the consistent lack of evidentiary support for plaintiffs' claims . . . supports a finding that plaintiffs' actions . . . were objectively unreasonable." *Id.* at *5.

Here, Plaintiffs suffer from a similar lack of proof. Plaintiffs abandoned the issue of access altogether. Moreover, the undisputed facts show that *BDG* was released only on vinyl, but that BT did not even own a turntable. Ahrens Dec. Ex. B (Roberts Dep. Tr. 104:2-4), Ex. A (Vargas Dep. Tr. 204:2-206:3), Ex G (BT Supp. Decl. at ¶ 17). As for expert testimony, the Court held that Plaintiffs' presented no proof sufficient to preclude the possibility of independent creation. At most, Plaintiffs proved

it *might* have been possible for BT to copy *BDG*, but offered no proof that would suggest he actually did so.  Like the plaintiffs' claims in *Arclightz*, Plaintiffs' claim here is based on nothing more than "supposition and innuendo."  *Arclightz*, 2003 WL 22434153, at *7.

Indeed, Plaintiffs' failure of proof here is even more glaring than that in *Arclightz*.  Here, Plaintiffs' own expert acknowledged that FFT analysis was the best tool for assessing the similarity between *BDG* and *Aparthenonia*. Ahrens Dec. Ex R (Smith Dep. Tr. at 79:25-80:16).  Yet only one of Plaintiff's three experts based his striking similarity opinion on FFT analysis. Ahrens Dec. Ex. O (Order Granting SJ at 7).  The Court observed that the one Plaintiffs' expert who did perform FFT analysis "<u>confirmed</u> that *Aparthenonia* was not digitally copied from *BDG*" and thus not only failed to support Plaintiffs' theory, but "undermined" it.  *Id.*

As for Plaintiffs' other experts, the Court suggested that Ritter's testimony was "worthless" based on the fact that he "equivocate[d]" on the issue of similarity, while Rodriguez offered only "conclusory assertions." *Id*. at 10.  While Plaintiffs bore the burden of precluding the possibility of independent creation in order to support their claims, both Ritter and Rodriguez "conceded at [their] deposition[s] that they could not rule out the possibility of independent creation." *Id*. at 10.  Accordingly, the Court found that Plaintiffs' provided nothing but contradictory testimony that, in fact, "expressly admit[s] . . . the possibility of independent creation" that Plaintiffs were required to disprove.  *Id*. at 11-12.

A "consistent lack of evidentiary support" renders a party's claims objectively unreasonable. *Arclightz*, 2003 WL 22434153, at *5; *see Sparaco*, 60.F.Supp.2d at 259 (awarding attorneys fees where copyright plaintiff presented "no

evidence" of "any infringing act"); *Williams*, 891 F.Supp. at 122 (awarding fees where copyright plaintiff failed to produce evidence necessary to prove required level of similarity); *Screenlife*, 868 F.Supp. at 52 (relying on expert testimony premised on speculation is objectively unreasonable); *Adsani v. Miller*, No. 94 Civ. 9131, 1996 WL 531858, at *16 (S.D.N.Y. Sept. 19, 1996) (finding objective unreasonableness where expert report failed to support plaintiff's assertions of similarity between works at issue).

Proceeding on evidence that not only fails to support, but actually *disproves*, a claim is unreasonable by any measure, if not simply frivolous.

### 3. Considerations Of Compensation And Deterrence Demand A Fee Award Here

Where an action is devoid of a proper legal or factual basis, it is essential to compensate a defendant for the cost of defending himself and vindicating his rights of free expression. *See, e.g.*, *Baker*, 431 F.Supp.2d at 359 (citing *Fogerty*, 510 U.S. at 529). Otherwise, defendants may be forced to abandon their rights simply due to the expense of suit. *See id.* It is likewise essential to deter litigants from bringing "similarly unreasonable actions without fear of any consequences." *Earth Flag, Ltd. v. Alamo Flag Co.*, 154 F.Supp.2d 663, 668 (S.D.N.Y. 2001); *see Video-Cinema Films, Inc. v. Cable News Network, Inc.,* No. 98 Civ. 7128, 2003 WL 1701904, at *5 (S.D.N.Y. Mar. 31, 2003) (awarding fees "to deter future copyright owners from using the threat of litigation to chill" free expression).

The need for compensation is particularly acute here. The cost of defending Plaintiffs' claims was very significant – more than $500,000. This is exactly the sort of case where innocent defendants may be inclined to settle instead of bearing the very significant cost of defending their creative and artistic rights. Indeed, three

defendants in this case did exactly that, settling prior to expert discovery. Accordingly, Defendants have recovered [REDACTED] on claims that are literally baseless. That money should go toward compensating Defendants for the expense involved in proving Plaintiffs' claims to be false, not to the Plaintiffs who put Defendants to that significant expense without any plausible proof of wrongdoing. *See, e.g.*, *Assessment Techs. of Wis., LLC v. WIREData, Inc*., 361 F.3d 434, 437 (7th Cir. 2004) (without the prospect of fee award, copyright defendant "might be forced into a nuisance settlement or deterred altogether from exercising his rights").

The need for deterrence is similarly acute here. Plaintiffs chose to pursue a copyright infringement claim without any plausible proof of copying. If there is no penalty for that, it simply "invite[s] others to bring similarly unreasonable actions without fear of any consequences." *Baker*, 431 F.Supp.2d at 359-60 (quoting *Earth Flag*, 154 F.Supp.2d at 668). Here, there must be consequences. The type of claim asserted in this case has the potential to do grave harm to creative freedom. It raises the possibility that the creator of any musical work can be hauled into court and forced to defend himself at great expense, all based on passing similarity of common musical elements but no actual proof of copying. This can have no effect but to deter the creation of new musical works, a result flatly contradictory to the central purposes of the Copyright Act.

## C. An Award Of $752,485 In Fees And Costs Is Reasonable And Appropriate Here

As the prevailing party in this action, BT may recover his "full costs" and a "reasonable attorney's fee." 17 U.S.C. § 505. The determination of what is a reasonable attorneys' fee is within the sound and broad discretion of the district court. *Knitwaves, Inc. v. Lollytogs Ltd. (Inc.)*, 71 F.3d 996, 1011 (2d Cir. 1995); *Goldberger v.*

*Integrated Resources, Inc.*, 209 F.3d 43, 47 (2d Cir. 2000); *Cohen v. West Haven Bd. of Police Com'rs*, 638 F.2d 496, 505 (2d Cir. 1980).

The starting point in determining a fee award is the "lodestar" method, under which fees are determined by multiplying the number of hours reasonably expended by a reasonable hourly rate. *See Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983); *Crescent Publ'g Group, Inc. v. Playboy Enters., Inc.*, 246 F.3d 142, 150 (2d Cir. 2001); *Cohen*, 638 F.2d at 505. To determine the reasonable hourly rate for each attorney, courts look to current market rates "prevailing in the community for similar services by lawyers of reasonably comparable skill, experience, and reputation." *Gierlinger v. Gleason*, 160 F.3d 858, 882 (2d Cir.1998). Prevailing parties may recover attorney fees, even when their attorneys were acting pro bono. *See Heng Chan v. Sung Yue Tung Corp.*, No. 03 Civ. 6048, 2007 WL 1373118, at *2-3, *7 (S.D.N.Y. May 8, 2007) (citing *Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany*, No. 06-0086, 2007 WL 1189487, at *1 (2d Cir. Apr. 24, 2007)). A presumptively reasonable hourly rate for a pro bono attorney should reflect customary rates for a competent attorney in the field. *Id.* at *8-9.

A fee application must be supported by contemporaneous time records that detail for each attorney, the hours worked and the nature of the work completed. The award should not only reflect the amount of the work performed but also reflect the skill of the attorneys and the results achieved. *New York State Ass'n for Retarded Children, Inc. v. Carey*, 711 F.2d 1136, 1148 (2d Cir. 1983); *N.A.S. Import, Corp. v. Chenson Enters., Inc.*, 968 F.2d 250, 254 (2d Cir. 1992); *Arclightz*, 2003 WL 22434153, at *6. The

degree of success is an important factor in determining whether a fee award is reasonable. *See Hensley*, 461 U.S. at 433.

Here, BT's request for fees and costs is documented with great specificity and detail, as set forth in the accompanying declarations of Anthony T. Falzone, David S. Olson, Julie A. Ahrens, Eric Chan, Christian Chadd Taylor, and Eric M. Stahl. These declarations include copies of all available invoices for attorneys' fees and costs incurred by BT through June 28, 2007. BT respectfully submits that based on that documentation and information, he is entitled to an award of attorneys' fees in the sum of $652,647 through June 28, 2007, and additional amounts incurred after June 28 according to proof.

The work performed on this matter was necessary and appropriate in light of the technical nature of the claims, the need to undertake significant discovery, and to prepare for trial – all upon coming into the case late and preparing a dispositive motion based on expert testimony and technical analysis. These tasks required far more attorney time than is claimed here.

The hourly rates claimed here are similarly reasonable. While CIS attorneys Anthony Falzone and David Olson are experienced litigators who have in the past billed more than $450 and $400 per hour, respectively, for their services, BT seeks only $350 and $300 per hour, respectively for their time. *See* Falzone Dec. ¶ 7; Declaration of David S. Olson in Support of Defendant Brian Transeau's Motion for Attorneys' Fees and Costs ("Olson Dec.") ¶ 3. BT claims fees for services from his attorneys at Kirkland & Ellis at no more than their standard hourly rates, and has reduced the fees claimed even further by excluding altogether several hundred hours of work performed by several attorneys. *See* Declaration of Christian Chadd Taylor in Support of

Defendant Brian Transeau's Motion for Attorneys' Fees and Costs ("Taylor Dec.") ¶ 6. Moreover, the invoices submitted demonstrate that counsel consistently delegated work to less expensive timekeepers, and that the attorneys charging the highest rates are the attorneys who billed the fewest hours to the case.

Defendants also seek to recover their costs in prosecuting this action. The Copyright Act allows for the recovery of "full costs" as a matter of the court's discretion, *see* 17 U.S.C. § 505, and courts "routinely award costs to the prevailing party in copyright cases." *National Football League v. PrimeTime 24 Joint Venture*, 131 F.Supp.2d 458, 484 (S.D.N.Y. 2001) (quoting *Antenna Television, A.E. v. Aegean Video, Inc.*, No. 95-CV-2328, 1996 WL 298252 at *14 (E.D.N.Y. Apr. 23, 1996)); *Arclightz*, 2003 WL 22434153, at *7. The costs incurred in the defense of this action are itemized in specific detail, and total $99,838. *See* Falzone Dec. Ex. B.

Defendants attained complete success here and achieved a significant victory for free expression and creative freedom. The fees and costs incurred in the course of their defense are reasonable and appropriate to the needs and circumstances of the case. Accordingly, an award to BT of $652,647 in fees and $99,838 in costs is appropriate.

## CONCLUSION

The Court should grant BT's motion for attorneys' fees and costs in the amount of $752,485, plus any attorneys' fees and costs Defendants incur after June 28, 2007 in an amount to be proven.

Dated:  June 29, 2007

STANFORD LAW SCHOOL CENTER FOR INTERNET AND SOCIETY

By:_____/s/_____

Anthony T. Falzone
Julie A. Ahrens
STANFORD LAW SCHOOL
559 Nathan Abbott Way
Stanford, CA 94305-8610
Telephone:(650) 736-9050
Facsimile: (650) 723-4426

Alice Garber
Christopher W. Keegan
KIRKLAND & ELLIS LLP
555 California Street
San Francisco, California  94104-1501
Telephone:(415) 439-1400
Facsimile: (415) 439-1500

Attorneys for Defendant
BRIAN TRANSEAU