# EXHIBIT B

```
                79BHVARC.txt
                                                                      1
         79BHVARC
1        UNITED STATES DISTRICT COURT
1        SOUTHERN DISTRICT OF NEW YORK
2        ------------------------------x
2
3        RALPH VARGAS, et al.,
3
4                   Plaintiffs,
4
5                v.                            04 Civ. 9772 (WHP)
5
6        PFIZER, INC., et al.,
6
7                   Defendants.
7
8        ------------------------------x
8
9
9                                              New York, N.Y.
10                                             September 11, 2007
10                                             11:25 a.m.
11
11       Before:
12
12                      HON. WILLIAM H. PAULEY III
13
13                                      District Judge
14
14                         APPEARANCES
15
15       PAUL A. CHIN
16            Attorney for Plaintiffs
16
17       STANFORD LAW SCHOOL CENTER FOR INTERNET & SOCIETY
17            Attorneys for Defendant Brian Transeau
18       BY:  ANTHONY T. FALZONE
18            DAVID S. OLSON
19               -and-
19       KIRKLAND & ELLIS, LLP
20       BY:  ALICE GARBER (via phone)
20
21       DAVIS WRIGHT TREMAINE, LLP
21            Attorneys for defendant East West Communications
22       BY:  ERIC M. STAHL (via phone)
23
24
24
25
25
                    SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300
                                                                      2
         79BHVARC
1                 (In open court)
2                 THE DEPUTY CLERK:  Matter on for oral argument,
3        Vargas, et al. v. Pfizer.
4                 Would counsel for the plaintiff please state his
5        appearance for the record.
6                 MR. CHIN:  Good morning.  Paul Chin, 233 Broadway, New
7        York, New York 10279, for the plaintiffs.
8                 THE COURT:  Good morning, Mr. Chin.
9                 THE DEPUTY CLERK:  Counsel for the defendants.
                                 Page 1
```

| | |
|---|---|
| 10 | MR. FALZONE:  Good morning, your Honor.  Anthony |
| 11 | Falzone for defendant Brian Transeau.  With me here beside me |
| 12 | is my cocounsel David Olson, and on the phone is my cocounsel |
| 13 | Alice Garber. |
| 14 | THE COURT:  Good morning, Mr. Falzone. |
| 15 | Ms. Garber, can you hear us? |
| 16 | MS. GARBER:  I can, yes. |
| 17 | THE COURT:  Very well.  Good morning to you. |
| 18 | MS. GARBER:  Thank you. |
| 19 | MR. STAHL:  Your Honor, Eric Stahl, on the telephone, |
| 20 | for defendant East West Communications. |
| 21 | THE COURT:  Very well.  Good morning to you, |
| 22 | Mr. Stahl. |
| 23 | Mr. Stahl, I have basically a housekeeping question |
| 24 | for you at the outset.  East West was not a moving party on |
| 25 | this application.  Am I correct about that? |

| | |
|---|---|
| 1 | MR. STAHL:  No, your Honor.  We joined in the motion |
| 2 | and filed a short separate memorandum.  The original motion was |
| 3 | brought on behalf of both defendants. |
| 4 | THE COURT:  But I thought I understood your part of |
| 5 | the motion to be on behalf of Brian Transeau during the time |
| 6 | that your firm represented him.  Does it also include an |
| 7 | application with respect to East West? |
| 8 | MR. STAHL:  Yes.  There is a separate application for |
| 9 | East West.  Part of the confusion, your Honor, might be that I |
| 10 | submitted two separate declarations, one covering the fees that |
| 11 | were incurred by my firm while we were representing |
| 12 | Mr. Transeau, and then a separate declaration and a short |
| 13 | joining memorandum that covers the fees for East West for the |
| 14 | entire time we represented them as well.  I can break that down |
| 15 | by amount if that makes it easier. |
| 16 | THE COURT:  Well, let me ask you this.  The $33,494.50 |
| 17 | in fees sought by your firm, is that solely related to Brian |
| 18 | Transeau or does that also include time expended on behalf of |
| 19 | East West? |
| 20 | MR. STAHL:  The 33,494 is fees, and there was another |
| 21 | 1,064 in costs for Brian Transeau.  The separate amount for |
| 22 | East West was 43,385.50 plus 1,300 and change in costs.  That |
| 23 | is for East West. |
| 24 | THE COURT:  Be kind enough to give me those figures |
| 25 | again.  Somehow that particular affidavit did not make its way |

| | |
|---|---|
| 1 | to my file, which is what has precipitated my confusion.  Give |
| 2 | me the amount on behalf of East West. |
| 3 | MR. STAHL:  $43,385.50 in fees and $1,350.50 in costs. |
| 4 | The total is $44,736. |
| 5 | THE COURT:  All right.  Thank you very much. |
| 6 | MR. STAHL:  You're welcome. |
| 7 | Your Honor, if it helps, if you want us to e-mail a |
| 8 | separate filing for East West to the clerk, we can do that. |
| 9 | They were filed with the initial motion, at the time of the |
| 10 | initial motion. |
| 11 | THE COURT:  I will find them in the clerk's file. |
| 12 | MR. STAHL:  Thank you, your Honor. |
| 13 | THE COURT:  All right.  Now, Mr. Falzone, do you wish |
| 14 | to be heard with respect to the application? |

15          MR. FALZONE:  I do.  Thank you, your Honor.
16          On the previous topic, there is, by the way, an
17   Exhibit B to my declaration which summarizes and breaks down
18   all the fees and costs that Mr. Transeau seeks by law firm.  So
19   it will show the Stanford fees, the Kirkland fees, and the
20   Davis Wright fees.
21          THE COURT:  I have those.
22          MR. FALZONE:  Thank you.
23          THE COURT:  What I don't have, though, is some clear
24   summary of how many hours were expended by each of the
25   attorneys at Kirkland & Ellis in connection with the -- I have

1    their hourly rates and I imagine I could tease from the record
2    what each individual partner, associate, and paralegal
3    expended.  But unlike CIS, where I have the total hours for
4    each individual who is working, I don't have that from Kirkland
5    & Ellis.
6           Is there some handy reference to it in the papers that
7    I may have missed?
8           MR. FALZONE:  There is in fact, your Honor.  If you
9    look at Mr. Taylor's declaration, submitted in support of the
10   fee motion, if you go to Exhibit 1, the second page of Exhibit
11   1 has a summary of hours billed for all Kirkland timekeepers.
12          THE COURT:  All right.  I have that in front of me.
13          MR. FALZONE:  That should be helpful.
14          THE COURT:  Fine.  Is there something similar with
15   respect to Davis Wright Tremaine as well, a summary?
16          MR. STAHL:  I don't think it is summarized or broken
17   out in the same way that Kirkland & Ellis did it, your Honor.
18   We can provide that information if you like.
19          THE COURT:  All right.  I am going to ask that you
20   just submit a letter to me with the individual breakouts for
21   Chan, Leaf, Lee, Brockett, Majer, and Duffy.  All right?
22          MR. STAHL:  OK.
23          THE COURT:  I think we have cleared the hurdles on the
24   preliminaries.  I will hear you now, Mr. Falzone.
25          MR. FALZONE:  Perfect.  Thank you, your Honor.

1           This case is remarkable, not so much because BT won,
2    but because of how little proofs, proof plaintiffs could muster
3    in support of their claims and the profound effect those claims
4    can have on musicians like BT.  To this day plaintiffs do not
5    suggest that they or their experts did anything before filing
6    this claim other than listen to the two works, and on that
7    basis filed this claim for $10 million.
8           It should come as no surprise to the plaintiffs that
9    there were commonalities between the two works because both
10   contain rhythm elements that have been a significant part of
11   popular music for more than 30 years.  In fact, Funky Drummer
12   is not just the name of the album on which Mr. Vargas' work
13   appears, it is also the name of a James Brown song, that bears
14   more than a passing resemblance to the allegedly infringed work
15   here.  So Mr. Vargas was not exactly writing on a clean slate
16   when he started.
17          That brings me to one of the most critical reasons a
18   fee award is required here.  The purpose of the Copyright Act
19   is to encourage original works of authorship, music included.

20  What has happened here is one musician has imposed huge
21  litigation costs on another based on nothing more than a
22  passing and superficial similarity between the two works, and
23  that has the potential to cast a very long shadow over the
24  creative process.  Now, let's look carefully at the evidence
25  plaintiffs brought forth.

7
79BHVARC

1  Rodriguez, the fellow that plaintiffs said they
2  consulted before filing suit, admitted right off the bat that
3  the two works have different pitches, different tempos, and
4  that the drum strikes appear in a different order, and, indeed,
5  a transcription of the two works demonstrated that.
6  So then in the face of those differences plaintiffs
7  concocted the theory that BT took the vinyl album, digitized
8  it, and then manipulated the digitized copy to create
9  Aparthenonia.  Hence, the differences between the two works.
10  The problem, your Honor, is there was simply no proof
11  whatsoever to support that theory.  The album Funky Drummer II
12  was available at most for six months in 1994.  There is not a
13  single record of any sale of it to anyone, anywhere, wholesale
14  or retail.  And on top of that, it was released only on vinyl,
15  and the undisputed facts are that BT did not even own a
16  turntable in 2001 when he created Aparthenonia.
17  As for the digital manipulation theory, there was no
18  evidence to support it either.  None of the experts plaintiff
19  retained claimed to know anything about the specific computer
20  programs that BT used to create Aparthenonia.  Rodriguez was
21  the only one who spoke to the so-called digital manipulation
22  theory, and he provided absolutely no support for his
23  supposition that that manipulation was possible, much less
24  likely to have happened here.  In fact, he tried to create
25  Aparthenonia from Bust Dat Groove at his deposition, and he

8
79BHVARC

1  admitted that his recreation sounded different.
2  So all we ended up with at the end of the day in
3  support of this claim were conclusory statements about striking
4  similarity from plaintiffs' experts, two of which, as the court
5  observed in its summary judgment ruling, flat out conceded the
6  possibility of independent creation, and the third of which
7  actually confirmed independent creation.  It is this utter and
8  consistent lack of evidentiary support that renders plaintiffs'
9  claims objectively unreasonable, indeed unreasonable by any
10  measure.
11  Another issue I want to address is motivations.  They
12  are difficult to discern, but they are nonetheless relevant to
13  the fee question.  Here, there is evidence to suggest that it
14  was plaintiffs' purpose not so much to pursue the dispositive
15  facts of this case but, rather, to keep it alive long enough to
16  force a settlement with the remaining two defendants.
17  At the beginning, when BT explained that he created
18  Aparthenonia on his computer using logic and reason computer
19  programs, we did not see plaintiffs come forth with an expert
20  who could speak to these issues at all.  They had nothing to
21  say about it.
22  At BT's deposition, we offered to have him recreate
23  Aparthenonia from scratch, on the fly, right then and there at
24  the deposition.  Plaintiffs refused that offer.

```
25            After that, we offered to make available the computer
```

```
          79BHVARC
 1   on which BT created Aparthenonia for plaintiffs' inspection.
 2   Plaintiffs refused that offer.
 3            Plaintiffs' expert Smith agreed that Fast Fourier
 4   Transform analysis, FFT, was the best tool to determine whether
 5   in fact Aparthenonia had been copied or not, and after we
 6   revealed to him his erroneous assumptions at his deposition, he
 7   was never heard from again, and we heard no further FFT-based
 8   evidence from plaintiffs at all.
 9            So far from trying to elicit the dispositive facts in
10   this case, plaintiff attempted to ignore them, and they
11   continue to ignore them now.
12            Today in the papers they suggest the court improperly
13   weighed credibility in adjudicating the summary judgment
14   motion.  That simply did not happen.  The problem was that the
15   plaintiffs' experts, even if believed 100 percent, simply
16   provided no evidence that would support plaintiffs' claims
17   here.  The fact of the matter is plaintiffs have imposed nearly
18   a million dollar litigation burden on other artists without any
19   plausible proof to support that claim, and that cost should be
20   shifted to them.
21            If your Honor has any questions about that, I would be
22   happy to address them.  If you would like me to speak to the
23   amounts and the reasonableness of the hourly rates, I would be
24   happy to do that, too.
25            THE COURT:  Well, assuming that fees should be shifted
```

```
          79BHVARC
 1   in this case, would you agree that fee shifting should not mean
 2   financial ruin to in this case a plaintiff?
 3            MR. FALZONE:  Well, your Honor, it is hard to answer
 4   that question in the abstract, that is correct.  The problem
 5   here is there is no proof in the record that would reveal any
 6   such financial ruin.  In fact, if --
 7            THE COURT:  That may be another question that I am
 8   going to take up with your adversary.
 9            MR. FALZONE:  That is a legitimate concern your Honor
10   has expressed.  But I would like to point out -- I will not
11   name the amount here because it is confidential, but we
12   identified it in our papers -- there was a significant amount
13   of money that changed hands in settlement of this matter.
14            THE COURT:  I understand that.
15            Approximately how many depositions were taken in this
16   case?
17            MR. FALZONE:  There were, I believe, five.  I'm not
18   positive about that.  Mr. Olson might have a more precise --
19            MS. GARBER:  I think there were six.
20            MR. FALZONE:  Six.
21            THE COURT:  Were any of these multi-day depositions?
22            MR. FALZONE:  I was not present at any of the
23   depositions.  I can't speak specifically to whether they were
24   multi-day depositions.
25            THE COURT:  Can anyone here speak to that?
```

1    MS. GARBER: I don't believe any of them were
2 multi-day.
3    THE COURT: All right. Is it appropriate for a court
4 to decrease a fee award where work may have been duplicative?
5    MR. FALZONE: Yes, it would be appropriate to reduce a
6 fee award for duplicative work. However, here plaintiffs do
7 not point to any work, any specific work they contend to be
8 duplicative. And so I don't think that issue has been raised
9 here. I also submit to your Honor that none of the work
10 performed here was duplicative and all was necessary.
11    THE COURT: But the staffing was -- Colin Powell would
12 be proud of the staffing. It would comport with his view of
13 waging warfare in any event, right?
14    MR. FALZONE: Overwhelming force.
15    THE COURT: Overwhelming force.
16    MR. FALZONE: With commensurate results.
17    THE COURT: No doubt about it. But I'm looking at
18 essentially three partners, three associates, a bevvy of
19 paralegals. Substantial investments of time against a solo
20 practitioner.
21    MR. FALZONE: Absolutely, your Honor. I would like to
22 point out that if you look at the Kirkland time, and I am happy
23 to have Alice jump in if she has anything specific she would
24 like to say about it, but you will see that the vast bulk of
25 the Kirkland time came from one lawyer, Julie Ahrens, who

1 really took the laboring oar on this, and there was significant
2 time from Ms. Garber and from Christopher Keegan, too.
3    As Mr. Taylor sets forth in his declaration, he has
4 excluded from fees and time claimed here a significant amount
5 of further work that was done by Kirkland lawyers. So we are
6 certainly sensitive to that concern, that your Honor has
7 properly raised, and it's been accounted for at least on that
8 level, and we have been very diligent in trying to trim down
9 the time claimed and be very reasonable about it.
10    I think as far as the amount of work that went into
11 this, there was a lot of work necessary to prepare for these
12 expert depositions. A lot of them involved technical issues.
13 We came into the case late. If you remember, discovery had
14 been closed. We had to get up to speed on the entire case and
15 in very short order conduct complicated expert depositions
16 while getting ready for trial. Because if you recall, we had a
17 November 2006 trial date at one point.
18    So that task was more expensive than I think maybe it
19 would have been had we been in under different circumstances.
20    But I think given the circumstances, our point of
21 entry into the case, how complicated it was, how much there was
22 to do, conduct those depos, get ready for trial, I think all of
23 that work was essential and none of it was unnecessary, much
24 less unreasonable.
25    THE COURT: Now, the initial summary judgment motion

1 by defendants, which albeit was unsuccessful, was a purely
2 legal challenge. Accepting what you say as true about
3 essentially the dispositive nature of performing and the FFT
4 analysis, is there any reason that the defendants could not
5 have performed an FFT analysis early on in the litigation in

```
 6   contemplation of some further motion?
 7            MR. FALZONE:  I think really the trouble there, your
 8   Honor, is the nature of plaintiffs' claim changed over time.
 9   This digital manipulation theory was hatched some ways into the
10   case.  It was really that theory that triggered a lot of the
11   need for the complicated expert work.  Because the task there
12   was to determine whether you could trace individual component
13   sounds from Aparthenonia back to Bust Dat Groove.  So it was a
14   bit of chasing a moving target.
15            I am not saying it couldn't have been done earlier,
16   but I am saying it was done timely, and the results were
17   commensurate with the force of that proof.  So really until we
18   had nailed down the theory under which plaintiffs decided to
19   proceed, it didn't make sense necessarily to do that any
20   earlier.
21            THE COURT:  Given the fact that your clinic entered
22   the litigation at a late stage, do you think that the plaintiff
23   should bear the additional cost of your coming up to speed at a
24   late stage in the litigation with a trial looming?
25            MR. FALZONE:  Absolutely, your Honor.  Absolutely.
```

```
 1   The reason for that is a symptom of the bigger problem at work
 2   here.  When you have a plaintiff who proceeds on a claim with
 3   no evidence to support it and somebody like Mr. Transeau, who
 4   cannot afford to bring forth the proof necessary to defeat it,
 5   that is exactly when lawyers acting pro bono need to step in
 6   and set the situation right.  So the fact we got into the case
 7   is exactly what should have happened and exactly what should --
 8   that is the very cost that should be shifted to plaintiffs
 9   because they are absolutely responsible for it.  If that hadn't
10   happened, your Honor, Mr. Transeau would probably have been
11   forced to abandon the position that we now know is right.  So,
12   yes, plaintiffs should absolutely bear that cost.
13            THE COURT:  All right.  Thank you very much,
14   Mr. Falzone.
15            Let me hear from your adversary.
16            MR. CHIN:  Thank you, your Honor.
17            Your Honor, I think you touched upon this in your
18   questioning of my colleague, Mr. Falzone, that a good theme for
19   this case would be David versus many, many, many Goliaths, and
20   all too often that is the position that copyright plaintiffs
21   find themselves in when they attempt to bring forth their
22   claims against some very big companies.
23            In this case my colleague, Mr. Falzone, suggests that
24   we didn't do anything before we filed suit.  We simply ran in,
25   rushed in, and filed a lawsuit and started suing people.  That
```

```
 1   simply is not the case.  In our papers we submitted copies of
 2   letters that we wrote to some of the earlier defendants asking
 3   them, hey, this is what we think has occurred, we would like to
 4   find a way to resolve this.  That opportunity was turned down.
 5   We went to -- I'm sorry.
 6            THE COURT:  Did you undertake any FFT analysis of Bust
 7   Dat Groove and Aparthenonia?
 8            MR. CHIN:  Your Honor, before this case I did not know
 9   what an FFT analysis was, and, as Mr. Falzone clearly
10   indicated, neither did the other defendants.
```

11    Dr. Boulanger, the FFT expert, came in after they lost
12 the initial summary judgment.  They had musicologists.  They
13 had, I think his name was Dr. Ferarre or another musicologist
14 that they tried to use.  We had somebody opposing them, Matthew
15 Ritter, a drum expert.
16    THE COURT:  But you are the plaintiff.  Don't you need
17 a basis for making allegations of infringement?
18    MR. CHIN:  Absolutely.  Absolutely.  The basis for our
19 infringement was a sound engineer, who reviewed both our
20 composition and the infringing composition and made a
21 determination that, yes, this is the same thing.  These two
22 things are 98 percent the same.
23    We had a drum expert, Matthew Ritter, who comes in and
24 says, I've listened to the drum patterns in your composition,
25 Mr. Chin, and I have listened to the drum patterns in the

1 infringing composition and, guess what, they are identical.
2 Not only are they identical, but they have something that
3 usually no other drum sounds would have, ghost notes, and they
4 occur in the same place.
5    Now, based on that evidence I think it was clearly
6 prudent for our clients to pursue this case.
7    Now, the FFT analysis, I have searched and searched
8 throughout this district and the Second Circuit, throughout our
9 circuits.  I have not yet found one case in which FFT analysis
10 has been used as evidence in support of or defense of a
11 copyright infringement claim.  I haven't found one.  They
12 haven't cited one case in which FFT analysis has been used to
13 support or disprove a copyright infringement claim.  So no,
14 your Honor, we did not undertake an FFT analysis.
15    There is actually a large part of the facts that
16 Mr. Falzone left out before going to the point where he said we
17 didn't present any evidence.  The fact that --
18    THE COURT:  But at the end of the day, during
19 discovery didn't your expert concede that the best way to
20 address the question is through an FFT analysis?
21    MR. CHIN:  Oh, yes.  Yes.  After they got their FFT
22 expert, which occurred, again, after they lost the initial
23 summary judgment and one day or two days before the end of the
24 initial discovery period, I get a report from this FFT analysis
25 guy and they say, hey, Mr. Chin, take a look at this.  This

1 proves our case.  I say, all right, I will take a look at it,
2 but let me get my own expert.  I get my own expert.  What does
3 my expert say?  My expert says, number one, the report
4 submitted by the FFT expert is flawed in many, many, many
5 respects.  Not only is his methodology flawed, but his
6 conclusions were flawed.
7    Number two, looking at the information presented by
8 their FFT expert, the conclusion that I have reached, that
9 there is extremely strong evidence that supports plaintiffs'
10 theory that defendant used Bust Dat Groove digitally edited or
11 manipulated to create Aparthenonia.  He says that.
12    THE COURT:  You are revisiting summary judgment now.
13 I wish you wouldn't do that.  I made it fairly clear, at least
14 as clear as I can make it, in my opinion why the defendants
15 were entitled to summary judgment in the case and why your

16    experts essentially supported the defendants' arguments.  So
17    let's not go back there.
18             MR. CHIN:  I didn't mean to.  I was just explaining to
19    the court what precipitated us to actually hire an FFT expert
20    in the first place.  But prior to them bringing this guy in, we
21    had no idea.  Usually it is musicologists that are used to
22    support and defend against copyright infringement cases.
23             THE COURT:  But you were the one who was advancing a
24    claim of digital copying, weren't you?
25             MR. CHIN:  I advanced that claim after our sound

1     engineer expert, who was a sampling expert, said this is what
2     occurred.
3              THE COURT:  All right.  Let's turn to another
4     question.  Are you asserting that attorneys who work pro bono
5     cannot recover fees?
6              MR. CHIN:  No, I am not asserting that, and I think I
7     tried to make that clear in my papers.  The point that I was
8     trying to make is that under the statute the right to the fees
9     belongs to the plaintiff -- not the plaintiff, I'm sorry, the
10    client.  And if the client hasn't been charged any fees, it
11    would seem inappropriate to award fees.  That is the only point
12    I was trying to make.
13             Whether or not pro bono counsel in a copyright
14    infringement case are entitled to fees, I didn't find a case on
15    point on that.  There are cases dealing with the employment
16    laws and other federal statutes, but there wasn't one that the
17    defendants cited dealing specifically with Section 505.
18             My point is that the rule is that the award of fees is
19    a right not for the attorneys but for the client, and that if
20    he wasn't charged any fees -- and in fact, the law does state
21    that the court cannot award more fees than the client was
22    actually charged.
23             THE COURT:  What case says that?
24             MR. CHIN:  If you would just give me one second.
25             (Pause)

1              MR. CHIN:  That case is Lieb v. Topstone Industries.
2     It is at 788 F.2d 151 (1986).
3              If the court recalls, I think Lieb is a Third Circuit
4     case that I believe the Fogerty court had referenced in terms
5     of the factors that should be considered when making a
6     determination as to whether or not to award attorneys fees.  I
7     think the Lieb case was referenced in the Fogerty case.
8              So, no, I am not saying that pro bono counsel are not
9     entitled to an award of attorneys fees.  I am just making a
10    point to the court that the right is to the client and that the
11    case law suggests that the award should not exceed what the
12    client was charged.
13             THE COURT:  Do you agree that the defendants achieved
14    a complete victory in this case?
15             MR. CHIN:  I would say that the defendants achieved a
16    success on their second motion for summary judgment on the
17    issue of striking similarity.  That had the effect of getting
18    rid of this case.  To suggest that --
19             THE COURT:  But do you have any case law to support
20    the argument that the degree of success courts have used in

21  adjusting a lodestar calculation is measured by success at
22  various stages of a litigation rather than by success as to the
23  claims that were brought?
24         MR. CHIN:  Well, I discussed that issue in my papers.
25  The best that I could do was to cite two cases in which certain

20

1  courts, both district and Second Circuit courts, have suggested
2  that the attorneys fees should be awarded for work that was
3  done on successful claims.
4         THE COURT:  Claims.  That is the point.
5         Weren't the defendants successful on all the claims
6  here?
7         MR. CHIN:  The defendant was successful on our
8  copyright infringement claim, yes.
9         The point that I would like to make, your Honor, if I
10  may, is that if -- an award of attorneys fees is discretionary.
11  Just because you win, you don't automatically get paid.  That
12  is not the law.  In the Second Circuit the standard is
13  objectively unreasonable litigation.  I mean, that is the main
14  factor to look at.
15         Now, if you take the facts of this case, I am a solo
16  practitioner.  These are two individual plaintiffs against
17  fortune 500 companies, being represented by some of the most
18  prestigious law firms in the country, and then --
19         THE COURT:  But some of those fortune 500 companies,
20  they settled with you, didn't they?
21         MR. CHIN:  They didn't settle at the beginning of the
22  case.  It took --
23         THE COURT:  They settled.  You are not suggesting that
24  Mr. Transeau is a Goliath, are you?
25         MR. CHIN:  I am not saying that he is a Goliath.  What

21

1  I am suggesting is the court has to look at the case in
2  context.  It has to look at the totality of the factors.
3         What I am suggesting is that we -- to say that our
4  case was objectively unreasonable, given the fact that we
5  survived the initial motion for summary judgment, that we
6  survived -- the defendants, all five of which submitted a Rule
7  68 offer of judgment, which could have put us in a very
8  precarious position had we lost summary judgment.  But then we
9  survived the summary judgment, came back, and then settled with
10  three of the five of the defendants, tried to settle with the
11  last two, but they chose litigation over settlement.  In fact,
12  it was the defendant BT's own conduct which necessitated the
13  extension of the discovery schedule, which extended the time in
14  which new counsel had to come in, to expend more money, to get
15  these new experts, to take all these depositions.  I noticed
16  one deposition in this case, your Honor.  I noticed --
17         THE COURT:  So Mr. Transeau should be faulted for
18  sticking to his principles as opposed to capitulating with a
19  payment?
20         MR. CHIN:  I am not saying that.
21         THE COURT:  Good, because that is what I just thought
22  I heard you say.
23         MR. CHIN:  I'm sorry then.  I must have misspoke.
24         What I am suggesting is that a defendant shouldn't be
25  able to benefit from his own malfeasance.  The fact that he did

1 not conduct discovery within the time period required by this
2 court's scheduling order, which then required additional time,
3 additional depositions, additional discovery, precipitated by
4 the defendants, now he's saying that was all our fault.
5     THE COURT: All right. Let me turn to another issue.
6 Your clients' ability to pay. Am I really expected to believe
7 that his income was $4,350 in 2005 and $4,369 in 2006?
8     MR. CHIN: Whether or not you believe it, that is the
9 truth, and I can submit the tax records to support it. I
10 submitted that in my papers, that if the court required the tax
11 records, we would present them.
12     THE COURT: How does he live?
13     MR. CHIN: His wife works.
14     THE COURT: What assets does he have?
15     MR. CHIN: I'm not certain. I don't think he has any.
16 They have an apartment. They live in an apartment.
17     THE COURT: Is it a co-op or a condominium?
18     MR. CHIN: I think it is just a regular apartment that
19 they pay rent.
20     THE COURT: You just thinking it as opposed to having
21 an assertion of fact --
22     MR. CHIN: They do not own their own home, I know
23 that. That is a fact.
24     THE COURT: But you don't know whether they own their
25 own apartment, right?

1     MR. CHIN: I don't know if they own their own
2 apartment, no.
3     THE COURT: Well, I am going to tell you right now
4 that I think that an award is appropriate in this case, but the
5 question is one of amount.
6     I want to receive a submission from you, which will be
7 placed under seal, describing precisely what occurred with the
8 settlements reached with the other defendants in the case,
9 where that money went, and I will afford your client the
10 opportunity to submit an affidavit of net worth, detailing his
11 assets, and he will furnish that to opposing counsel. I will
12 give opposing counsel an opportunity to comment on that.
13 Because otherwise, there is an absence of evidence here about
14 the plaintiff's assets and his ability to pay.
15     When can you make such submissions to me?
16     MR. CHIN: 30 days.
17     THE COURT: That seems awfully long to me. I am
18 accommodating you by giving you this opportunity. You will
19 submit something by September 28th; otherwise, I will take the
20 motion as it is.
21     Yes, Mr. Falzone.
22     MR. FALZONE: I just want to raise a couple of
23 questions about this exercise.
24     THE COURT: Certainly.
25     MR. FALZONE: Would you like me to do that later or

1 while we are on this topic?

2          THE COURT:  Why don't you do it right now while we are
3  on this topic.
4          MR. FALZONE:  I just want to make sure we are going to
5  get the submission from both plaintiffs.  There are two
6  plaintiffs here, Mr. Vargas and Mr. Roberts.  I assume we are
7  going to do the exercise for both of them.
8          MR. CHIN:  I can do that.
9          THE COURT:  Yes.  Absolutely.
10         MR. FALZONE:  The other thing I would submit, your
11 Honor, is it is customary for one to be able to depose a
12 litigant who claims an inability to pay, and we would like that
13 opportunity if it is determined that his lack of ability to pay
14 is an issue.
15         MR. CHIN:  I would object to that request, your Honor.
16         THE COURT:  First of all, I suggest that we wait to
17 see what Mr. Vargas and Mr. Roberts put forth under oath with
18 respect to their assets.
19         If after you see those submissions, Mr. Falzone, you
20 want to conduct a deposition, I will entertain a letter
21 application in that regard.
22         If I think that argument is necessary, I will hear you
23 by telephone.
24         But it is a serious matter, Mr. Chin, and I am a firm
25 believer in the adversarial process, and depositions are a

1  great way to get to the truth.  So it is likely that I will
2  grant such an application.  But first I want to see the
3  affidavits.  Maybe it will be academic.  Maybe one of these
4  plaintiffs won lotto recently.  Who knows what will be
5  revealed.
6          MR. FALZONE:  Just so I understand the scope of the
7  exercise, your Honor, is it correct that the statement of
8  financial condition will include any and all assets that either
9  plaintiff has control over?
10         THE COURT:  Control over or joint control with a
11 spouse or other person.  Assets that they have an interest in,
12 beneficially or legally.
13         MR. CHIN:  Your Honor, if I may.
14         THE COURT:  Yes.
15         MR. CHIN:  With respect to your ruling on the
16 appropriateness of imposing an award, will you be issuing a
17 decision on that?
18         THE COURT:  I am going to write an opinion.
19         The only reason I am telegraphing to you now what my
20 view is based upon the submissions is so that you can impress
21 upon your clients the importance of being completely forthright
22 with the court and defendants concerning their financial
23 conditions.
24         MR. CHIN:  I will do that.
25         THE COURT:  Anything further?

1          MR. CHIN:  No.
2          THE COURT:  Anything further, Mr. Falzone?
3          MR. FALZONE:  No.
4          Thank you, your Honor.
5          THE COURT:  Thank you for your arguments.
6          (Adjourned)

```
 7
 8
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300